**STEPHEN QUESENBERRY (8073)**
**J. BRYAN QUESENBERRY (9156)**
**HILL, JOHNSON & SCHMUTZ, L.C.**
Jamestown Square
3319 North University Avenue
Provo, Utah 84604
Telephone (801) 375-6600

**Attorneys for Defendants Frank L. Davis, Harvest Marketing, LLC, and**
**First Harvest, LLC**

IN THE UNITED STATES DISTRICT COURT
STATE OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JENNIFER STEIMKE, as trustee of the ODETTE GRAHAM TRUST, sole beneficiary of the MICHELON FAMILY TRUST, and sole devisee and representative of the ESTATE OF LYNDA STEIMKE MICHELON, | **REPLY TO MEMORANDUM IN OPPOSITION TO SECOND MOTION FOR SUMMARY JUDGMENT** |
| Plaintiffs, | |
| JAE FORSCHEN, DAVID J. ORR, individually and dba WORLD CONTRACTUAL SERVICES, HARVEST MARKETING, L.L.C., FIRST HARVEST MARKETING, L.L.C., FRANK L. DAVIS, and JOHN DOES 1 through 10, | Case No. 2:03CV00487 DAK |
| Defendants. | Judge Dale A. Kimball |

Defendants Frank L. Davis, Harvest Marketing, LLC, and First Harvest, LLC

(collectively, "Davis"), by and through counsel, hereby reply to Plaintiffs' Memorandum in

Opposition to Second Motion for Summary Judgment ("Opposition Memorandum").



**TABLE OF CONTENTS**

STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

RESPONSE TO PLAINTIFFS' *STATEMENT OF ADDITIONAL MATERIAL FACTS* . . . . . . . iv

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      SECOND CLAIM FOR RELIEF: AIDER AND ABETTER LIABILITY –
        FEDERAL LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        A.      The Initial High-Yield Investment Program . . . . . . . . . . . . . . . . . . . . . 3

        B.      The Debt-Elimination Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.     FOURTH CLAIM FOR RELIEF: AIDER AND ABETTER LIABILITY –
        STATE LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.    SEVENTH CLAIM FOR RELIEF: CONSPIRACY TO DEFRAUD . . . . . . . . . . 7

IV.     EIGHTH CLAIM FOR RELIEF: NEGLIGENT MISREPRESENTATION . . . . . 9

        A.      Davis Made No Representations to Plaintiffs . . . . . . . . . . . . . . . . . . . . . 9

                1.      The Davis Note . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

                2.      Davis' Supposed Failure to Disclose the Forschen Note, the
                        Forschen Loan, and Certain Material Facts Prior to the Diversion
                        of Plaintiffs' Funds to the Debt Elimination Program . . . . . . . . . 10

        B.      Economic Loss Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

V.      ELEVENTH CLAIM FOR RELIEF: CONVERSION . . . . . . . . . . . . . . . . . . 12

VI.     TWELFTH CLAIM FOR RELIEF: MONEY HAD AND RECEIVED . . . . . . . 13

VII.    THIRTEENTH CLAIM FOR RELIEF: ALTER EGO LIABILITY . . . . . . . . . . 14

VIII.   FOURTEENTH CLAIM FOR RELIEF: CONSTRUCTIVE TRUST AND
        SEVENTEENTH CLAIM FOR RELIEF: BREACH OF FIDUCIARY
        DUTY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

IX.     FIFTEENTH CLAIM FOR RELIEF: PUNITIVE DAMAGES  . . . . . . . . . . . .  14

X.      SEVENTEENTH CLAIM FOR RELIEF: BREACH OF FIDUCIARY
        DUTY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

XI.     EIGHTEENTH CLAIM FOR RELIEF: BREACH OF PROMISSORY
        NOTE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

XII.    THE COURT SHOULD DENY PLAINTIFFS' RULE 56(f) REQUEST  . . . . . 16

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## STATEMENT OF ISSUES

1. Is Davis liable under federal securities statutes for aiding and abetting Forschen to allegedly defraud Plaintiffs when there was no "sale" by Forschen or Davis of a "security"?

2. Did Davis conspire with Forschen under Utah law to defraud Plaintiffs?

3. Did Davis make any negligent misrepresentations to Plaintiffs that survive the economic loss rule, and that are based on a duty of Davis to disclose certain facts to Plaintiffs?

4. Is Davis liable for money had and received when he never possessed or exercised dominion or control over Plaintiffs' money?

5. Is there a cause of action for alter ego and punitive damages?

6. Is Davis liable for breach of fiduciary duty to Plaintiffs when he was never their trustee and there is no legal duty he owed them?

7. Does the Davis note fail for consideration when Davis never received any of Plaintiffs' money?

8. Should the Court grant Plaintiffs' belated Rule 56(f) request for additional discovery time even though the discovery cutoff date of June 30, 2004 has expired?

### RESPONSE TO PLAINTIFFS' *STATEMENT OF ADDITIONAL MATERIAL FACTS*

Davis objects to Plaintiffs' *Statement of Additional Material Facts* insofar as it attempts to bring into evidence conversations Forschen had with the back East people (i.e. Maralee Haldeman and Burt Patterson). Whatever Haldeman or Patterson may have told Forschen about the first high yield investment program or the alleged second debt elimination investment program is hearsay, and should not be admitted or considered for purposes of summary judgment.

