

David M. Wahlquist (Bar No. 3349)
Daniel J. McDonald (Bar No. 7935)
**KIRTON & McCONKIE**
1800 Eagle Gate Tower
60 East South Temple
P.O. Box 45120
Salt Lake City, UT 84145-0120

Attorneys for Plaintiff

---

## IN THE UNITED STATES DISTRICT COURT

## STATE OF UTAH, CENTRAL DIVISION

---

| | | |
|---|---|---|
| JENNIFER STEIMKE, as trustee of the ODETTE GRAHAM TRUST, sole beneficiary of the MICHELON FAMILY TRUST, and sole devisee and representative of the ESTATE OF LYNDA STEIMKE MICHELON, | : : : : : | **MEMORANDUM IN OPPOSITION TO DAVIS DEFENDANTS' THIRD MOTION FOR SUMMARY JUDGMENT** |
| Plaintiff, | : : | |
| v. | : : | Case No. 2:03CV-0487 |
| JAE FORSCHEN, DAVID J. ORR, individually and dba WORLD CONTRACTUAL SERVICES, HARVEST MARKETING, L.L.C., FIRST HARVEST, L.L.C., FRANK L. DAVIS, and JOHN DOES 1 through 10, | : : : : : : | Judge Dale A. Kimball |
| Defendants. | : : | |

---

Plaintiff, Jennifer Steimke, as trustee of the Odette Graham Trust and sole beneficiary of

the Michelon Family Trust ("MFT"), by and through her undersigned counsel of record, submits

this Memorandum in Opposition to Davis Defendants' Third Motion for Summary Judgment.

## STATEMENT OF DISPUTED MATERIAL FACTS

Pursuant to D.U. Civ. R. 56-1(c), Plaintiff contends there are genuine issues of material fact with respect to the following paragraphs of the "Statement of Undisputed Material Facts" contained in the Memorandum in Support of Third Motion for Summary Judgment filed by Defendants Frank L. Davis ("Davis"), Harvest Marketing, L.L.C ("Harvest Marketing") and First Harvest, L.L.C. (collectively "the Davis Defendants"):

　　　1.　　　MFT disputes this paragraph. Defendant Jae Forschen ("Forschen") never invested MFT's funds in any high-yield program.  Davis needed money to expand his company, Harvest Marketing, L.L.C.  Davis was an current customer of Forschen's company, World Contractual Services.  As a result, Forschen knew Davis was seeking additional funding. Forschen was referred to Hubert Patterson, of Reynoldsburg, Ohio, to obtain assistance in getting a loan for Davis and his company.  Forschen contacted Patterson who represented he could help Davis get a loan.  Patterson told Forschen that he would need to receive a $220,000 up-front fee to process the loan for Davis.  Forschen contacted Davis and explained to him that he had become aware of a loan program through which Davis and his company could procure a business development loan.  Forschen proposed that they work together to procure a multi-million dollar loan for Davis.  Forschen would use trust funds from trusts over which he was trustee, to pay the up-front fee for Davis.  Once the loan funded, Davis could keep 8% of the loan proceeds to assist in his business needs.  Forschen would take the remaining 92% of the proceeds, invest them in high yield programs, and generate sufficient funds to pay the loan off and make some profit for himself. Davis agreed to the program.  Patterson instructed Forschen to send the up front fee to a

bank account owned by Rehab by L&M, Inc.("Rehab") at Huntington National Bank in

Reynoldsburg, Ohio. He told Forschen that once the fee was received, Maralee Haldeman, a

principal in Rehab, would process the loan. Forschen transferred funds from MFT to Rehab's

account as instructed. The funds were received. The day after the funds were sent, Davis

received a loan commitment and some loan documents to complete.   MFT's money was never

invested in any high yield program;  nor were MFT's funds ever sent to Rehab or anywhere else

"back East" to be invested in any such program. They were sent to Rehabsolely for the purpose

of paying the up-front fee for Davis' loan. [Excerpts from the Deposition of Jae Forschen

("Forschen Dep.") attached as Exhibit "A", p. 20, ll. 2 through 25;  p. 57, l. 10 through p. 58, l.

25;  68:ll. 19 through 25; p. 69, ll. 12 through 24; p. 72, ll. 1 through 6; p. 74, l. 16 through p.

75, l.16; p. 78, l.14 through 25; p. 79, l. 25 through p. 80, l. 15. p. 101, l. 4 through p. 102, l. 20;

p. 106, l. 7 through p. 107, l. 8; p. 116, ll. 15 through 25; p. 131, l. 19 through p. 132, l. 14;  p.

136, l. 22 through p. 140, l. 22;  p. 180, ll. 13-15;   Answer of Harvest Marketing, First Harvest,

L.L.C. and Frank L. Davis ("Davis Answer"), para. 5;  Excerpts from the Deposition of Frank L.

Davis ("Davis Dep.") attached as Exhibit "B", p. 20,ll. 14 through 17;   p. 28, l. 3 through p. 55 l.

11;  p. 55, ll. 19 through 23; p. 56, ll. 6 through18; p. 58, l. 13 through p. 60, l.1;  p.60, l. 23

through p. 61, l.4;  p. 65, l. 25 through p. 66, ll. 5 through 23;   Excerpts from the Deposition of

Hubert Patterson ("Patterson Dep.") attached as Exhibit "C", p. 14, l. 8 through p. 18, l. 22; p.

26, l. 8 through p. 30, l. 20);  Excerpts from the Deposition of Maralee Haldeman ("Haldeman

Dep.") attached as Exhibit "D", p. 19, l. 7 through p. 23, l. 23;  p. 24, l. 2 through p. 26, l. 6;  p.

37, l. 16 through p. 43, l.1; copy of the wire confirming transfer of funds from Lynda Michelon to

MFT dated October 22, 1999 attached as Exhibit "E"; copy of Forschen's wiring instructions to Pinnacle attached as Exhibit "F"; copy of Rehab bank statement showing receipt of funds attached as Exhibit "G"; commitment letter dated November 16, 1999 attached as Exhibit "H"; and copy of letter to Davis from Michael Brown dated November 17, 1999 attached as Exhibit "I")

2.      Plaintiff disputes this paragraph.  Patterson never spoke with Forschen about any high yield program.  Nor were the MFT funds sent to Rehab for investment in any such program.  The MFT funds were sent to Rehab solely for the purpose of paying the up-front fee Forschen and Davis needed to procure a loan in furtherance of their joint venture.  *See* discussion in 1, above, incorporated herein by reference.  (*See also* Haldeman Dep., p. 24, l. 2 through p. 26, l. 6; Forschen Dep., p. 137, l. 16 through p. 138, l. 7; Patterson Dep., p. 16, l. 16 through p. 18, l. 22)

3.      Plaintiff disputes this paragraph.  Under the Forschen-Davis plan, all of the loan proceeds were to go to Davis who in turn agreed to give Forschen 92% of the proceeds.  The "organization back east" were not to receive any of the loan proceeds.  Nor was MFT to receive any of the proceeds from Forschen's investment of 92% of the loan proceeds.  (Davis Dep. , p. 58, l. 13 through p. 60, l.1; p.  p. 65, l. 25 through p. 66, l. 12;  p.66, ll. 5 through 23)

5.      Plaintiff disputes portions of this paragraph.  The referenced loan was not just "Forschen's loan program."  As shown in paragraph 1, *supra*, the Forschen and Davis agreed to work together in a joint venture to obtain a loan for Davis and split the proceeds of the loan 92% / 8%. Forschen and Davis first agreed that MFT would be repaid from the loan proceeds in November of 1999.  The referenced promissory note ("Davis Note") merely documented their

earlier agreement.  Michelon was pressuring Forschen for documentation regarding the

disposition of her trust funds.  Forschen asked Davis to sign the Davis Note so that Forschen

could prove to Michelon that her funds had been used as he had represented and that there was

indeed a note from Davis and his company promising to pay MFT the sum of $175,000.

