FILED
U.S. DISTRICT COURT

2005 MAY -6  P 4: 39

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

David M. Wahlquist (Bar No. 3349)
Daniel J. McDonald (Bar No. 7935)
**KIRTON & McCONKIE**
1800 Eagle Gate Tower
60 East South Temple
P.O. Box 45120
Salt Lake City, UT 84145-0120

Attorneys for Plaintiff

---

## IN THE UNITED STATES DISTRICT COURT

## STATE OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| JENNIFER STEIMKE, as trustee of the ODETTE GRAHAM TRUST, sole beneficiary of the MICHELON FAMILY TRUST, and sole devisee and representative of the ESTATE OF LYNDA STEIMKE MICHELON, | : : : : **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| Plaintiff, | : : **AGAINST DEFENDANTS HARVEST MARKETING, L.L.C., FIRST HARVEST, L.L.C., AND FRANK L. DAVIS** |
| v. | : : |
| JAE FORSCHEN, DAVID J. ORR, individually and dba WORLD CONTRACTUAL SERVICES, HARVEST MARKETING, L.L.C., FIRST HARVEST, L.L.C., FRANK L. DAVIS, and JOHN DOES 1 through 10, | : : : : : : Case No. 2:03CV-0487 Judge Dale A. Kimball |
| Defendants. | : |

---

Plaintiff Jennifer Steimke, acting on behalf of the Michelon Family Trust, submits this

memorandum of points and authorities in support of Plaintiff's Cross Motion For Partial Summary

Judgment Against Defendants Harvest Marketing, L.L.C., First Harvest, L.L.C., and Frank L. Davis.

The Michelon Family Trust seeks summary judgment against these defendants on its Eighteenth

Claim for relief for failure to pay amounts due under the promissory note attached as Exhibit "K" to this memorandum. Specifically, the Michelon Family Trust asks the court to award it judgment against the three defendants named above in the amount of $175,000 for the principal balance of the note, late charges in the amount of $1,000 per week from March 3, 2000 until paid in full or, in the alternative, interest at the legal rate from March 3, 2000 until paid in full, andv the Michelon Family Trust's costs and attorneys fees incurred herein.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

The following undisputed facts are material to the issues present by MFT's motion:

1.     The Michelon Family Trust ("MFT") is a family trust formed in accordance with the laws of the State of Utah.  Plaintiff Jennifer Steimke is the trustee and sole beneficiary of MFT.  (*See* Complaint, para. 1)

2.     Defendant Jae Forschen ("Forschen") is an individual residing in Salt Lake County, State of Utah. At all times relevant herein, Forschen worked for defendant World Contractual Services in Salt Lake City, Utah. [Excerpts from the Deposition of Jae Forschen ("Forscehn Dep.") attached as Exhibit "A", p. 20, ll. 2 through 25;  p. 180, ll. 13-15]

3.     Defendant Harvest Marketing, L.L.C. ("Harvest Marketing") is a Utah limited liability company with its principal place of business in Utah County, State of Utah.  Harvest Marketing was formed for the purpose of marketing food products produced by First Harvest, L.L.C. [Answer of Harvest Marketing, First Harvest, L.L.C. and Frank L. Davis ("Davis Answer"), para. 5;  Excerpts from the Deposition of Frank L. Davis ("Davis Dep.") attached as Exhibit "B", p. 20,ll. 14 through 17]

ii

4.      Defendant First Harvest, L.L.C. ("First Harvest") is a Utah limited liability company with its principal place of business in Utah County, State of Utah. First Harvest manufactured food products. (Davis Answer, para. 6; Davis Dep., p. 26, l. 14 through 24)

5.      Defendant Frank L. Davis ("Davis") is an individual residing in Orem, Utah.  At all times relevant herein, Davis was the sole and managing member of Harvest Marketing. He was also owned the majority interest in First Harvest. (Davis Answer, para. 7; Davis Dep., p. 19, l 19 through p.20, l 17; p. 21 l. 25 through p. 22, l. 25)