For example, based on these hearsay facts, Plaintiffs claim that Forschen had Plaintiffs' money "diverted" from the first high yield investment program to the alleged second debt elimination investment program is inadmissible hearsay. There is no admissible evidence supporting this allegation. All Plaintiffs have to support the alleged transfer of funds to the debt elimination investment program is Forschen's hearsay deposition testimony. The only *admissible* evidence regarding the disposition of Plaintiffs' money is the wire transfers of the money from Forschen to Haleman and Patterson for the first high yield investment program. The disposition of Plaintiffs money from that point on cannot be determined from Plaintiffs' hearsay

iv

evidence.

Plaintiffs' hearsay "facts" are found in the following paragraphs (among others) of Plaintiffs' *Statement of Additional Material Facts*:

¶ 10 – This paragraph states: "Although Forschen told Ms. Michelon that her money was going to a high-yield investment, *Forschen learned, shortly after his initial contact with Patterson and Haldeman, that the high-yield program would not work and that Ms. Michelon's monies could be used to buy in to a debt elimination program*." (Emphasis added). This paragraph relies on information Forschen claims Patterson or Haldeman told him, which is inadmissible hearsay. Plaintiffs' citation to pg. 72:17-22 of Forschen's deposition in support of this paragraph contains the same hearsay problem.

¶¶ 13-14 – These paragraphs allege Davis' supposed understanding of what Forschen told him about the second high-yield investment program (the debt elimination program). To the extent they establish the debt elimination program or that money was transferred to this second program, they contain hearsay within hearsay and lack foundation as to the original source of this information.

¶ 16 – This paragraph states that "Mr. Davis knew that Ms. Michelon's $100,000.00 was going to be used *as part of the original buy-in to this debt elimination program*. He also knew that *if this debt elimination program was going to work* Ms. Michelon would have to be repaid." Whatever Davis knew came from Forschen. Whatever Forschen knew about the alleged debt

elimination supposedly came from someone else (i.e. Patterson or Haldeman).  Thus, Mr. Davis'

knowledge is grounded on double hearsay and lacks foundation.

¶ 17 – Plaintiffs imply in this paragraph that Forschen transferred Plaintiffs' money to the

people back East (Haldeman and Patterson) in conjunction with the alleged debt elimination

program.  This is untrue.  Forschen wired Plaintiffs' money to Haldeman and Patterson for the

first high yield program, which was not the debt elimination program.  (See, Davis Depo. 55:11-

17; 66:21-67:8; 68:19-23; 69:16-24; 74:12-75:2; 78:14-20 attached hereto as Exhibit A).

## ARGUMENT

Plaintiffs assert twelve causes of action against Defendants: (1) Second Claim for Relief:

aider and abetter liability – federal law; (2) Fourth Claim for Relief: aider and abetter liability –

state law; (3) Seventh Claim for Relief: conspiracy to defraud; (4) Eighth Claim for Relief:

negligent misrepresentation; (5) Eleventh Claim for Relief: conversion; (6) Twelfth Claim for

Relief: money had and received; (7) Thirteenth Claim for Relief: alter ego liability; (8)

Fourteenth Claim for Relief: constructive trust; (9) Fifteenth Claim for Relief: punitive damages;

(10) Sixteenth Claim for Relief: injunctive relief; (11) Seventeenth Claim for Relief: breach of

fiduciary duty; and (12) Eighteenth Claim for Relief: breach of promissory note.[1]

Plaintiffs claim in their Opposition Memorandum that they can establish the requisite

elements to these claims to survive summary judgment.  Davis will address each of Plaintiffs'

---

[1] Plaintiffs asserted a RICO claim against Davis, but upon threat of a Rule 11 motion by Davis, Plaintiffs dismissed the RICO claim.

opposition arguments supporting their causes of action as set forth below.

**I.      SECOND CLAIM FOR RELIEF: AIDER AND ABETTER LIABILITY – FEDERAL LAW**

Plaintiffs' federal aider and abetter liability cause of action fails because there are no

issues of fact regarding Plaintiffs' inability to establish the first element required in this claim –

i.e. that Davis defrauded Plaintiffs in the sale of securities.  The Tenth Circuit has held that under

10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5, to establish aider and abettor

liability a plaintiff must "show [1] *fraud in the sale of securities by the primary violator*, [2]

knowledge of that fraud by an aider and abettor, and [3] 'substantial assistance' by the aider and

abettor." Farlow v. Peat, Marwick, Mitchell & Co., 956 F.2d 982, 986 (10th Cir. 1992) (emphasis

added).

The fraud alleged by Plaintiffs could have occurred only in the two investment plans[2] by

Forschen at issue in this litigation: (1) his initial investment of Plaintiffs' money into a high-yield

program with some people "back East," and (2) the subsequent diversion of those funds to the

debt elimination program (the facts surrounding which are based on inadmissible hearsay as set

forth above).

---

[2] Plaintiffs's Opposition Memorandum refers to Forschen using Plaintiffs' money to "buy in to" the debt elimination program, perhaps to make the two programs sound more like securities under 15 U.S.C. § 78c(a)(10).  However, Forschen refers over and over in his deposition to "investing" Plaintiffs money in the two programs.  (See, Davis Dep. excerpts attached to Opposition Memorandum and attached hereto).  Nowhere in their depositions does Forschen or Davis refer to "buying in to" the two programs.