Forschen told Davis that he needed the note "to cover myself with Lynda [Michelon]."and  "To

show her that, you know, I had the note guaranteed, I had that money guaranteed."  (Forschen

Dep., p. 58, l.14 through p. 59, l. 3;   p. 143, l. 15 through p. 144, l. 13;   p. 150, ll. 7 through 17;

p. 166, l. 20 through p. 168, l. 15;  Davis Dep., p. 77, l. 13 through p. 78, l. 24; also see

correspondence attached as Exhibit "J")

      6.     Plaintiff disputes this paragraph is disputed.  Davis told Forschen that he would

sign the Davis Note, but only if Forschen gave Davis a similar note from Forschen personally to

Davis and his company, to indemnify them in the event that they had to pay on their note to

MFT. [Davis Dep., p. 74, l. 4 through p. 75, l. 3;  p. 76, l. 4 through p. 77, l. 12;   p.100, l.23

through p. 103, l. 7; Forschen Dep., p. 146, l. 6 through p. 149, l. 16;  a copy of the Davis Note

attached as Exhibit "K"; a copy of the hand written promise attached as Exhibit "L"; and a copy

of the promissory note signed by Forschen ("Forschen Note") attached as Exhibit "M"]

      7.     Plaintiff disputes portions of this paragraph.  Plaintiff admits that Forschen agreed

to sign a personal note to Davis and his company to indemnify them in the event they had to pay

MFT on their Promissory Note.  However, Forschen never told him it was mere paperwork.  To

the contrary, Forschen testified that the Promissory Note was intended to be a real obligation and

that he expected the Davis Defendants to fulfill their obligations under the Promissory Note. (Forschen Dep., p.152, ll. 18 and 19; p. 153, ll. 12 through18.)

8.      Plaintiff disputes only the first four words of this paragraph.  As demonstrated in 6 and 7 above, Forschen did not make the "assurances" referenced in this paragraph.  (*Id.*)

12.      Plaintiff does not dispute this paragraph but notes that Forschen signed the Forschen Note in his personal capacity and *not* in his capacity as trustee of MFT.The face of the Forschen Note clearly indicates that Forschen signed it in Forschen's individual capacity.  (*See* Exhibit "M")  In contrast, the Davis Note executed by Forschen expressly states that he is acting in his capacity as trustee of the Michelon Family Trust.  (*See* Exhibit "K") (Forschen Dep., p.86, l. 25 through p. 187, l. 3)

13.      Plaintiff disputes this paragraph.  Forschen never told Davis that the notes were mere paper transactions and that no money would exchange hands.  While it is true that Forschen and Davis thought the loan would fund, Forschen expected Davis to honor his note to MFT in the event the loan did not fund.  (Forschen Dep., p. 152, l. 7 through p. 153, l. 14)

14.      Plaintiff disputes this paragraph.  The parties intended the Forschen note to serve as an indemnity for the Davis note, not a replacement of the Davis Note. (Davis Dep., p. 74, l. 4 through p. 75, l. 3;  p. 76, l. 4 through p. 77, l. 12;   p.100, l.23 through p. 103, l. 7; Forschen Dep., p. 146, l. 6 through p. 149, l. 16;  a copy of the Davis Note attached as Exhibit "K"; a copy of the hand written promise attached as Exhibit "L"; and a copy of the promissory note signed by Forschen Note attached as Exhibit "M")

15.     Plaintiff disputes portions of this paragraph. Forschen and Davis used $100,000 of MFT's funds to pay the up-front fee required for their joint venture to obtain the loan. (Forschen Dep., p. 136, l. 22 through p. 140, l. 22; Haldeman Dep., p. 24, l. 2 through p. 26, l. 6; Patterson Dep., p. 16, l. 16 through p. 18, l. 22; *See also* Exhibits "F" and "G")

16.     Plaintiff disputes this paragraph. Forschen testified that he told Davis about the need for an up-front fee. It is clear that Forschen sent the MFT funds to Pinnacle Title on November 16, 1999; Michael Brown sent the commitment letter and loan application documents to Davis on November 17, 1999; and Pinnacle Title sent the MFT funds to Rehab for the up-front fee on November 18, 1999. Davis knew that MFT's funds were being used for his loan. He also knew that, if he agreed to be a part of the joint venture with Forschen, he would have to repay MFT. (Haldeman Dep., p. 24, l. 2 through p. 26, l. 6; Forschen Dep., p. 74, l.16 through p. 75, l.16; p.78, ll. 14 through 25; p. 79, l. 25 through p. 80, l. 15; p. 137, l. 16 through p. 138, l. 7; Patterson Dep., p. 16, l. 16 through p. 18, l. 22)

17.     Plaintiff disputes this paragraph. Davis received the following consideration in return for his promissory note: (a) use of $100,000 of MFT's funds to pay the up-front fee needed to obtain a loan for his company; (b) the Forschen Note agreeing to pay Davis and his company an amount equal to the Davis Note; and (c) Davis and Forschen were able to forestall action by MFT to recover its funds which they needed to further their venture. (*See* citations listed in ¶¶ 1, 5, 6 and 7)

21.     Plaintiff disputes this paragraph. Davis knew that he was misrepresenting to potential lenders his intended use of the loan proceeds. While he represented to them that the

funds would be used for business expansion, he intended to use only 8% of the loan proceeds for

that purpose; the remaining 92% would go to Forschen to invest in his own high yield program.

Moreover, when Davis signed the Davis Note, he knew that Forschen  would deliver a copy to

Michelon to convince her that her funds had been used as represented and that Harvest Marketing

and Davis had signed a promissory note promising to pay MFT $175,000 on 3 March 2000.

However, Davis testified that he never intended to honor the promissory note.   Davis knew that

the Forschen Note would never be shown to Michelon.  (Davis Dep., p. 61,  l. 5 through p. 62, l.

17; p. 63, l. 24 through p. 67, l. 5;  p 77, l. 13 through p. 79, l.1;  p.82, l.18 through p. 83, l.5;   p.

85, l.19 through p. 86, l.10;  p.94, ll. 2-14; Forschen Dep., p. 143, l. 15 through p. 144, l. 13; p.

166, l. 20 through p. 168, l. 15; *see also* Exhibit "J" and copy of application attached as Exhibit

"N")

       22.     Plaintiff disputes this paragraph.  *See* para. 21, *supra*.  Moreover, Davis and

Forschen were joint venturers in that they were involved in a common scheme to make profits.

Since the misrepresentations to MFT were part of the scheme, Davis is personally liable for such

misrepresentation whether they were made personally by him or by Forschen, his joint venture

partner. (*Id.*)

       23.    Plaintiff disputes this paragraph.  *See* para. 22, *supra*.

       24.    Plaintiff disputes this paragraph.  *See* para. 15, *supra*.

## STATEMENT OF ADDITIONAL FACTS

MFT asserts the following additional facts material to resolution of the issues raised by

the Davis Defendants' motion:

1.     The Michelon Family Trust ("MFT") is a family trust formed in accordance with the laws of the State of Utah.  Plaintiff Jennifer Steimke is the trustee and sole beneficiary of MFT. (*See* Complaint, para. 1)

2.     Defendant Jae Forschen ("Forschen") is an individual residing in Salt Lake County, State of Utah. At all times relevant herein, Forschen worked for defendant World Contractual Services in Salt Lake City, Utah. [Excerpts from the Deposition of Jae Forschen ("Forscehn Dep.") attached as Exhibit "A", p. 20, ll. 2 through 25;  p. 180, ll. 13-15]

3.     Defendant Harvest Marketing, L.L.C. ("Harvest Marketing") is a Utah limited liability company with its principal place of business in Utah County, State of Utah.  Harvest Marketing was formed for the purpose of marketing food products produced by First Harvest, L.L.C. [Answer of Harvest Marketing, First Harvest, L.L.C. and Frank L. Davis ("Davis Answer"), para. 5;   Excerpts from the Deposition of Frank L. Davis ("Davis Dep.") attached as Exhibit "B", p. 20,ll. 14 through 17]

4.     Defendant First Harvest, L.L.C. ("First Harvest") is a Utah limited liability company with its principal place of business in Utah County, State of Utah. First Harvest manufactured food products.  (Davis Answer, para. 6; Davis Dep., p. 26, l. 14 through 24)

5.     Defendant Frank L. Davis ("Davis") is an individual residing in Orem, Utah.  At all times relevant herein, Davis was the sole and managing  member of Harvest Marketing.  He was also owned the majority interest in First Harvest.  (Davis Answer, para. 7; Davis Dep., p. 19, l 19 through p.20, l 17; p. 21 l. 25 through p. 22, l. 25)