6.      In mid-1999, Harvest Marketing needed funds to purchase some raw materials for a food product it intended to sell in Saudi Arabia.  Davis was referred to Forschen at World Contractual Services which loaned Harvest Marketing and Davis money for that purchase.  (Davis Dep., p. 28, l. 3 through p. 55 l. 11)

7.      By late 1999, Davis was having difficulty paying interest on his loan with World Contractual Services and had discussed that fact with Forschen.  Forschen wanted to find a way to help Davis with his financial difficulties. (Davis Dep, p. 55, ll. 19 through 23; p. 56, ll. 6 through 18)

8.      Earlier in 1999, Jennifer Steimke's mother, Lynda Michelon ("Michelon"), had met Forschen at financial planning seminar in Cancun, Mexico.  Over a period of months, Forschen persuaded to Michelon to invest over $100,000 from her individual retirement funds and over $50,000 from her mother's family trust with Forschen and WSC. (Forschen Dep, p. 101, l. 4 through p. 102, l. 20; p. 106, l. 7 through p. 107, l. 8)

9.      World Contractual Services created MFT and appointed Forschen and Orr as co-trustees. Forschen then directed Michelon to transfer her retirement funds to MFT. On October 22,

1999, Michelon wired $108,170.11 to MFT.  A copy of the wiring confirmation is attached as Exhibit "D".  Forschen claims he told Michelon that he was going to invest these funds in a high yield investment program.  (Forschen Dep., p. 116, ll. 15 through 25; p. 131, l. 19 through p. 132, l. 14)

10.      Around this time, Forschen was referred to Hubert Patterson ("Patterson") who lived in Ohio as a person who could assist in developing business opportunities for Forschen's clients. Forschen telephoned Patterson.  Forschen states that he called Patterson to discuss potential high yield investments for Michelon, but was advised that the high yield program was not "ready". Patterson disputes that he ever discussed a high yield program with Forschen.  In any event, they both agree that Patterson introduced Forschen to  "debt-elimination" loan program that might be available to Forschen's clients who had inventory but needed funds for business expansion.   They further agree that Patterson told Forschen that in order to participate in that program, an up-front fee of $220,000 must be paid to get the loan process started.  [Forschen Dep. p. 57, l. 10 through p. 58 l. 25;  68:ll. 19 through 25;  p.  69, ll. 12 through 24; p. 72, ll. 1 through 6;   Excerpts from the Deposition of Hubert Patterson ("Patterson Dep.") attached as Exhibit "C", p. 14, l. 8 through p. 18, l. 10; p. 26, l. 8 through p. 30, l. 20)

11.      In November, Forschen approached Davis with a proposal to resolve Davis' money problems through Patterson's "debt elimination" loan program.  He explained to Davis that he had been involved in some high yield programs that were very successful.  He proposed that Harvest Marketing obtain a "self-liquidating" loan through Patterson based upon Harvest Marketing's financial statements and business plan.  Once the loan was obtained, Harvest Marketing would keep

approximately $1 million of the proceeds.  Forschen would take the bulk of the loan proceeds and

invest them in one of his high yield programs which would generate enough money to pay off the

loan.  Assuming, Forschen paid off the loan as represented, Harvest Marketing would not have to

repay any portion of the loan.  (Davis Dep. , p. 58, l. 13 through p. 60, l.1; p.  p. 65, l. 25 through p.

66, l. 12)   In Davis' words:

> . . . he [Forschen] approached me, sometime I believe, in November of '99 and suggested
> that . . . he could get a loan, what he called a self-liquidating loan, but he needed to channel
> it through an entity that could provide a business plan, show purpose for the loan, provide
> financial statements, et cetera, and proposed to me that if Harvest Marketing would be that
> entity, it was a way he could get me money, because the way he called – the way he
> explained to me the self-liquidated loan, that they had these high yield programs that they
> were putting it into and he would be able to pay me a percentage of that that I would not have
> to repay and that he would take the bulk of those proceeds, place it into these high yield
> programs, pay off the loan, you know.