**A.     The Initial High-Yield Investment Program**

After Forschen initially informed Lynda Michelon that he would invest her money in a high-yield program to which she approved, he transferred her money to the "back East" people – Haldeman and Patterson – for that purpose. Plaintiff asserts, based on Forschen's deposition testimony of what Haldeman and Patterson told him, that sometime after the transfer, the back East people told Forschen that the high-yield program would not work and that Ms. Michelon's monies could be used to invest in anther program – the debt elimination program. (See, Davis Depo. 55:11-17; 66:21-67:8; 68:19-23; 69:16-24; 74:12-75:2; 78:14-20 attached hereto as Exhibit A). However, this testimony about diverting Plaintiffs' money to the debt elimination program is inadmissible hearsay, as stated above.

As Plaintiffs admit in ¶¶ 5-6 on page ix and x of the Opposition Memorandum, Forschen discussed this initial high-yield investment program with Ms. Michelon. The alleged debt-elimination program, however, was not even an option at this point because Forschen (and Davis) did not even know about the alleged debt-elimination program until after Plaintiffs transferred their money to Forschen who transferred it to the back-East people. Id. Thus, there could have been no fraudulent misrepresentation associated with the initial transfer of Plaintiffs' money to the back-East people *vis-a-vis* the initial high-yield program.

The second problem for Plaintiffs to establish this first element of aider and abetter liability *vis-a-vis* the initial high-yield program is that Forschen did not sell any securities – he

3

invested Plaintiffs' money.  Investment of money is not a "security" under 15 U.S.C. §

78c(a)(10), which states:

> The term 'security' means any note, stock, treasury stock, security future, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a 'security'; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance, which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

Plaintiff cannot establish that Forschen's investment of Plaintiffs' money in the high-yield

program was a sale of a "security" as defined in this statute.  Accordingly, because the transfer of

Plaintiffs' money to the back-East people was disclosed to Plaintiffs, and such an investment is

not a "security" under 15 U.S.C. § 78c(a)(10), Plaintiffs cannot establish the first element to

proving federal aider and abetter liability against Davis.

**B.     The Debt-Elimination Program**

As stated above, there is no admissible evidence that Forschen or anyone else transferred

Plaintiffs' money to the debt-elimination program.  Accordingly, there is no admissible evidence

to establish a "sale" of a "security" *vis-a-vis* the debt-elimination program which would be

required for Plaintiffs to establish their aider and abetter claim against Davis.

4

Furthermore, the alleged diversion would not be a "sale" of anything, it would be the transfer of an investment. Further, it is not a "security" pursuant to 15 U.S.C. § 78c(a)(10) (quoted above). Thus, the debt-elimination program, if properly established with admissible evidence, would be an investment of money, not a sale of securities. Accordingly, this second program cannot be the basis for the first element of Plaintiffs' aider and abetter liability cause of action.

In sum, neither the initial high-yield investment program nor the alleged debt-elimination program satisfy the first element of Plaintiffs' aider and abetter liability claim.

## II.   FOURTH CLAIM FOR RELIEF: AIDER AND ABETTER LIABILITY – STATE LAW

Plaintiffs do not appear to address their state aider and abetter liability cause of action in their Opposition Memorandum, even though Defendants asserted in their summary judgment memorandum that said claim was without merit and should be dismissed. In any event, as detailed below, said claim is without merit.

Plaintiffs' state securities violation claim (third claim for relief) against Forschen (and thus the premise for Plaintiffs' state aider and abetter liability claim against Davis) is based on U.C.A. § 61-1-22(1) (a),[3] which states:

> A person who ***offers or sells a security*** in violation of Subsection 61-1-3(1), Section 61-1-7, Subsection 61-1-17(2), any rule or order under Section 61-1-15, which requires the affirmative approval of sales literature before it is used, any condition imposed under

---

[3] According to the Complaint.

5

> Subsection 61-1-10(4) or 61-1-11(7), or offers, sells, or purchases a security in violation of Subsection 61-1-1(2) *is liable to the person selling the security to or buying the security from him*, who may sue either at law or in equity to recover *the consideration paid for the security*, together with interest at 12% per year from the date of payment, costs, and reasonable attorney's fees, less the amount of any income received on the security, upon the tender of the security or for damages if he no longer owns the security.

(Emphasis added). As stated above, Forschen and/or Davis did not offer or sell any security.

Forschen invested Plaintiffs money, which did not involve an offer or a sale. Further, Forschen did not pay any consideration to Plaintiffs for their money. Thus, Forschen's investment of Plaintiffs' money in the initial high-yield investment program does not fit the statute which is Plaintiffs' basis for the underlying state securities law violation claim against Forschen.

Additionally, Forschen's investments do not qualify as a "security" under U.C.A. § 61-1-13(24)(a), which states:

> 'Security' means any:
>     (i) note;
>     (ii) stock;
>     (iii) treasury stock;
>     (iv) bond;
>     (v) debenture;
>     (vi) evidence of indebtedness;
>     (vii) certificate of interest or participation in any profit-sharing agreement;
>     (viii) collateral-trust certificate;
>     (ix) preorganization certificate or subscription;
>     (x) transferable share;
>     (xi) investment contract;
>     (xii) burial certificate or burial contract;
>     (xiii) voting-trust certificate;
>     (xiv) certificate of deposit for a security;
>     (xv) certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under such a title or lease;

6

(xvi) commodity contract or commodity option;
(xvii) interest in a limited liability company;
(xviii) viatical settlement interest; or
(xix) in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase any of the foregoing.