6.      In mid-1999, Harvest Marketing needed funds to purchase some raw materials for a food product it intended to sell in Saudi Arabia.  Davis was referred to Forschen at World Contractual Services which loaned Harvest Marketing and Davis money for that purchase. (Davis Dep., p. 28, l. 3 through p. 55 l. 11)

7.      By late 1999, Davis was having difficulty paying interest on his loan with World Contractual Services and had discussed that fact with Forschen.  Forschen wanted to find a way to help Davis with his financial difficulties. (Davis Dep, p. 55, ll. 19 through 23; p. 56, ll. 6 through18)

8.      Earlier in 1999, Jennifer Steimke's mother, Lynda Michelon ("Michelon"), had met  Forschen at financial planning seminar in Cancun, Mexico.  Over a period of months, Forschen persuaded to Michelon to invest over $100,000 from her individual retirement funds and over $50,000 from her mother's family trust with Forschen and WSC.  (Forschen Dep, p. 101, l. 4 through p. 102, l. 20; p. 106, l. 7 through p. 107, l. 8)

9.      World Contractual Services created MFT and appointed Forschen and Orr as co-trustees.  Forschen then directed Michelon to transfer her retirement funds to MFT.  On October 22, 1999, Michelon wired $108,170.11 to MFT.  A copy of the wiring confirmation is attached as Exhibit "D".  Forschen claims he told Michelon that he was going to invest these funds in a high yield investment program.  (Forschen Dep., p. 116, ll. 15 through 25; p. 131, l. 19 through p. 132, l. 14)

10.      Around this time, Forschen was referred to Hubert Patterson ("Patterson") who lived in Ohio as a person who could assist in developing business opportunities for Forschen's

-x-

clients.  Forschen telephoned Patterson.  Forschen states that he called Patterson to discuss

potential high yield investments for Michelon, but was advised that the high yield program was

not "ready".  Patterson disputes that he ever discussed a high yield program with Forschen.  In

any event, they both agree that Patterson introduced Forschen to  "debt-elimination" loan

program that might be available to Forschen's clients who had inventory but needed funds for

business expansion.   They further agree that Patterson told Forschen that in order to participate

in that program, an up-front fee of $220,000 must be paid to get the loan process started.

[Forschen Dep. p. 57, l. 10 through p. 58 l. 25;  68:ll. 19 through 25; p.  69, ll. 12 through 24; p.

72, ll. 1 through 6;   Excerpts from the Deposition of Hubert Patterson ("Patterson Dep.")

attached as Exhibit "C", p. 14, l. 8 through p. 18, l. 10; p. 26, l. 8 through p. 30, l. 20)

     11.    In November, Forschen approached Davis with a proposal to resolve Davis'

money problems through Patterson's "debt elimination" loan program.  He explained to Davis

that he had been involved in some high yield programs that were very successful.  He proposed

that Harvest Marketing obtain a "self-liquidating" loan through Patterson based upon Harvest

Marketing's financial statements and business plan.  Once the loan was obtained, Harvest

Marketing would keep approximately $1 million of the proceeds.  Forschen would take the bulk

of the loan proceeds and invest them in one of his high yield programs which would generate

enough money to pay off the loan.  Assuming, Forschen paid off the loan as represented, Harvest

Marketing would not have to repay any portion of the loan.  (Davis Dep. , p. 58, l. 13 through p.

60, l.1; p.  p. 65, l. 25 through p. 66, l. 12)  In Davis' words:

> . . . he [Forschen] approached me, sometime I believe, in November of '99 and suggested
> that . . . he could get a loan, what he called a self-liquidating loan, but he needed to

channel it through an entity that could provide a business plan, show purpose for the loan, provide financial statements, et cetera, and proposed to me that if Harvest Marketing would be that entity, it was a way he could get me money, because the way he called – the way he explained to me the self-liquidated loan, that they had these high yield programs that they were putting it into and he would be able to pay me a percentage of that that I would not have to repay and that he would take the bulk of those proceeds, place it into these high yield programs, pay off the loan, you know.

(Davis Dep., p. 58, l. 14 through p. 59, l.3; *Accord* Forschen Dep. at 74-75; 78-80.)  Davis

further: testified:

> Q.    And from that, what you understood was that the proceeds from the loan would be invested in some high yield program that would yield enough money to pay back the loan and generate some profit?
> A.    That's correct.
> Q.    Part of which Harvest Marketing, LLC would get for its participation in taking out the loan in the first place?
> A.    That's correct.

(Davis Dep., p. 59, l. 18 through p. 60, l.1;  *Accord* Davis Dep., p.66, ll. 5 through 23)

12.    Forschen told Davis that in order to procure the loan, an up-front fee was

necessary.  He told Davis that they could use funds provided by FMT and other customers of

World Contractual Services that had already been sent to Patterson to pay that up-front fee, but

that those funds together with a profit would need to be repaid. Forschen testified:

> Q.    So did you approach Mr. Davis, then, about his company being involved in this deal?
> A.    I believe I did, yes.
> Q.    And that, of course, would have been in the fall of 1999 some time?
> A.    Yes.
> Q.    And you explained to him about this debt elimination program?
> A.    Yes.
> Q.    And about the funds that you had already sent?
> A.    Yes.
> Q.    And that those funds then would be used to work through this program whereby his company could get some funding, pay back the investment

[to MFT] with a good return . . . and leave Frank with some money without
having to pay it back.

> A.      Well that's– Yes.
> . . . .
> Q.      That's what you explained to Frank that the deal was?
> A.      I believe so, yes.

(Forschen Dep. at 74:16 - 75:16.)  Forschen further testified:

> Q.      And you explained to him that there were some funds that you had already
> sent to Burt [Patterson] that would have to be repaid?
> A.      Yes.
> Q.      And you told him those originally had been sent in connection with
> a high yield investment?
> A.      I believe so.
> Q.      And you also disclosed to him that that had not worked and so
> those funds were now going to be diverted over to this transaction if in fact it was
> to go?
> A.      Yes.

(Forschen Dep., p. 78, ll.14 through 25; p. 79, l. 25 through p. 80, l.15)

13.     Davis agreed work together with Forschen to obtain the proposed loan.  Davis

testified:

> Q.      So did you tell Jae [Forschen] that you and Harvest Marketing,
> LLC would work with him, would work with Jae, to pursue this plan that he was
> proposing?
> A.      I did.
> Q.      And in fact you and Jae and Harvest Marketing, LLC then
> undertook some activities to make that happen?
> A.      That's correct.

(Davis Dep., p.60, l. 23 through p. 61, l.4.)

14      Once Forschen advised Patterson that Davis and his companies would apply for

one his debt-elimination loans, Patterson instructed Forschen that they would be dealing with

Maralee Haldeman ("Haldeman") to process the loan.  Patterson also directed that the up-front

fee be paid to an account at Huntington National Bank owned by Rehab by L&M, Inc., a company controlled by Haldeman.  (Patterson Dep., p. 14, l. 8 through p. 18, l. 22)

15.      In accordance with their agreement, on November 16, 1999, Forschen transferred $100,000 of MFT's finds and $120,000 belonging to other clients of World Contractual Services to Pinnacle Title.  Forschen instructed Pinnacle Title to send the total $220,000 to Huntington National Bank account #01891814954 in Reynoldsburg, Ohio.  That account was owned by Rehab by L&M, Inc.  Copies of the checks depositing the $220,000 with Pinnacle Title and Forschen's hand written instructions to Pinnacle Title are attached as Exhibit "F".(Forschen Dep., p. 136, l. 22 through p. 140, l. 22)

16.      Pursuant to Haldeman's request, a Michael Brown forwarded a loan commitment and loan documents to Davis on November 17, 1999. [Excerpts from the Deposition of Maralee Haldeman ("Haldeman Dep.") attached as Exhibit "D", p. 19, l. 7 through p. 23, l. 23; p. 37, l. 16 through p. 43, l.1; copies of the commitment letter and letter from Michael Brown are attached as Exhibits "H" and "I" respectively]

17.      On November 18, 1999, Pinnacle Title forwarded the $220,000 including $100,000 from MFT to the account of Rehab by L&M, Inc. at Hungtington National Bank in Reynoldsburg, Ohio.  Both Patterson and Haldeman understood it was to pay the up-front fee for the Davis loan. (Haldeman Dep., p. 24, l. 2 through p. 26, l. 6; Forschen Dep., p. 137, l. 16 through p. 138, l. 7; Patterson Dep., p. 16, l. 16 through p. 18, l. 22)