(Davis Dep., p. 58, l. 14 through p. 59, l.3; *Accord* Forschen Dep. at 74-75; 78-80.)  Davis  further:

testified:

> Q.      And from that, what you understood was that the proceeds from the
> loan would be invested in some high yield program that would yield enough money
> to pay back the loan and generate some profit?
> A.      That's correct.
> Q.      Part of which Harvest Marketing, LLC would get for its participation
> in taking out the loan in the first place?
> A.      That's correct.

(Davis Dep., p.  59, l. 18 through p. 60, l.1;  *Accord* Davis Dep., p.66, ll. 5 through 23)

12.     Forschen told Davis that in order to procure the loan, an up-front fee was necessary.

He told Davis that they could use funds provided by FMT and other customers of World Contractual

Services that had already been sent to Patterson to pay that up-front fee, but that those funds together

with a profit would need to be repaid. Forschen testified:

Q.      So did you approach Mr. Davis, then, about his company being involved in this deal?

A.      I believe I did, yes.

Q.      And that, of course, would have been in the fall of 1999 some time?

A.      Yes.

Q.      And you explained to him about this debt elimination program?

A.      Yes.

Q.      And about the funds that you had already sent?

A.      Yes.

Q.      And that those funds then would be used to work through this program whereby his company could get some funding, pay back the investment [to MFT] with a good return . . . and leave Frank with some money without having to pay it back.

A.      Well that's– Yes.

. . . .

Q.      That's what you explained to Frank that the deal was?

A.      I believe so, yes.

(Forschen Dep. at 74:16 - 75:16.)  Forschen further testified:

Q.      And you explained to him that there were some funds that you had already sent to Burt [Patterson] that would have to be repaid?

A.      Yes.

Q.      And you told him those originally had been sent in connection with a high yield investment?

A.      I believe so.

Q.      And you also disclosed to him that that had not worked and so those funds were now going to be diverted over to this transaction if in fact it was to go?

A.      Yes.

(Forschen Dep., p. 78, ll.14 through 25; p. 79, l. 25 through p. 80, l.15)

13.     Davis agreed work together with Forschen to obtain the proposed loan.  Davis testified:

Q.      So did you tell Jae [Forschen] that you and Harvest Marketing, LLC would work with him, would work with Jae, to pursue this plan that he was proposing?

A.      I did.

Q.      And in fact you and Jae and Harvest Marketing, LLC then undertook some activities to make that happen?

vi

A.      That's correct.

(Davis Dep., p.60, l. 23 through p. 61, l.4.)

14      Once Forschen advised Patterson that Davis and his companies would apply for one his debt-elimination loans, Patterson instructed Forschen that they would be dealing with Maralee Haldeman ("Haldeman") to process the loan.  Patterson also directed that the up-front fee be paid to an account at Huntington National Bank owned by Rehab by L&M, Inc., a company controlled by Haldeman.  (Patterson Dep., p. 14, l. 8 through p. 18, l. 22)

15.     In accordance with their agreement, on November 16, 1999, Forschen transferred $100,000 of MFT's finds and $120,000 belonging to other clients of World Contractual Services to Pinnacle Title.  Forschen instructed Pinnacle Title to send the total $220,000 to Huntington National Bank account #01891814954 in Reynoldsburg, Ohio.  That account was owned by Rehab by L&M, Inc.  Copies of the checks depositing the $220,000 with Pinnacle Title and Forschen's hand written instructions to Pinnacle Title are attached as Exhibit "F".(Forschen Dep., p. 136, l. 22 through p. 140, l. 22)

16.     Pursuant to Haldeman's request, a Michael Brown forwarded a loan commitment and loan documents to Davis on November 17, 1999. [Excerpts from the Deposition of Maralee Haldeman ("Haldeman Dep.") attached as Exhibit "D", p. 19, l. 7 through p. 23, l. 23; p. 37, l. 16 through p. 43, l.1; copies of the commitment letter and letter from Michael Brown are attached as Exhibits "H" and "I" respectively]