Finally, Plaintiffs' state aider and abetter claim against Davis, according to the Complaint, is premised on U.C.A. § 61-1-22(4)(a), which states:

> *Every person who directly or indirectly controls a seller or buyer liable under Subsection (1)*, every partner, officer, or director of such a seller or buyer, every person occupying a similar status or performing similar functions, every employee of such a seller or buyer who materially aids in the sale or purchase, and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller or purchaser, unless the nonseller or nonpurchaser who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

(Emphasis added). It is undisputed that Davis did not indirectly or directly control Forschen or anyone else in this case. Plaintiffs have certainly made no such claim. In fact, Forschen was the trustee in charge of Plaintiffs' trust and made the decisions regarding where to invest Plaintiffs' money. Thus, Plaintiffs' state aider and abetter claim against Davis fails this statute.

Accordingly, because Plaintiffs' state aider and abetter claim against Davis fails the relevant Utah securities statutes, this claim is without merit and must be dismissed.

## III.   SEVENTH CLAIM FOR RELIEF: CONSPIRACY TO DEFRAUD

Plaintiffs support their conspiracy to defraud claim by ignoring controlling Utah caselaw in favor of caselaw from other states and jurisdictions. Utah caselaw, however, controls this

7

issue.  The Utah Supreme Court recently held in <u>Gildea v. Guardian Title Co.</u>, 980 P.2d 1265, 1271 (1998) that:

> conspiracy to defraud requires proof of the underlying fraud. See DeBry v. Cascade Enters., 879 P.2d 1353, 1359 (Utah 1994) ("A conspiracy to defraud is **fraud committed by two or more persons** who share an intent to defraud another." (emphasis added)).

(Emphasis added).  Thus, according to <u>Gildea</u> and <u>DeBry</u>, Davis must have committed a fraud against Plaintiffs to be held for conspiracy to defraud.  Eschewing this Utah controlling precedent, Plaintiffs rely on <u>Deere & Co. v. Zahm</u>, 837 F.Supp. 346 (D. Kan. 1993) (interpreting Kansas law), <u>Dixon v. City of Lawton</u>, 898 F.2d 1443 (10th Cir. 1990) (interpreting Oklahoma law), <u>Singer v. Wadman</u>, 745 F.2d 606 (10th Cir. 1984) (interpreting federal caselaw), <u>Snell v. Turner</u>, 920 F.2d 673 (10th Cir. 1990) (interpreting federal caselaw), <u>Singer v. Wadman</u>, 595 F.Supp. 188 (D. Utah 1982) (interpreting federal caselaw), <u>Clulow v. State</u>, 700 F.2d 1291 (10th Cir. 1983) (interpreting Oklahoma law) and <u>Fisher v. Shamburg</u>, 624 F.2d 156 (10th Cir.) (interpreting Kansas law) to support their claim that Davis did not have to commit the fraud in order to be held liable for conspiracy to defraud.  However, all of the above cases interpret conspiracy caselaw from other states or jurisdictions.  Clearly, Utah conspiracy law governs.

Thus, pursuant to <u>Gildea</u> and <u>DeBry</u>, Plaintiffs' conspiracy to defraud claim fails because there is no evidence that Davis made an representations to Plaintiffs (or even spoke, met or saw them during the relevant time).[4]

---

[4] Plaintiffs begin their analysis of conspiracy law from other jurisdictions by claiming that, "First of all, Davis did commit fraud, as shown above."  Nowhere in the Opposition

Furthermore, if the Court where to impute Forschen's alleged fraud to Davis, Plaintiffs' conspiracy to defraud claim against Davis still fails because there is no evidence that Forschen fraudulently misrepresented the first high-yield program to Plaintiffs (as set forth above). As there is no admissible credible evidence or foundation as to the disposition of Plaintiffs' money after Forschen transferred it initially to the back East people, there are no facts to support Plaintiffs' claim that Forschen fraudulently misrepresented material facts to Plaintiffs.

## IV.    EIGHTH CLAIM FOR RELIEF: NEGLIGENT MISREPRESENTATION

As set forth in Davis' summary judgment memorandum, Plaintiffs' negligent misrepresentation claim fails because Davis made no representations to Plaintiffs and because of the economic loss rule.

### A.    Davis Made No Representations to Plaintiffs

In their Opposition Memorandum, Plaintiffs assert that Davis made a representation to them *via* (1) the Davis note, and (2) by failing to disclose the Forschen note, the Forschen loan and certain information prior to the diversion of Plaintiffs' funds to the debt elimination program. These putative representations are without merit.

#### 1.    The Davis Note

To the extent that Plaintiffs claim the Davis note is an affirmative representation, said

---

Memorandum do Plaintiffs explain how Davis fraudulently misrepresented anything to Plaintiffs (except for their claim that Davis made a misrepresentation with the Davis note and failed to disclose certain information to Plaintiffs). The Davis note and non-disclosed information are addressed in the following *Negligent Misrepresentation* section.

claim is barred by the economic loss rule, as discussed in the next section (i.e. § IV(B) below).