18.      Once the up-front fee was paid, Davis filled out various application forms and submitted business plans, financial statements, tax returns and other information.  For

unexplained reasons, the loan did not fund and Davis continued to submit papers as requested by

Forschen and Haldeman for several months.  Some of the papers submitted by Davis to potential

lenders required him to explain the intended use of proceeds.  He described those purposes as "to

expand and increase distribution of First Harvest Foods."  Davis never disclosed to these

potential lenders that only 8% of the loan proceeds would go to Davis and/or his entities for the

described uses, and the other 92% would go to Forschen for purposes of making  "high yield"

investments.  (Davis Dep., p. 61,  l. 5 through p. 62, l. 17; p. 63, l. 24 through p. 67, l. 5) Davis

testified:

> Q.      Do you recall representing to any potential lenders that the proceeds from
> the loan would be used to expand and increase distribution of First Harvest Foods?
> A.      I probably in that – in the initial paperwork, it was probably in
> there, that, you know –
> Q.      The paperwork that you submitted?
> A.      Correct.
> Q.      And that statement would be true with respect to eight percent of
> the loan proceeds –
> A.      Correct.
> Q.      – that you would keep?  With respect to 92 percent of the loan
> proceeds, that would not be true?
> A.      That's correct?

(Davis Dep., p.94, ll. 2-14; copy of application containing representation about use of proceeds is

attached as Exhibit "N")

19.      In early 2000, Michelon began pressuring Forschen for an accounting of what he

had done with MFT's $100,000.00 and when she would receive her promised return.  Forschen

told her that it had been used for a "bridge loan" to First Harvest and that there was

documentation evidencing the loan obligation.  He advised her she would receive a return of

$75,000 in addition to her investment of $100,000.  (Forschen Dep., p. 143, l. 15 through p. 144, l. 13; p. 166, l. 20 through p. 168, l. 15; also see correspondence attached as Exhibit "J")

20.    In response to Michelon's demands for documentation,  Forschen prepared the promissory note attached as Exhibit "K" and arranged a meeting with Davis in the parking lot of the Sandy City Library late in the evening of February 9, 2000.  Forschen told Davis that he needed Davis and his company to sign the note to  "cover himself with Lynda" and "to show her that, you know, I had the note guaranteed" by Davis and his company.  (Davis Dep., p. 77, l. 13 through p. 78, l. 24; Forschen Dep., p. 150, ll. 7 through 17)

21.    Davis told Forschen that he would sign the note, but only if Forschen gave Davis a similar note from Forschen to Davis and his company, to indemnify them in the event that they had to pay on their note to MFT.   Davis testified:

> Q.    He was working regularly on trying to get you this big loan?
> A.    Right.  So I just said, you know, "There's no way I'm going to sign a note and obligate myself because I have no idea this loan is going to materialize or not."  And, you know, of course he assured me every which way but loose that the money was coming, that if it didn't come that way, it was coming another way, whatever, so – and I said, "The only way I'll do this is if you sign a note, you know, equal, identical note, saying that this is your responsibility," whatever. "The fact that you want the money that's coming into the corporation, or the money that's coming in to Harvest Consulting on this loan, if you want to pay this money back out of that, I don't have a problem with it."  You know, and he wanted to do – have some document to evidence that that was going to happen.
> But I just said, "I'm unwilling to do it unless you indemnify me, or whatever, because I have no – I don't have the same level of confidence and faith you do that the loan's going to materialize."
> So he took the original note and we wrote on the back of that, you know, that he was going to execute an identical note . . . ."

(Davis Dep., p. 74, l. 4 through p. 75, l. 3; Forschen Dep., p. 146, l. 6 through p. 149, l. 16)

22.     Forschen agreed to give Davis his personal indemnity note.  On that basis, Davis

signed the note to MFT personally and on behalf of his companies, and gave it to Forschen.

Forschen gave Davis a copy of the note with a hand written promise to provide a note from

Forschen personally to Davis and his companies.  The hand-written promise reads:

> I Jae R. Forschen personal [sic] will sign take over this note with all responicbles
> [sic] and obligations that will be belong to Jae R. Forshen [sic]
> 2/9/2000
>
> [/s/] By Jae R. Forschen
>
> The note referrenced [sic] above is Promisory [sic] note between Michelon Family
> Trust and Harvest Marketing Dated 11/15/99 wherein Jae R. Forschen will
> execute a note with Frank Davis/Harvest Marketing taking over the liability of the
> note & all responsibilities associated with note.
>
> [/s/] By Jae R. Forschen

(Davis Dep., p.100, l.23 through p. 103, l. 7; a copy of the hand written promise is attached as

Exhibit "L")

23.     Within a few days, Forschen delivered to Davis his personal indemnity note, a

copy of which is attached as Exhibit "M"  (Davis Dep., p. 75, ll. 1 through 3; p. 76, l. 4 through

p. 77, l. 12; Forschen Dep., p. 148, l. 16 through p. 149, l. 16)

24.     The Davis Note promised that "Harvest Marketing/First Harvest" would "pay

[the] sum of One Hundred Seventy-five Thousand Dollars and zero cents, ($175,000.00) to

Michelon Family Trust" in one installment due on March 3, 2000.  (Exhibit "M")  It also

provided that "[t]his agreement is personally guaranteed by Frank Davis . . . ."  (*Id.*)  It is not

conditioned upon Davis receiving loan proceeds.  Nor does it reference Forschen's indemnity

note. (Davis Dep., p. 79, ll. 10 through 19)

25.    Davis admits that he did not intend to pay MFT under the terms of the note if the loan did not fund. (Davis Dep., p. 84, ll. 5 though 23)

26.    At the time that Mr. Davis signed the Davis Note he knew that Forschen was going to show it to Lynda Michelon for the purpose of assuring her that she would receive a return on her investment and that her investment was secured. (Davis Dep., p 77, l. 13 through p. 79, l. 1)

27.    Davis also knew that Forschen would conceal from Michelon the fact that Davis and/or his entities ultimately had no intention of ever paying the Davis Note to Michelon.  In fact, Davis and Forschen executed duplicate originals of the Davis Note so that the version of the note with the hand-written agreement between Forschen and Davis on the back could be retained by Forschen and Davis.  (Davis Dep., p. 80, l. 24 through p. 82, l. 11)  When confronted with this deception in his deposition, Davis accounted for his actions as "stupidity" or "naivety" on his part and retreated from his prior deposition testimony that he knew Forschen would show the Davis Note to FMT:

> Q.    Did you not feel at the time that you were signing this document that you were assisting Jae to deceive the Michelon Family Trust?
>
> A.    Really, let's say – call it stupidity, I mean, or the fact that I believed what Jae was, you know, telling me, and he was – his level of confidence and he was the trustee.  And I don't know what he was going to do with the document.[1]  He just, you know, convinced me that it would be beneficial.

---

[1]  This is in direct contradiction to Mr. Davis' testimony earlier in the deposition that, while he and Forschen were sitting in the Sand City Library parking lot, he agreed to sign the note to make it appear that the Michelon Family Trust was going to be repaid (by Davis and/or his entities). (Davis Dep. at 73:6-21; 77:23 - 78:8; 78:20 - 79:1; 82:7 - 11.) Also Forschen testified that he told Davis that he needed Davis to do this in order "to cover myself with Lynda." (Forschen Dep. at 150:12.) "To show her that, you know, I had the note guaranteed, I had that money guaranteed." (Forschen Dep. at 150:14-15.)

And in retrospect, it was probably one of the dumbest things I did is to sign it. But I did it. And I did it because I felt that – you know, a little pressure. .
. .

(Davis Dep., p.82, l.18 through p. 83, l.5)

Q.      Didn't you understand at the time that if Jae was going to tell these people exactly how they were going to get their money back, through some loan that was being made by a bank, that he wouldn't have needed this note?

A.      I didn't really get into details with him. Like I said, I broke away from a birthday party to come and talk to him. And, you know, naively, I felt if I had him sign on the back that he indemnified me, and he was just showing, you know, documenting – whether he showed it or whether he had it in his trust documents, that this is how this money that apparently he had, you know, use or – from the Michelon Family Trust, how they were getting it back, you know, I didn't really get into the details with him, what he was doing, how he was doing it, you know, and I don't remember how he explained it per se to me.