17.     On November 18, 1999, Pinnacle Title forwarded the $220,000 including $100,000 from MFT to the account of Rehab by L&M, Inc. at Hungtington National Bank in Reynoldsburg,

Ohio.  Both Patterson and Haldeman understood it was to pay the up-front fee for the Davis loan. (Haldeman Dep., p. 24, l. 2 through p. 26, l. 6; Forschen Dep., p. 137, l. 16 through p. 138, l. 7; Patterson Dep., p. 16, l. 16 through p. 18, l. 22)

18.     Once the up-front fee was paid, Davis filled out various application forms and submitted business plans, financial statements, tax returns and other information.  For unexplained reasons, the loan did not fund and Davis continued to submit papers as requested by Forschen and Haldeman for several months.  Some of the papers submitted by Davis to potential lenders required him to explain the intended use of proceeds.  He described those purposes as "to expand and increase distribution of First Harvest Foods."  Davis never disclosed to these potential lenders that only 8% of the loan proceeds would go to Davis and/or his entities for the described uses, and the other 92% would go to Forschen for purposes of making "high yield" investments.  (Davis Dep., p. 61, l. 5 through p. 62, l. 17; p. 63, l. 24 through p. 67, l. 5) Davis testified:

> Q.     Do you recall representing to any potential lenders that the proceeds from the loan would be used to expand and increase distribution of First Harvest Foods?
> A.     I probably in that – in the initial paperwork, it was probably in there, that, you know –
> Q.     The paperwork that you submitted?
> A.     Correct.
> Q.     And that statement would be true with respect to eight percent of the loan proceeds –
> A.     Correct.
> Q.     – that you would keep?  With respect to 92 percent of the loan proceeds, that would not be true?
> A.     That's correct?

(Davis Dep., p.94, ll. 2-14; copy of application containing representation about use of proceeds is attached as Exhibit "N")

19.     In early 2000, Michelon began pressuring Forschen for an accounting of what he had

done with MFT's $100,000.00 and when she would receive her promised return.  Forschen told her

that it had been used for a "bridge loan" to First Harvest and that there was documentation

evidencing the loan obligation.  He advised her she would receive a return of $75,000 in addition to

her investment of $100,000.  (Forschen Dep., p. 143, l. 15 through p. 144, l. 13; p. 166, l. 20 through

p. 168, l. 15; also see correspondence attached as Exhibit "J")

20.     In response to Michelon's demands for documentation,  Forschen prepared the

promissory note attached as Exhibit "K" and arranged a meeting with Davis in the parking lot of the

Sandy City Library late in the evening of February 9, 2000.  Forschen told Davis that he needed

Davis and his company to sign the note to  "cover himself with Lynda" and "to show her that, you

know, I had the note guaranteed" by Davis and his company.  (Davis Dep., p. 77, l. 13 through p. 78,

l. 24; Forschen Dep., p. 150, ll. 7 through 17)

21.     Davis told Forschen that he would sign the note, but only if Forschen gave Davis a

similar note from Forschen to Davis and his company, to indemnify them in the event that they had

to pay on their note to MFT.   Davis testified:

> Q.     He was working regularly on trying to get you this big loan?
> A.     Right.  So I just said, you know, "There's no way I'm going to sign
> a note and obligate myself because I have no idea this loan is going to materialize or
> not."  And, you know, of course he assured me every which way but loose that the
> money was coming, that if it didn't come that way, it was coming another way,
> whatever, so – and I said, "The only way I'll do this is if you sign a note, you know,
> equal, identical note, saying that this is your responsibility," whatever.  "The fact that
> you want the money that's coming into the corporation, or the money that's coming
> in to Harvest Consulting on this loan, if you want to pay this money back out of that,
> I don't have a problem with it."  You know, and he wanted to do – have some
> document to evidence that that was going to happen.
> But I just said, "I'm unwilling to do it unless you indemnify me, or whatever,
> because I have no – I don't have the same level of confidence and faith you do that
> the loan's going to materialize."