> **2.    Davis' Supposed Failure to Disclose the Forschen Note, the Forschen Loan, and Certain Material Facts Prior to the Diversion of Plaintiffs' Funds to the Debt Elimination Program**

The other alleged misrepresentations stem from Davis' supposed failure to disclose certain material facts to Plaintiffs.  This category of representations, however, require that Davis owed Plaintiffs a duty to disclose the Forschen Note, the Forschen loan, and the debt elimination program.[5]  Smith v. Frandsen, 2004 UT 55, ¶ 11 (holding, "we have found that in addition to affirmative misstatements, an omission may be actionable as a negligent misrepresentation *where the defendant has a duty to disclose*") (emphasis added).

The only source of the duty Plaintiffs claim Davis owed to them is based on Davis' supposed joint venture with Forschen, pursuant to which Plaintiffs claim that Davis "voluntarily agreed to assume the liabilities arising from the breach of the duties that Davis had to Ms. Michelon as trustee of the Michelon Family Trust."  (See, Opposition Memorandum at 11). While Forschen undoubtedly owed Plaintiffs certain duties based on his status as their trustee, Plaintiffs provide the Court absolutely no caselaw that a joint venture imputes the duties of one party of the joint venture to another party of the joint venture *vis-a-vis* third parties.  Further, it is undisputed that there was no joint venture agreement, and Plaintiffs fail to cite to any deposition testimony supporting their theory that Davis "voluntarily agreed to assume" Forschen's liabilities

---

[5] The debt elimination allegations are inadmissible because they are based on what the back East people allegedly told Forschen.

arising from his role as trustee to Plaintiffs.

Because Plaintiffs cannot establish as a matter of law that Davis owed Plaintiffs a duty, or establish with facts that Davis voluntarily agreed to assume Forschen's duties to Plaintiffs, Davis could not have failed to disclose anything to Plaintiffs.

**B.      Economic Loss Rule**

Plaintiffs claim that the economic loss rule does not apply to bar their negligent misrepresentation claim because (1) Davis asserts in his summary judgment memorandum that the Davis note was never valid and that without a contract there is no economic loss rule, and (2) Davis owed Plaintiffs a duty independent of the Davis note based on his supposed joint venture with Forschen.

As for the first claim, to the extent that the Court affirms the validity of the Davis note, Plaintiffs' negligent misrepresentation claim is barred by the economic loss rule.  If the Court invalidates the Davis note, then the economic loss rule would not apply as a bar to Plaintiffs' negligent misrepresentation claim.

As for the second claim, Plaintiffs absolutely fail to provide any legal support – statute, caselaw, rule, etc. – supporting their novel claim that joint venturers take on and assume each others' duties *vis-a-vis* third parties they have never dealt with.  Further, there is no factual support for Plaintiffs' claim that Davis voluntarily agreed to assume the duties Forschen owed Plaintiffs based on his role as their trustee.  Thus, Plaintiffs' claim that Davis owed them a duty

11

is wholly without legal or factual support.

## V.   ELEVENTH CLAIM FOR RELIEF: CONVERSION

Davis moved the Court to dismiss this claim because Davis never exercised dominion or control over Plaintiffs' money.  Plaintiffs responded in their Opposition Memorandum: "The fact that the trust monies were never physically in the Davis Defendants' possession is immaterial because he was Forschen's joint venturer and co-conspirator." (See, Opposition Memorandum at 15).  Nowhere, however, do Plaintiffs bother to cite any caselaw, statute or rule that attaches a claim for conversion to a joint venturer, partner, or anyone other than the person who actually exercised dominion or control over the money in question.

"A conversion is an act of wilful interference with a chattel, done without lawful justification by which the person entitled thereto is deprived of its use and possession." Allred v. Hinkley, 328 P.2d 726, 728 (Utah 1958). *"Conversion is concerned with possession*, not title." Fibro Trust, Inc. v. Brahman Fin., Inc., 974 P.2d 288, 296 (Utah 1999) (citation omitted) (emphasis added).  Plaintiffs must thus explain (which they failed to do in their Opposition Memorandum) the specific "act of wilful interference" that Davis himself did – i.e. when was his "possession" of the money?

Further, Plaintiffs' conversion claim should is based on the hearsay allegations that Forschen had Plaintiffs' money diverted to the debt elimination investment program.  Because such allegations are inadmissible due to hearsay, Plaintiffs cannot establish that Davis converted

12

their money.

Thus, because there are no issues of fact regarding this claim and Plaintiffs have not provided any facts indicating Davis possessed or exercised dominion or control over their money, this claim should be dismissed.

## VI.   TWELFTH CLAIM FOR RELIEF: MONEY HAD AND RECEIVED

Plaintiffs' Opposition Memorandum correctly cites the requisite elements for their claim of money had and received: i.e. Plaintiffs must "show that **defendant obtained money from plaintiff**, under such circumstances that in equity and good conscience it should be returned." Helper State Bank v. Crus, 90 Utah 207, 211 (1936) (emphasis added).  However, Plaintiffs distort the requirement that Davis "obtained money" from Plaintiffs by claiming that Davis "**received the benefit** of $100,000.00 of Ms. Michelon's trust monies . . ." (See, Opposition Memorandum at 15) (emphasis added).  This argument fails for two reasons.