(Davis Dep., p. 85, l.19 through p. 86, l.10)

28.      Forschen showed Michelon the Davis Note but did not disclose to her the Forschen Note (either the hand-or type-written version). (Forschen Dep., p. 149, ll.17 though 25; p. 151, ll. 2 through18) . Michelon was not aware of the Forschen-Davis side agreement. (Forschen Dep., p. 152, ll. 4 though 6.)

29.      Forschen and Davis continued to work together on their scheme to obtain the Forschen-Davis Loan through at least October, 2000, and, perhaps, even as late as March, 2001. (Davis Dep., p. 94, l. 24 through p. 95, l.. 4; p. 95, l. 25 through p. 96, l. 10; Forschen Dep., p. 97, l. 14 through p. 98, l. 11)

30.      Even though Davis readily acknowledges that part of the consideration he received for signing the Davis Note was the reciprocal promise embodied in the Forschen Note,

-xix-

Davis has not asserted a cross-claim against Forschen because, according to Davis, "I don't think

[Forschen] has a pot to pee in . . . ." (Davis Dep., p. 84, l.24 through p. 85, l. 7)

      31.    Forschen testified that the Davis Note was real and that he expected Davis to

fulfill his obligation under the Davis Note. Forschen testified:

> Q.    So with what you sent her you intended her to understand that Frank Davis
> and his company had signed a note to her.
> A.    Yes.
> Q.    Was that the way it was or were you trying to deceive her?
> A.    I was not trying to deceive her.  I just let her know this is the wau it was
> happening and this is how it transpired. . . . .
> Q.    So did you expect him to honor his note?
> A.    I expected that note to be fulfilled, yes. . . .
> Q.    You understand that Frank [Davis] and his company have an obligation to
> pay that note?
> A.    Yes.
> Q.    You also understand that you have an obligation to Frank and his
> company to take care of that obligation for him?
> A.    Correct.

(Forschen Dep, p.153, ll. 12 through18)

      32.    Although the March 3, 2000 maturity date under the Davis Note has long since

expired, neither Forschen nor Davis or their entities paid MFT any amounts due under the Davis

Note.  (Forschen Dep., p. 153, ll. 21 through 24)

## STANDARD OF REVIEW

"Summary judgment is proper only 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Bower v. Stein Eriksen Lodge Owners Ass'n, Inc.*, 201 F. Supp. 2d 1134, 1137 (D. Utah 2002) (quoting Fed. R. Civ. P. 56(c)). "The party seeking summary judgment bears the initial burden of demonstrating that there is an absence of evidence to support the nonmoving party's case." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). "In applying this standard, the court must construe all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Pueblo v. Santa Ana v. Kelly*, 104 F.3d 1546, 1552 (10th Cir. 1997)).

## ARGUMENT

### I.   PLAINTIFFS CAN ESTABLISH SECURITIES FRAUD LIABILITY.

The Davis Defendants do not challenge the fact that there was a primary violation of the securities laws by Forschen, WCS and/or Orr. Rather, the Davis Defendants assert that "Davis had no knowledge of any scheme to defraud the Trust[,]" and that Forschen "didn't bring Davis into the transaction until he had already transferred the Trust funds to the organization back-

1

East."[2] (Mem. Supp. Third Mot. Summ. J. at 7.)  Plaintiff has raised genuine issues with respect

to each of these assertions.

     A.    Davis' Intent to Defraud MFT..  Plaintiff believes that Davis attempted to defraud

MFT in two respects: (1) by using MFT's funds for use as an up-front fee for the Davis loan

which MFT knew nothing about; and (2) by signing a promissory note in favor of MFT

promising to pay MFT $175,000 on March 3, 2000 when Davis did not intend to honor the terms

of the promissory note.

          1.  Diversion of MFT Funds.  Plaintiff has, at minimum, raised genuine issues of

fact regarding whether Davis knew the MFT funds were being used to pay the up-front fee for his

loan without MFT's knowledge.  The Davis Defendants knew that an up-front fee was required

in order for Davis to procure the desired loan.  Forschen explained to Davis that the MFT

monies "would be used to work through this program whereby his company could get some

funding, pay back the investment [to Michelon] with a good return . . . and leave [Davis] with

some money without having to pay it back."  (Forschen Dep., p. 75, ll. 3 through 7)

     Forschen said that he explained to Davis that MFT's funds had originally been sent back

East for a high-yield program that did not work and that, if Davis was agreeable to being the

conduit and nominal applicant for the Forschen-Davis Loan, "those funds were now *going to be*

*diverted* over to this [the Davis loan] transaction if in fact it was to go[.]"  (Forschen Dep., p. 78,

ll. 14 through 25 (emphasis added).)  Davis knew that Michelon's funds had not yet been but

---

    [2]  The Davis Defendants also contend that"Defendants cannot demonstrate that Davis participated in any unlawful activity." (Mem. Supp. Third Mot. Summ. J. at 7.)  However, since participation in unlawful activity is not an element that plaintiff is required to establish under the Utah Uniform Securities Act, Plaintiffs need not address this unsupported assertion.

were "going to be" diverted from the investment Michelon originally intended to a new debt elimination program *if* Davis agreed to participate in the deal.  Of course, the facts show that Davis did, in fact, agree to be the nominal loan applicant for the Forschen-Davis Loan that was part of the debt elimination program and that, as part of his consideration for the deal, agreed that the Michelon monies would have to be repaid.  (Forschen Dep., p. 74, l. 16 through p. 75, l. 16; p. 76, ll. 4 through14; p. 78, ll. 14 through 25.)  Forschen admitted that Michelon was not informed of this diversion.[3]  Davis' knowledge of this diversion of MFT's funds to further the Forschen-Davis scheme without Michelon's knowledge is fraudulent.

   2. Promissory Note.  Davis' signing and delivery to Forschen of the promissory note constitutes further participation in Forschen's scheme to defraud MFT.   Davis knew Forschen wanted the note so he could give it to Michelon "to cover [him]self," (Forschen Dep., p. 150, l. 12), with Ms. Michelon, to make it look as if her $100,000.00 investment was "guaranteed" and had been guaranteed from November 19, 1999.  (Forschen Dep., p. 150, ll. 14 and 15; Davis Dep., p. 73, ll. 6 through 21; p. 77, l. 13 through p. 79, l. 1; p. 82, ll. 7 through 11.)  The note was backdated.  The note contained an unconditional promise to pay MFT $175,000 on March 3,

---

   [3] Plaintiff does not believe Forschen's claims that he initially sent the funds to Patterson "back East" for use in a high-yield program but that those funds were later diverted to accommodate Davis' loan.  The evidence shows that from the beginning the funds were sent to be used solely for the Davis loan.  Patterson testified that he knew of no high-yield program and never spoke with Forschen about it.  Moreover the chronology discredits Forschen.  Davis received the loan commitment and loan documents on November 17, 1999.  Forschen obviously spoke with Patterson and Haldeman about the loan program before those documents were sent.  Yet the funds were not transferred to Rehab's account until November 18, 1999, the day after the loan documents were sent to Davis.  Regardless, Davis knew the MFT funds were being used or "diverted" to pay an up-front fee required to procure the loan he and Forschen were seeking.

3

2000 which Davis acknowledges he did not intend to honor.  The fact that Davis and Forschen

executed duplicate originals of the Davis Note–one with the Forschen Note handwritten on the

back and the other without–shows that Davis knew Forschen was going to present the Davis Note

to Ms. Michelon without disclosing the Forschen Note or the Forschen-Davis Loan scheme to

her.  (Davis Dep., p. 79; p. 80, l. 24 through p. 82, l. 11; p. 85, l. 19 through p. 86, l. 10)

Based on these facts, a reasonable jury could conclude that the Davis Defendants had

knowledge of the scheme to defraud MFT both as to the use of its funds and the Davis

Defendants' promise to pay MFT, all so Davis could receive 8% of the loan proceeds, which loan

could be procured only by misrepresenting to the lender his intended use of the bulk of the

proceeds.

B.      Timing of the Transfer of Funds.  The Davis Defendants assert that Forschen

"didn't bring Davis into the transaction until he had already transferred the Trust funds to the

organization back-East."  (Mem. Supp. Third Mot. Summ. J. at 7.)  However, the documentary

evidence disproves this assertion.