So he took the original note and we wrote on the back of that, you know, that he was going to execute an identical note . . . ."

(Davis Dep., p. 74, l. 4 through p. 75, l. 3; Forschen Dep., p. 146, l. 6 through p. 149, l. 16)

22.    Forschen agreed to give Davis his personal indemnity note.  On that basis, Davis signed the note to MFT personally and on behalf of his companies, and gave it to Forschen. Forschen gave Davis a copy of the note with a hand written promise to provide a note from Forschen personally to Davis and his companies.  The hand-written promise reads:

> I Jae R. Forschen personal [sic] will sign take over this note with all responicbles [sic] and obligations that will be belong to Jae R. Forshen [sic]
> 2/9/2000
>
> [/s/] By Jae R. Forschen

> The note referenced [sic] above is Promisory [sic] note between Michelon Family Trust and Harvest Marketing Dated 11/15/99 wherein Jae R. Forschen will execute a note with Frank Davis/Harvest Marketing taking over the liability of the note & all responsibilities associated with note.
>
> [/s/] By Jae R. Forschen

(Davis Dep., p.100, l.23 through p. 103, l. 7; a copy of the hand written promise is attached as Exhibit "L")

23.    Within a few days, Forschen delivered to Davis his personal indemnity note, a copy of which is attached as Exhibit "M"  (Davis Dep., p. 75, ll. 1 through 3; p. 76, l. 4 through p. 77, l. 12; Forschen Dep., p. 148, l. 16 through p. 149, l. 16)

24.    The Davis Note promised that "Harvest Marketing/First Harvest" would "pay [the] sum of One Hundred Seventy-five Thousand Dollars and zero cents, ($175,000.00) to Michelon Family Trust" in one installment due on March 3, 2000.  (Exhibit "M")  It also provided that "[t]his agreement is personally guaranteed by Frank Davis . . . ."  (*Id.*)  It is not conditioned upon Davis

receiving loan proceeds.  Nor does it reference Forschen's indemnity note.  (Davis Dep., p. 79, ll. 10 through 19)

25.     Davis admits that he did not intend to pay MFT under the terms of the note if the loan did not fund.  (Davis Dep., p. 84, ll. 5 though 23)

26.     At the time that Mr. Davis signed the Davis Note he knew that Forschen was going to show it to Lynda Michelon for the purpose of assuring her that she would receive a return on her investment and that her investment was secured. (Davis Dep., p 77,  l. 13 through p. 79, l. 1)

27.     Davis also knew that Forschen would conceal from Michelon the fact that Davis and/or his entities ultimately had no intention of ever paying the Davis Note to Michelon.  In fact, Davis and Forschen executed duplicate originals of the Davis Note so that the version of the note with the hand-written agreement between Forschen and Davis on the back could be retained by Forschen and Davis.  (Davis Dep., p. 80, l. 24 through p. 82, l. 11)  When confronted with this deception in his deposition, Davis accounted for his actions as "stupidity" or "naivety" on his part and retreated from his prior deposition testimony that he knew Forschen would show the Davis Note to FMT:

> Q.     Did you not feel at the time that you were signing this document that you were assisting Jae to deceive the Michelon Family Trust?
>
> A.     Really, let's say – call it stupidity, I mean, or the fact that I believed what Jae was, you know, telling me, and he was – his level of confidence and he was the trustee. And I don't know what he was going to do with the document.[1] He just,

---

[1] This is in direct contradiction to Mr. Davis' testimony earlier in the deposition that, while he and Forschen were sitting in the Sand City Library parking lot, he agreed to sign the note to make it appear that the Michelon Family Trust was going to be repaid (by Davis and/or his entities).  (Davis Dep. at 73:6-21; 77:23 - 78:8; 78:20 - 79:1; 82:7 - 11.)  Also Forschen testified that he told Davis that he needed Davis to do this in order "to cover myself with Lynda."  (Forschen Dep. at 150:12.)  "To show her that, you know, I had the note guaranteed, I had that

you know, convinced me that it would be beneficial.