First, it is undisputed that Davis never "obtained" a dime of the $100,000 from Plaintiffs. Plaintiffs brush aside this requirement by claiming the money was transferred around on Davis' behalf – i.e. for Davis' benefit.  However, this cause of action is not "money had and benefitted from," it is "money had and received."

Second, Plaintiffs fail to explain how exactly Davis benefitted from the transfer of the $100,000 from Plaintiffs to Forschen.  The key question Plaintiffs are unable to answer is, what benefit did Davis actually receive from Forschen's transfer of Plaintiffs' money to the back East

13

people?  The question is not, what benefit did he want to receive, what benefit should he have

received, what benefit did he think he would receive, or what benefit could he have received.

The critical question is, what money of Plaintiffs did Davis receive?  The answer: none.

 Thus, there are no issue of fact as to Plaintiffs' inability to support this cause of action.

The Court should thus dismiss it as a matter of law.

## VII. THIRTEENTH CLAIM FOR RELIEF: ALTER EGO LIABILITY

 Plaintiffs claim that notwithstanding <u>Richardson v. Matador Steak House</u>, 948 P.2d 347,

348 n.1 (Utah App. 1997) (holding, "There is no claim for relief known as 'piercing the corporate

veil'"), they should still be able to introduce evidence supporting their alter ego theory.  While

Defendants do not dispute Plaintiffs' right to introduce evidence supporting their alter ego theory,

it is not a bona fide cause of action and should thus be dismissed as such.  This does not mean

that Plaintiffs are barred from asserting this theory.  It simply means that it is not a proper *cause*

*of action* as held in <u>Richardson</u>.

## VIII. FOURTEENTH CLAIM FOR RELIEF: CONSTRUCTIVE TRUST AND SEVENTEENTH CLAIM FOR RELIEF: BREACH OF FIDUCIARY DUTY

 Plaintiffs' Opposition Memorandum did not oppose Davis' summary judgment

arguments regarding these two causes of action.  Thus, the Court should dismiss them as a matter

of law.

## IX. FIFTEENTH CLAIM FOR RELIEF: PUNITIVE DAMAGES

 Defendants do not dispute that Plaintiffs may request punitive damages under some of the

torts alleged in the Complaint.  In that context, punitive damages are a form of relief.  They are

not, however, an independent cause of action as the Utah Supreme Court held in <u>Waddoups v.</u>
<u>Amalgamated Sugar Co.</u>, 2002 UT 69, ¶ 8, n. 1 (holding that "because punitive damages are a
remedy and not an independent cause of action, we do not analyze it as a separate cause of
action.").

Thus, as far as this specific cause of action goes, there is no legal support for an
independent punitive damages cause of action.  This claim should thus be dismissed.

## X.     SEVENTEENTH CLAIM FOR RELIEF: BREACH OF FIDUCIARY DUTY

Plaintiffs attempt to establish the validity of their breach of fiduciary duty cause of action
by arguing that Forschen owed Plaintiffs a duty based on his status as trustee of the Michelon
Family Trust, and that because Davis was supposedly a joint venturer with Forschen he
"voluntarily agreed to assume the liabilities arising out of the breach of Forschen's duties to Mrs.
Michelon as trustee of the Michelon Family Trust."  (<u>See</u>, Opposition Memorandum at 18-19).
Glaringly absent from this argument is any caselaw whatsoever that creates a duty from Davis to
Plaintiffs even assuming Davis partnered up with trustee Forschen to obtain a loan.  Further
absent is any testimony from Davis whereby he voluntarily agreed to assume Forschen's
liabilities to the Michelon Family Trust.

Because there is thus no legal or factual basis for this cause of action, it should be
dismissed.

## XI.    EIGHTEENTH CLAIM FOR RELIEF: BREACH OF PROMISSORY NOTE

Plaintiffs claim that their breach of promissory note claim is valid because:

the Davis Defendants received consideration from plaintiff. Plaintiff performed – it paid the $100,000.00. The plaintiff's $100,000.00 was, in fact, 'diverted' to the debt elimination scheme for the benefit of the Davis Defendants.

(See, Opposition Memorandum at 20). Plaintiffs ignore the fact that they did not pay the $100,000.00 to Davis. They paid the money to Forschen who unwisely invested it on their behalf. There is no evidence showing that Davis received any portion of the $100,000. Even if the money was diverted to the debt elimination program, none of it went to Davis. He is not the debt elimination program. This claim for breach of promissory note should thus be dismissed for failure of consideration.

## XII.   THE COURT SHOULD DENY PLAINTIFFS' RULE 56(f) REQUEST

Plaintiffs submitted an affidavit requesting additional time under Rule 56(f) to conduct further depositions. Plaintiffs fail to state that Davis has already withdrew his first Motion for Summary Judgment and agreed to a discovery cutoff of June 30, 2 004. Consider the following:

*   On <u>May 23, 2003</u>, Plaintiffs filed their Complaint.

*   On <u>January 29, 2004</u>, Davis filed his first Motion for Summary Judgment.

*   Sometime thereafter, Plaintiffs agreed to give Plaintiff additional time to conduct discovery pursuant to an Attorneys' Planning Meeting Report filed in March of 2004.[6]

---

[6] On April 5, 2004, the Court entered an order wherein the Court stated, "Defendants notified the court that the parties were conducting discovery and the [first summary judgment] motion would be renewed at a later date."