Forschen admits he spoke to Patterson about the Davis loan before Davis received any

loan documents.  Forschen also proposed the loan scheme to Davis before Davis received any

loan documents.  Michael Brown sent the commitment letter and loan application documents to

Davis on November 17, 2000.  Forschen sent MFT funds to Pinnacle Title on November 16,

1999 which were forwarded to Rehab's account on November 18, 1999.  Haldeman was a

principal in Rehab.  Her sole involvement in the transaction was to receive the up-front fee, make

disbursements from the fee, and process Davis loan papers.  Haldeman and Patterson both

4

testified that the funds were sent solely to procure the loan.  The scheme had been proposed by Forschen and agreed to by Davis before MFT's money was sent to Rehab.

Even if the funds had already been sent, that would not excuse Davis.  He knew the funds were being diverted for use as an up-front fee to facilitate the Davis loan without MFT's knowledge.  He assisted Forschen in deceiving Michelon by executed and backdating the Davis Note as part of a cover-up.  Courts have held that "a party could substantially assist a cover-up, and thus aid and abet a prior sale.  By analogy, one can be guilty of aiding and abetting a typical criminal endeavor through conduct occurring only after the underlying crime has been completed." *Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040, 1047 (11th Cir. 1986).[4]

In sum, Davis knew MFT's funds were going to be used to pay the up front fee necessary for his loan "if in fact it was to go," (Forschen Dep. at 78:14-25).  When Davis agreed to be the conduit to receive the Forschen-Davis Loan monies he became a knowing participant and joint venturer in the scheme to defraud Ms. Michelon.  Thereafter his involvement in the deception only became deeper by, among other things, executing and backdating the Davis Note and withholding the Forschen Note from MFT, which substantially assisted the ongoing scheme to defraud plaintiff.  MFT has, at a minimum,  raised genuine issues regarding Davis' participation in a common scheme to defraud MFT.  Accordingly, summary judgment should be denied.

---

[4]  Of course, this cannot be the case with regard to federal securities liability because there is no private right of action for aiding and abetting.  However, the same cannot be said for state securities laws violations.

## II.   PLAINTIFF CAN ESTABLISH THE ELEMENTS OF CONSPIRACY.

The Davis Defendants next challenge plaintiff's seventh claim for relief under a theory of civil conspiracy.  The Davis Defendants begin their analysis by citing *Gildea v. Guardian Title Co.*, 970 P.2d 1265, 1271 (Utah 1998), for the proposition that a "[c]onspiracy to defraud requires proof of the underlying fraud."  But the Davis Defendants misapply this principle when they argue that "because Davis committed no fraud against Plaintiff, Defendants could not have conspired to defraud."  (Mem. Supp. Third Mot. Summ. J. at 8.)

First of all, Davis *did* commit fraud, as shown above.  They participated in a diversion of MFT's funds to further the Davis/Forschen scheme without telling MFT.  When Michelon demanded proof of MFT's funds, Forschen told her the money had been used as a bridge loan to Harvest Marketing and that Harvest Marketing and its owner, Davis, had signed a promissory note promising to pay her $175,000 by March 3, 2000.  Davis signed and backdated the note he knew would be given to Michelon to appease her concerns over her funds, even at a time when Davis had no intent to honor the note.

Moreover, to make Davis liable as a co-conspirator in a scheme to defraud, plaintiff does not have to show that *Davis* committed the underlying fraud.  *See, e.g., Deere & Co. v. Zahm*, 837 F. Supp. 346, 351 (D. Kan. 1993) ("defendants have not shown that a civil conspiracy to commit fraud requires that each and every conspirator must be able to be held liable for the underlying fraud").  It is sufficient to show that the underlying fraud was committed by one of the co-conspirators.  Indeed, it is axiomatic that because a "conspiracy claim allows for imputed liability; a plaintiff may be able to impose liability on one defendant for the actions of another

performed in the course of the conspiracy." *Dixon v. City of Lawton*, 898 F.2d 1443, 1449 n.6 (10th Cir. 1990).

By definition, a civil conspiracy is "the combination of two or more persons acting in concert, either to commit an unlawful act, or to commit a lawful act by unlawful means." *Singer v. Wadman*, 745 F.2d 606, 609 (10th Cir. 1984). *Accord Wenneman v. Brown*, 49 F. Supp. 2d 1283, 1291 (D. Utah 1999).[14] Logically, different participants in a conspiracy will have different roles in the conspiracy. For example, one co-conspirator may draw up the plans for a robbery, another might actually conduct the hold-up, and another might drive the getaway car. It is not necessary for each co-conspirator to commit each unlawful act in order to be liable as a co-conspirators for the actions of each other.

Indeed, as the Tenth Circuit has explained, "[a] plaintiff seeking redress need not prove that each participant in a conspiracy knew the exact limits of the illegal plan or the identity of all the participants therein." *Snell v. Turner*, 920 F.2d 673, 702 (10th Cir. 1990) (quotations and citations omitted). "The fact that some of the participants might not have foreseen the exact nature of the deprivation is of no moment." *Id.*

The Davis Defendants have not challenged MFT's claim that the other defendants engaged in fraud. There is ample evidence, as detailed above, that they did.

At the very least there are disputed issues of fact concerning the underlying fraud and the Davis Defendants' role in the underlying fraud that cannot be resolved on summary judgment. This court has cautioned that "the existence or nonexistence of a conspiracy is generally a fact

---

[14] Utah's law of conspiracy is generally consistent with the federal authorities discussed in this section. *See Israel Pagan Estate v. Cannon*, 746 P.2d 785, 790 (Utah Ct. App. 1987).

7

issue." *Singer v. Wadman*, 595 F. Supp. 188, 272 (D. Utah 1982).  In other contexts, the Tenth

Circuit has warned "that caution is advised in any pre-trial disposition of conspiracy allegations,"

*Clulow v. State*, 700 F.2d 1291, 1303 (10th Cir. 1983), overruled on other grounds by *Newcomb v.*

*Ingle,* 827 F. 2d 675 (10th Circ. 1989).  Indeed, in *Fisher v. Shamburg*, 624 F.2d 156 (10th Cir.

1980), the Tenth Circuit reversed the trial court's grant of summary judgment in favor of

defendants, holding that "the 'slight chance'" that defendants conspired in a parking lot to assault

plaintiff "created a genuine issue of fact." *Id.* at 158.  In so doing, the court quoted at length

from Justice Black's concurring opinion in *Adickes v. Kress & Co.*, 398 U.S. 144, 176, 90 S. Ct.

1598, 1618 (1970):

> "The existence or nonexistence of a conspiracy is essentially a factual
> issue that the jury, not the trial judge, should decide. In this case petitioner
> may have had to prove her case by impeaching the store's witnesses and
> appealing to the jury to disbelieve all that they said was true in the affidavits.
> The right to confront, cross-examine and impeach adverse witnesses is one
> of the most fundamental rights sought to be preserved by the Seventh
> Amendment provision for jury trials in civil cases. The advantages of trial
> before a live jury with live witnesses, and all the possibilities of considering
> the human factors, should not be eliminated by substituting trial by affidavit
> and the sterile bareness of summary judgment."

*Fisher*, 624 F.2d at 162.

Thus, even while characterizing the evidence establishing a conspiracy as "slight," the

*Fisher* court nonetheless held that "the issue of conspiracy must be resolved on the credibility of

the witnesses," that "[c]redibility is properly evaluated by the trier of facts," and that "[s]ummary

judgment should not be used to prevent the necessary examination of conflicting testimony and

credibility in the crucible of at trial." *Id.*  The court thus reversed a summary judgment and

remanded the case for trial.

In this case, the evidence presented by plaintiff shows more than merely a "slight chance" that there was a conspiracy. Consequently, it would be inappropriate to grant the Davis Defendants' motion for summary judgment.

### III. THE PLAINTIFF'S NEGLIGENT MISREPRESENTATION CLAIM SHOULD NOT BE DISMISSED.

After correctly citing the basic elements of a negligent misrepresentation claim, the Davis Defendants argue that plaintiff cannot establish the following three elements of a negligent misrepresentation claim: (1) "Davis did not have a pecuniary interest," (2) "Davis was not in a superior position to know material facts associated with the use of Plaintiffs' trust money," and (3) "Davis made no representations to Plaintiffs." (Mem. Supp. Third Mot. Summ. J. at 8-9.) Additionally, the Davis Defendants argue that plaintiff's negligent misrepresentation claim is barred by the economic loss doctrine. Each argument is without merit, as demonstrated in the following subsections.