And in retrospect, it was probably one of the dumbest things I did is to sign it. But I did it. And I did it because I felt that – you know, a little pressure. . . . (Davis Dep., p.82, l.18 through p. 83, l.5)

Q.     Didn't you understand at the time that if Jae was going to tell these people exactly how they were going to get their money back, through some loan that was being made by a bank, that he wouldn't have needed this note?

A.     I didn't really get into details with him. Like I said, I broke away from a birthday party to come and talk to him. And, you know, naively, I felt if I had him sign on the back that he indemnified me, and he was just showing, you know, documenting – whether he showed it or whether he had it in his trust documents, that this is how this money that apparently he had, you know, use or – from the Michelon Family Trust, how they were getting it back, you know, I didn't really get into the details with him, what he was doing, how he was doing it, you know, and I don't remember how he explained it per se to me.

(Davis Dep., p. 85, l.19 through p. 86, l.10)

28.     Forschen showed Michelon the Davis Note but did not disclose to her the Forschen Note (either the hand-or type-written version). (Forschen Dep., p. 149, ll.17 though 25; p. 151, ll. 2 through18) . Michelon was not aware of the Forschen-Davis side agreement. (Forschen Dep., p. 152, ll. 4 though 6.)

29.     Forschen and Davis continued to work together on their scheme to obtain the Forschen-Davis Loan through at least October, 2000, and, perhaps, even as late as March, 2001. (Davis Dep., p. 94, l. 24 through p. 95, l.. 4; p. 95, l. 25 through p. 96, l. 10; Forschen Dep., p. 97, l. 14 through p. 98, l. 11)

30.     Even though Davis readily acknowledges that part of the consideration he received

_____

money guaranteed." (Forschen Dep. at 150:14-15.)

for signing the Davis Note was the reciprocal promise embodied in the Forschen Note, Davis has not

asserted a cross-claim against Forschen because, according to Davis, "I don't think [Forschen] has

a pot to pee in . . . ." (Davis Dep., p. 84, l.24 through p. 85, l. 7)

    31.    Forschen testified that the Davis Note was real and that he expected Davis to fulfill

his obligation under the Davis Note. Forschen testified:

> Q.    So with what you sent her you intended her to understand that Frank Davis
> and his company had signed a note to her.
> A.    Yes.
> Q.    Was that the way it was or were you trying to deceive her?
> A.    I was not trying to deceive her.  I just let her know this is the wau it was
> happening and this is how it transpired. . . . .
> Q.    So did you expect him to honor his note?
> A.    I expected that note to be fulfilled, yes. . . .
> Q.    You understand that Frank [Davis] and his company have an obligation to pay
> that note?
> A.    Yes.
> Q.    You also understand that you have an obligation to Frank and his
> company to take care of that obligation for him?
> A.    Correct.

(Forschen Dep, p.153, ll. 12 through18)

    32.    Although the March 3, 2000 maturity date under the Davis Note has long since

expired, neither Forschen nor Davis or their entities paid MFT any amounts due under the Davis

Note.  (Forschen Dep., p. 153, ll. 21 through 24)

## ARGUMENT

## I.    SUMMARY JUDGMENT IS APPROPRIATE AS A MATTER OF LAW WHERE THERE ARE NO GENUINE ISSUES OF MATERIAL FACT

"Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law.'" *Bower v. Stein Eriksen Lodge Owners Ass'n, Inc.*, 201 F. Supp. 2d 1134, 1137 (D. Utah 2002) (quoting Fed. R. Civ. P. 56(c)). "The party seeking summary judgment bears the initial burden of demonstrating that there is an absence of evidence to support the nonmoving party's case." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). "In applying this standard, the court must construe all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Pueblo v. Santa Ana v. Kelly*, 104 F.3d 1546, 1552 (10th Cir. 1997)).

"Once the moving party has carried its burden, Rule 56(e) 'requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."'" *Id.* (quoting *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e))). "The non-moving party must set forth specific facts showing a genuine issue for trial; mere allegations and references to the pleadings will not suffice." *Id.* at 1138 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The purpose of a summary judgment motion is to determine whether there is evidence to support a party's factual claims." *Harrison v. Wahatoyas,* 253 F.3d 552, 557 (10th Cir. 2001).