- On <u>March 30, 2004</u>, the Court entered a Scheduling Order which gives June 30, 2004 as the discovery cutoff date.  June 30, 2004 was the discovery cutoff date agreed to by the parties in the Attorneys' Planning Meeting Report.

- On <u>July 1, 2004</u>, Davis filed his Second Motion for Summary Judgment.

- On <u>August 20, 2004</u>, Plaintiffs filed the currently-pending Rule 56(f) affidavit requesting additional discovery time.

Accordingly, the parties agreed to June 30, 2004 as the discovery cutoff date (after Davis

withdrew his first Motion for Summary Judgment to give Plaintiffs additional discovery time).

The Court entered a scheduling order to that affect.  Davis filed his Second Motion for Summary

Judgment immediately after discovery was over.  Plaintiffs waited until August 20, 2004 to

request additional discovery time under Rule 56(f).  Not only is said request improper, but it is in

violation of the Court's scheduling order and should thus be denied.

## CONCLUSION

Based on the foregoing, the Court should grant Davis' Second Motion for Summary

Judgment.

DATED this _23_ day of September, 2004.

HILL, JOHNSON & SCHMUTZ L.C.

Stephen Quesenberry
J. Bryan Quesenberry
Attorneys for Defendants

17

## CERTIFICATE OF MAILING

The undersigned hereby certifies that on the 23 day of September, 2004, they caused a

true and correct copy of the foregoing brief to be delivered to the following:

David M. Wahlquist
Kirton & McConkie
1800 Eagle Gate Tower
60 East South Temple
PO Box 45120
Salt Lake City, Utah 84145-0120

David J. Orr
5449 Suntree Avenue
West Valley, Utah 84120

Sent Via:
_____ Hand -Delivery
_____ Facsimile
___✓___ Mailed (postage prepaid)

18

EXHIBIT "A"

IN THE UNITED STATES DISTRICT COURT
STATE OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JENNIFER STEIMKE, as trustee of )<br>The ODETTE GRAHAM TRUST, sole )<br>Beneficiary of the MICHELON )<br>FAMILY TRUST, and sole devisee )<br>And representative of the )<br>ESTATE OF LYNDA STEIMKE MICHELON] )<br> | Deposition of:<br><br>JAE R. FORSCHEN |
| Plaintiff,  ) | Civil No. 2:03CV-0487 |
| )<br>Vs.  )<br>) | |
| JAE FORSCHEN, DAVID J. ORR,  )<br>Individually and dba WORLD  )<br>CONTRACTUAL SERVICES, HARVEST  )<br>MARKETING, L.L.C., FRANK L.  )<br>DAVIS, and JOHN DOES I-10,  )<br>)  | COPY |
| Defendants.  ) | |

June 4, 2004, 9:00 a.m.

Location:            Kirton & McConkie
                     1800 Eagle Gate Tower
                     60  East South Temple
                  Salt Lake City, Utah 84111


Reporter:            Peggy Grover, RMR
             Notary Public in and for the State of Utah

**Reporters, Inc.** 57 West South Temple, Suite 200 · Salt Lake City, Utah 84101
(801) 746-5080 phone · (801) 746-5083 fax · 1-866-310-DEPO · www.reportersinc.net



1      A.   Yes, a problem that I created with Ms.

2  Michelon and her trust, yes.

3      Q.   Okay. When did you have this discussion with

4  Paul?

5      A.   Fall of 1999.

6      Q.   Okay. Did you have--

7      A.   Or winter, I don't know, some time during

8  that time frame.

9      Q.   How were you going to help Frank's company

10  out?

11      A.   There was an organization back East that I

12  was consulting with that was doing something, and I sent

13  them some money, and they changed whatever it was they

14  were doing initially and would not return that money.

15  And they asked that if there was a company that had

16  receivables that there was an opportunity to get a

17  business loan on a debt elimination program.

18      Q.   What's that?

19      A.   It was a program that they said that they had

20  people that could invest in, and I did not get into all

21  the details on that, but they said that they needed

22  somebody that had the strength of receivables and

23  whatnot.

24      Q.   So how was the debt supposed to be

25  eliminated?

1  to return it.

2      Q.   Okay. I am not understanding your response.

3  You have some discussion with Mr. Patterson?

4      A.   Uh-huh.

5      Q.   In the fall of 1999?

6      A.   Correct.

7      Q.   That's the first time you have talked with

8  him?

9      A.   Correct.

10     Q.   As of the time of that discussion any money

11 you have belonging to Lynda Michelon is in your bank

12 account here?

13     A.   Yes.

14     Q.   It is not with Mr. Patterson?

15     A.   That's correct. Well, yes. Okay.

16     Q.   All right.

17     A.   Your chronology is-- Oh, go ahead.

18     Q.   So you had this discussion and I asked you

19 what happened next and you jumped to trying and get some

20 money back?

21     A.   Oh. What happened next was, if you want, I

22 went ahead and went through a title company, sent money

23 back to him, hers and some other client's money, and

24 that went through Pinnacle Title and that's how I

25 handled that matter.