#### A. Davis stood to gain anywhere from $960,000.00 to $3,200,000.00.

The Davis Defendants argue that Davis did not have a pecuniary interest in the transaction at issue "because Davis's transaction was merely a paper transaction with him receiving no consideration as a result . . . ." (Mem. Supp. Third Mot. Summ. J. at 8-9) There are sharply disputed facts on this point. That money did not change hands directly from plaintiff to Davis in exchange for the Davis Note cannot obscure the fact that Davis did, in fact, receive the benefit of Ms. Michelon's $100,000.00 investment, which was used as the up-front fee to pursue the Forschen-Davis Loan. Clearly, the Davis Defendants had a pecuniary interest in Ms. Michelon's $100,000.00, which was "diverted," (Forschen Dep., p. 78, ll. 14 through 25), to

9

Davis' use after Davis agreed to participate in loan scheme. Indeed, the record shows that Davis

was expecting to receive 8% of $12 - 40 million as his expected pecuniary interest in the

Forschen-Davis Loan. (Davis Dep., p. 65, ll. 4 through 5; p. 93, ll. 13 through 15; Forschen Dep.,

p. 91.) Davis knew that Ms. Michelon's $100,000.00 would have to be paid back at the time he

agreed to be a part of the debt elimination scheme. Davis also had a pecuniary interest in the

Forschen Note. Indeed, Davis insisted upon receiving the Forschen Note as his consideration for

giving Forschen the Davis Note.

The obvious purpose of the "pecuniary interest" prong is to prevent a complete "stranger"

to a transaction from being held liable when playing only a tacit or "gratuitous" role in the

transaction. *See Christenson v. Commonwealth Land Title Ins. Co.*, 666 P.2d 302, 305 (Utah

1983). The Davis Defendants clearly played more than a tacit role in the scheme to defraud Ms.

Michelon. They facilitated the initial diversion of her funds and then aided in the attempted

cover-up. Why did the Davis Defendants go along with this scheme? The obvious answer is that

they were hoping to obtain their 8% of $12 - $40 million. A pecuniary interest of $960,000.00 -

$3,200,000.00 should suffice to establish the first element of this tort.

**B.      Davis had superior knowledge of the true nature of the transaction.**

The Davis Defendants claim that plaintiff cannot establish the second element of

negligent misrepresentation because "Davis was not in a superior position to know material facts

associated with the use of Plaintiffs' trust money." The problem with the Davis Defendants'

argument is that it is factually unsupported. The evidence shows that Davis knew MFT's money

would be diverted away from the investment Michelon had authorized and instead used to pay

10

the up front fee for Davis' loan, and that Davis' co-conspirator failed to disclose this diversion to

Michelon.  When Forschen asked Davis to sign and backdate the Davis Note, Davis knew that

Forschen would use the Davis Note to "cover" himself with Michelon and that Forschen would

not show Ms. Forschen the Forschen Note or otherwise disclose to her the Forschen-Davis Loan

scheme.  (Davis Dep., p.72, l. 18 through p. 73, l. 21; p. 74, l. 4 through p. 75, l.2; pp. 77

through79; p. 80, l. 24 through p. 82, l.11; p. 84, ll. 5 through 23; p. 85, l. 19 through p. 86, l. 10;

Forschen Dep., pp. 74 through 76; p. 78, ll. 14 through 25; pp. 79,  80 and 115.)  The Davis

Defendants fail to produce any evidence that Michelon knew more than Davis about the true

nature of the transaction involving MFT's funds.  To the contrary, the evidence shows that Davis

and Forschen were deliberately trying to keep Michelon in the dark about the use of MFT's

funds. Obviously, as Forschen's co-conspirator and joint venture partner, Davis had superior

knowledge of the true nature of Ms. Michelon's investment than she did.

### C.    Misrepresentations were made.

The Davis Defendants next argue that no misrepresentations were made.  This is simply

not true.  The Davis Note is, itself, an affirmative misrepresentation.  It represents that the Davis

Defendants had an intent to pay MFT $175,000 on March 3, 2000 when Davis testified that he

did not intent to make that payment.  The failure to disclose the Forschen Note is a

misrepresentation.  The failure to disclose the Forschen-Davis Loan is a misrepresentation.  The

failure to disclose all material facts prior to the diversion of MFT's funds to the Davis Loan was

a misrepresentation. *See Smith v. Frandsen*, 2004 UT 55, ¶11 ("we have found that in addition to

11

affirmative misstatements, an omission may be actionable as a negligent misrepresentation where the defendant has a duty to disclose").

Moreover, when Davis agreed to become Forschen's joint venturer and/or co-conspirator in order to get the millions he hoped to receive from the Forschen-Davis Loan, he voluntarily agreed to assume the liabilities arising from breach of the duties that Davis had to Ms. Michelon as trustee of MFT. Those duties included, of course, Mr. Forschen's fiduciary duty to Ms. Michelon as a beneficiary of the trust, *In re Estate of West*, 948 P.2d 351, 355 (Utah 1997), the duty to act prudently with regard to trust investments, *id.*, the duty to avoid conflicts of interest, *id.*, all of the duties set forth in Utah Code Ann. §§ 75-7-301 *et seq.*, as well as the duty to avoid self-dealing and to make full and honest disclosure of the nature and status of Ms. Michelon's investment. *See Wheeler v. Mann*, 763 P.2d 758, 760 (Utah 1988).

### D.    The economic loss doctrine is inapplicable.

The Davis Defendants next contend that plaintiff's negligent misrepresentation claim is barred by the economic loss doctrine. The Davis Defendants' assertion that "[t]he economic loss rule bars all economic losses under a theory of non-intentional tort," (Mem. Supp. Third Mot. Summ. J. at 9), is not an accurate statement of the law. Although the Davis Defendants accurately extract this statement from *American Towers Owners Ass'n v. CCI Mech.*, 930 P.2d 1182, 1189 (Utah 1996), they fail to point out that in a more recent decision, *Grynberg v. Questar Pipeline Co.*, 2003 UT 8, 70 P.3d 1, the Utah Supreme Court held, "we do not find *American Towers Owners Ass'n* . . . persuasive authority regarding the current state of the economic loss rule in . . . Utah." *Grynberg*, 2003 UT 8, ¶ 49.

12

Also, they do not point out that, in *Hermansen v. Tasulis*, 2002 UT 52, 48 P.2d 235, the old *American Towers* rule–that economic damages are not recoverable in negligence absent physical property damage or bodily injury–was replaced by a new duty-based rule that allows for recovery of economic loss in tort.  In the *Hermansen* case, the trial court dismissed a homebuyer's tort claims against the seller's real estate broker and his agent because they sought recovery for only economic losses and *American Towers* precluded claims for economic loss arising from nonintentional torts.  *Id.* at ¶ 9.  The Utah Supreme Court reversed, adopting a new duty-based "interpretation," *id.* at ¶ 17, which provides as follows:

> "The proper focus in an analysis under the economic loss rule is on the source of the duties alleged to have been breached.  Thus, our formation of the economic loss rule is that a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach <u>absent an independent duty of care</u> under tort law."

*Id.* at ¶ 16 (quoting *Grynberg v. Agric. Tech., Inc.*, 10 P.3d 1267, 1269 (Colo. 2000)).

The *Hermansen* court clarified that, regardless of whether the damages sought are for economic losses, bodily injury or physical property damage, "[w]hen an independent duty exists, the economic loss rule does not bar a tort claim 'because the claim is based on a recognized independent duty of care and thus does not fall within the scope of the rule.'"  *Id.* at ¶ 17.  Similarly, in *Grynberg v. Questar*, the Utah Supreme Court rejected the touchstones of bodily injury or property damage and held that "the modern focus is not on the harm that occurs but instead is on the source of the duty that was breached," *Grynberg*, 2003 UT 8, ¶ 43.  The new formulation of the economic loss rule is more concerned with not allowing tort law to replace

13

and supplant contract law by insisting that "once there is a contract, any tort claim must be premised upon an independent duty that exists apart from the contract" *Id.*

While it is true that plaintiff claims the Davis Note is a contract between the Davis Defendants and plaintiff, there are two main problems with the Davis Defendants' reliance upon the economic loss rule. First, the Davis Defendants are asserting that "[b]ecause Davis received no consideration for his execution of the [Davis Note], the contract was never valid." (Mem. Supp. Third Mot. Summ. J. at 11.) If the Davis Defendants are correct, then the economic loss rule obviously cannot apply to bar any tort claims the plaintiff has against the Davis Defendants because the rule only comes in to play if there *is* a contract. Second, under the economic loss rule "'a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law.'" *Hermansen*, 2002 UT 52, ¶ 16. Thus, as in *Hermansen*, if plaintiff can establish the Davis Defendants owed it tort duties "independent of any contractual obligations between the parties," (*i.e.* the Davis Note) then the economic loss rule will not bar those independent causes of action notwithstanding the existence of the Davis Note.