With respect to MFT's Eighteenth Claim For Relief, there are no genuine issues of material fact. MFT is entitled to summary judgment against the Davis Defendants for the principal amount of the Davis Note $175,000, late charges in the amount of $1,000 per week after March 3, 2000 or, in the alternative, interest at the legal rate, and MFT's costs and attorneys fees incurred herein.

## II.    MFT IS ENTITLED TO SUMMARY JUDGMENT ON ITS EIGHTEENTH CLAIM FOR RELIEF BASED UPON BREACH OF THE DAVIS NOTE

The Davis Note is valid, enforceable promise on the part of each of the Davis Defendants to pay MFT $175,000 on March 3, 2000, together with late charges thereafter at the rate of $1,000 per week and MFT"s costs and attorneys fees incurred in collection on the note.

The Davis Defendants received consideration for the promissory note.  First, the promissory note evidenced an antecedent debt which arose when the Davis Defendants and Forschen used MFT's funds to pay the up front fee required for the Davis loan.  Davis acknowledged the existence of the debt and knew that it had to be repaid.  *A.M. Castle & Co. V. Beagley,* 467 P. 2d 408, 409 (Utah 1970), cited by the Davis Defendants, expressly provides that no contemporary consideration must be given to sustain a contract relating to an antecedent debt.

Second, Forschen provided his indemnity note as further consideration for the Davis Note. Forschen would not have given that note had Davis refused to sign the Davis Note.  Moreover, Davis acknowledged that he expressly bargained for the Forschen Note in return for his signing and delivery of the Forschen Note.

Third, Forschen and Davis needed to appease Michelon with respect to their use of her funds. Davis signed, backdated, and delivered the Davis Note to Forschen to be given to Michelon for this purpose.  Davis got what he bargained for, as Michelon relied upon the note to induce inaction from the date of delivery of the note until March 3, 2000.

The Davis Note is valid and enforceable.  MFT is entitled to judgment against the Davis Defendants in accordance with the terms of the Davis Note.

3

## CONCLUSION

The Davis Defendants have breached their promise contained in the Davis Note to pay MFT in accordance with the terms of the note on March 3, 2000.  The Davis Defendants have no justifiable excuse for failing to honor their obligations under the note.  For these reasons, MFT is entitled to summary judgment against each of the Davis Defendants in the amount of $175,000, plus $1,000 per week from March 3, 2000, plus MFT's costs and attorneys fees incurred herein.

DATED this _6th_ day of May, 2005.

**KIRTON & McCONKIE**

By: _David M. Wahlquist_
        David M. Wahlquist
        Daniel J. McDonald
        Attorneys for Plaintiff

4

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this __6th__ day of May, 2005, I caused to be served a true copy

of the foregoing **MEMORANDUM IN SUPPORT OF PLAINTIFF'S CROSS MOTION FOR**

**PARTIAL SUMMARY JUDGMENT,** by the method indicated below, to the following:

Stephen Quesenberry
HILL, JOHNSON & SCHMUTZ, L.C.
Jamestown Square
3319 North University Avenue
Provo, UT 84604
Attorneys for Defendants Frank Davis, Harvest
Marketing, LLC and First Harvest, LLC

( ) U.S. Mail, Postage Prepaid
(X) Hand Delivered
( ) Overnight Mail
( ) Facsimile

David J. Orr, Pro Se
5449 Suntree Avenue
West Valley, UT 84120

(x) U.S. Mail, Postage Prepaid
( ) Hand Delivered
( ) Overnight Mail
( ) Facsimile

Jae Forschen, Pro Se
406 East 3335 South, Apt. 16
Salt Lake City, UT 84115

(x) U.S. Mail, Postage Prepaid
( ) Hand Delivered
( ) Overnight Mail
( ) Facsimile

David Mudahlquist