1  Q. So you sent some money back to Burt

2 Patterson?

3  A. Yes, I did.

4  Q. You sent it to where he told you to send it?

5  A. Yes.

6  Q. And you sent it for purposes of investing in

7 some higher yield investment?

8  A. Correct.

9  Q. And at the time that you sent that money back

10 had you done any more to investigate this opportunity

11 other than talk with Mr. Patterson?

12  A. To my knowledge, no.

13  Q. Did you receive any kind of documentation at

14 all from Mr. Patterson or anybody acting on his behalf

15 acknowledging receipt of any funds?

16  A. There was at least a verbal acknowledgement

17 and I also got an acknowledgement from Maralee who was

18 also working with him.

19  Q. So they told you orally that they had

20 received the funds?

21  A. Correct.

22  Q. Did they send you anything in writing about

23 receiving the funds?

24  A. I don't remember that occurring.

25  Q. In your business and in your experience as a

1    trust officer was it common for you to just send

2    client's money off to different places without--

3         A.    No.

4         Q.    --without receiving a note or something in

5    return?

6         A.    No, this is my error.

7         Q.    You felt this was highly unusual?

8         A.    Yes, it was and, like I said, this was my

9    error.

10        Q.    Were the discussions you had with Mr.

11   Patterson and Maralee after you sent the funds by

12   telephone?

13        A.    Yes.

14        Q.    Have you ever met either of them in person?

15        A.    No.

16        Q.    Did they acknowledge receipt of this money to

17   you shortly after you had sent it?

18        A.    Yes.

19        Q.    Did they tell you what they were doing with

20   the money?

21        A.    My understanding was that they had that one

22   program and then they switched it and then they used

23   some of the money for the debt elimination program. That

24   is what Maralee told me.

25        Q.    Okay.

1       A.    And my understanding is Burt wrote checks and

2   helped himself but I have--

3       Q.    Okay.

4       A.    I have seen checks that Maralee sent out to

5   me on that issue.

6       Q.    That's how you learned that Burt wrote checks

7   to himself.

8       A.    That would be my understanding and also from

9   Maralee.

10      Q.    She told you that?

11      A.    Yes. Correct.

12      Q.    Anyway, the money was sent there and your

13  understanding was that it was to be put in some kind of

14  a high yield investment program?

15      A.    Correct.

16      Q.    And at some point in time you understood that

17  the program to which those funds were to be invested was

18  switched?

19      A.    Burt I think came back to me and told me that

20  he could not do what he told me initially and that he

21  was going to change it over to this other program

22  Maralee was doing.

23      Q.    This was to the debt elimination program?

24      A.    Correct.

25      Q.    Was that when she got involved?

1        Q.    And so at this time when you are being told

2    that we are now switching to a debt elimination program

3    that you were aware of Mr. Davis and his company,

4    Harvest Marketing, and his desire to obtain some funds

5    for Harvest Marketing.

6        A.    Correct.

7        Q.    So you felt that maybe there was a fit here,

8    that Harvest Marketing could be that company that had

9    accounts receivable that could be involved in this debt

10    elimination program?

11        A.    Yes.

12        Q.    And the money that you had sent to Burt

13    Patterson, would that be used to assist in that

14    transaction?

15        A.    Correct.

16        Q.    So did you approach Mr. Davis, then, about

17    his company being involved in this deal?

18        A.    I believe I did, yes.

19        Q.    And that, of course, would have been in the

20    fall of 1999 some time?

21        A.    Yes.

22        Q.    And you explained to him about this debt

23    elimination program?

24        A.    Yes.

25        Q.    And about the funds that you had already

1    sent?

2          A.    Yes.

3          Q.    And that those funds then would be used to

4    work through this program whereby his company could get

5    some funding, pay back the investment with a good return

6    to these customers and leave Frank with some money

7    without having to pay it back.

8          A.    Well that's-- Yes.

9          Q.    That's what you told him. Right?

10         A.    I don't know if that involved all that one

11   page but between the communications I got Maralee and

12   Frank together.  Frank talked to Maralee on occasion.

13   That was the way it was supposed to work.

14         Q.    That's what you explained to Frank that the

15   deal was?

16         A.    I believe so, yes.

17         Q.    Because you approached him about being

18   involved in this transaction?

19         A.    It was me, yes.

20         Q.    And you had to explain to him how it would

21   work as you understood it?

22         A.    Yes. I explained it to him or I got Maralee

23   to call him. I don't know if that-- I can't remember

24   what transpired, or Burt called him.

25         Q.    You at least understood that there was some

1  of time.

2         A.    Period of time, yes.

3         Q.    A period of several months?

4         A.    Yes.

5         Q.    In your discussing this opportunity with

6  Frank, you explained to him up front that this company,

7  his company would need to apply for a loan?

8         A.    Yes.

9         Q.    And you told him that his company needed to

10  have accounts receivable?

11         A.    Uh-huh.

12         Q.    You answered yes?

13         A.    Yes.

14         Q.    And you explained to him that there were some

15  funds that you had already sent to Burt that would have

16  to be repaid?

17         A.    Yes.

18         Q.    And you told him those originally had been

19  sent in connection with a high yield investment?

20         A.    I believe so.

21         Q.    And you also disclosed to him that that had

22  not worked and so those funds were now going to be

23  diverted over to this transaction if in fact it was to

24  go?

25         A.    Yes.