As explained above, at the very least, when Davis agreed to become Forschen's joint venturer and/or co-conspirator in order to get the millions he hoped to receive from the Forschen-Davis Loan, he voluntarily agreed to share the liabilities arising from breach of the duties that Davis had to Ms. Michelon as trustee of the Michelon Family Trust. Consequently, the economic loss doctrine does not bar plaintiff's negligent misrepresentation claim against the Davis Defendants.

14

IV.    **PLAINTIFF HAS STATED A CLAIM FOR CONVERSION**.

After correctly citing the elements of conversion, the Davis Defendants next argue that "Davis never exercised dominion or control over the Trust's money because it went from the Trust's bank to the back-East organization *via* Forschen before Forschen ever brought Davis into the transaction in question." (Mem. Supp. Second Mot. Summ. J. at 10.) However, the evidence shows otherwise.

Forschen admits he spoke with both Patterson and Davis about the loan scheme before Davis received loan documents. Brown sent him the first set of loan documents on November 17, 1999. The MFT funds were not wired to Rehab until November 18, 1999, one day after the loan documents were received. Clearly Davis was brought in before the funds were transferred,

In any event, even Forschen admits that Davis knew "the funds were now *going to be diverted* over to this [Davis loan] transaction if in fact it was to go[.]" (Forschen Dep., p.78, ll. 14 through 25 (emphasis added).) This diversion was accomplished by Davis' co-conspirator to further their scheme. MFT has demonstrated, at minimum, a genuine issue of fact regarding Davis' participation in a scheme to convert MFT's funds to their own use.

V.    **PLAINTIFF HAS STATED A CLAIM FOR MONEY HAD AND RECEIVED.**

"[T]o sustain a cause for money had and received it is only necessary to show that defendant obtained money from plaintiff, under such circumstances that in equity and good conscience it should be returned." *Helper State Bank v. Crus*, 90 Utah 207, 211 (1936). In this case, the Davis Defendants received the benefit of $100,000.00 of MFT's trust monies and then, in conjunction with Forschen, "diverted" that money to buy in to a loan program that was

15

intended to give the Davis Defendants millions of dollars.  The fact that the $100,000.00 did not

pass through the Davis Defendants' account or go directly through them does not change the fact

that plaintiff's $100,000.00 was transferred to Rehab on the Davis Defendants' behalf and with

the full knowledge and consent of the Davis Defendants.

Again, the fact that the trust monies were never physically in the Davis Defendants'

possession is immaterial because he was Forschen's joint venturer and co-conspirator, and there

is no dispute that Forschen had possession of plaintiff's monies before they were diverted.

## VI.   PLAINTIFF CAN ESTABLISH A BREACH OF FIDUCIARY DUTY CLAIM AGAINST THE DAVIS DEFENDANTS.

The Davis Defendants claim that "Plaintiffs cannot establish the existence of a fiduciary

duty between themselves and Defendants because Davis was never a principal, agent or

representative of the Trust." (Mem. Supp. Third Mot. Summ. J. at 11.)  Again, the facts are

sharply disputed on this point.  When Davis agreed to become Forschen's joint venturer and/or

co-conspirator in order to get the millions he hoped to receive from the Forschen-Davis Loan, he

voluntarily agreed to assume the liabilities arising out of the breach of Forschen's duties to Ms.

Michelon as trustee of the Michelon Family Trust.

## VII.   PLAINTIFF CAN ESTABLISH THE REQUISITE ELEMENTS OF BREACH OF PROMISSORY NOTE.

The Davis Defendants argue that the Davis Note is invalid "[b]ecause Davis received no

consideration for his execution of the Promissory Note . . . ." (Mem. Supp. Third Mot. Summ. J.

at 11.)  Alternatively, the Davis Defendants argue that "Plaintiffs never performed because they

never tendered to Davis any of the funds in question." (Mem. Supp. Third Mot. Summ. J. at 12.)

Each of these arguments is without merit.

Although it is difficult to decipher from the Davis Defendants' brief whether they are

contending that there was a lack or failure of consideration for the Davis Note, their answer

clarifies that they are asserting "Failure of Consideration (for the Promissory Note Agreement) in

that Plaintiff did not ever pay or provide any consideration for the Note[.]" (Davis Defs.'

Answer at 11, ¶ 117)

> "[A] failure of consideration means the contract is valid when formed but
> becomes unenforceable because the performance bargained for has not been
> rendered.

*Johnson v. Dodgen*, 451 N.W. 2d 168, 172 (Iowa 1990). *Accord General Ins. Co. v. Carnicero*

*Dynasty Corp.*, 545 P.2d 502, 504 (Utah 1976).

The Davis Defendants received consideration for the promissory note. First, the

promissory note evidenced an antecedent debt which arose when the Davis Defendants and

Forschen used MFT's funds to pay the up front fee required for the Davis loan. Davis

acknowledged the existence of the debt and knew that it had to be repaid. *A.M. Castle & Co. V.*

*Beagley,* 467 P. 2d 408, 409 (Utah 1970), cited by the Davis Defendants, expressly provides that

no contemporary consideration must be given to sustain a contract relating to an antecedent debt.

Second, Forschen provided his indemnity note as further consideration for the Davis

Note. Forschen would not have given that note had Davis refused to sign the Davis Note.

Moreover, Davis acknowledged that he expressly bargained for the Forschen Note in return for

his signing and delivery of the Forschen Note.

17

Third, Forschen and Davis needed to appease Michelon with respect to their use of her funds. Davis signed, backdated, and delivered the Davis Note to Forschen to be given to Michelon for this purpose. Davis got what he bargained for, as Michelon relied upon the note to induce inaction from the date of delivery of the note until March 3, 2000.

ever paid or provided consideration for the Note is, at the very least, hotly disputed in this case. And Mr. Forschen testified that he fully intended the Davis Note to be enforceable because of the

Indeed, if the Davis Defendants wanted to, they could sue Forschen under the Forschen Note. The fact that Forschen does not, as Mr. Davis puts it, "have a pot to pee in" does not alter the fact that the Forschen Note is an enforceable instrument and was good and valuable consideration for the giving of the Davis Note.

## CONCLUSION

MFT has raised genuine issues of material fact or demonstrated that the Davis Defendants' request for summary judgment is contrary to law with respect to each claim challenged by the Davis Defendants. Based upon the foregoing, this Court should deny the Davis Defendants' Third Motion for Summary Judgment.

DATED this __6th__ day of May, 2005.

KIRTON & McCONKIE

By: _David M. Wahlquist_

David M. Wahlquist
Daniel J. McDonald
Attorneys for Plaintiff

18

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this _6th_ day of May, 2005, I caused to be served a true

copy of the foregoing **MEMORANDUM IN OPPOSITION TO THIRD MOTION FOR**

**SUMMARY JUDGMENT,** by the method indicated below, to the following:

Stephen Quesenberry                              ( ) U.S. Mail, Postage Prepaid
HILL, JOHNSON & SCHMUTZ, L.C.        (X) Hand Delivered
Jamestown Square                                    ( ) Overnight Mail
3319 North University Avenue                  ( ) Facsimile
Provo, UT 84604
Attorneys for Defendants Frank Davis, Harvest
Marketing, LLC and First Harvest, LLC


David J. Orr, Pro Se                                 (✓) U.S. Mail, Postage Prepaid
5449 Suntree Avenue                               ( ) Hand Delivered
West Valley, UT84120                             ( ) Overnight Mail
                                                              ( ) Facsimile


Jae Forschen, Pro Se                               (✓) U.S. Mail, Postage Prepaid
406 East 3335 South, Apt. 16                   ( ) Hand Delivered
Salt Lake City, UT 84115                         ( ) Overnight Mail
                                                              ( ) Facsimile



_David M. Wahlquist_

19