**STEPHEN QUESENBERRY (8073)**
**J. BRYAN QUESENBERRY (9156)**
**HILL, JOHNSON & SCHMUTZ, L.C.**
Jamestown Square
3319 North University Avenue
Provo, Utah 84604
Telephone (801) 375-6600

**Attorneys for Defendants Frank L. Davis, Harvest Marketing, LLC, and**
**First Harvest, LLC**

IN THE UNITED STATES DISTRICT COURT
STATE OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JENNIFER STEIMKE, as trustee of the ODETTE GRAHAM TRUST, sole beneficiary of the MICHELON FAMILY TRUST, and sole devisee and representative of the ESTATE OF LYNDA STEIMKE MICHELON, <br><br> Plaintiffs, <br><br> JAE FORSCHEN, DAVID J. ORR, individually and dba WORLD CONTRACTUAL SERVICES, HARVEST MARKETING, L.L.C., FIRST HARVEST MARKETING, L.L.C., FRANK L. DAVIS, and JOHN DOES 1 through 10, <br><br> Defendants. | **MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br><br><br><br><br><br><br><br><br> Case No. 2:03CV00487 DAK <br><br> Judge Dale A. Kimball |

Defendants Frank L. Davis, Harvest Marketing, L.L.C., and First Harvest Marketing, L.L.C.

(collectively, "Davis Defendants"), by and through counsel, submit this memorandum in opposition to

Plaintiff's Motion for Partial Summary Judgment Against Defendants Harvest Marketing, L.L.C., First Harvest, L.L.C., and Frank L. Davis.

## RESPONSE TO PLAINTIFFS' *STATEMENT OF UNDISPUTED FACTS*

Regarding ¶¶ 1-18 of Plaintiffs' *Statement of Undisputed Facts*, the Davis Defendants do not dispute said statements of fact insofar as they are not contradicted by the Davis Defendants' Statement of Additional Facts outlined below, and only as they relate to Plaintiffs' Motion for Partial Summary Judgment.[1]

19. *In early 2000, Michelon began pressuring Forschen for an accounting of what he had done with the MFT's $100,000.00 and when she would receive her promised return. Forschen told her that it had been used for a "bridge loan" to First Harvest and that there was documentation evidencing the loan obligation. He advised her she would receive a return of $75,000 in addition to her investment of $100,000. (Forschen Dep., p. 143,1. 15 through p. 144,1. 13; p. 166,1. 20 through p. 168, 1. 15; also see correspondence attached as Exhibit "J")*

RESPONSE: Disputed. The term "bridge loan" was Michelon's phrase and none of the referenced support for this allegation supports Plaintiffs' claim that the "bridge loan" was to First Harvest. (See, Forschen Depo., 143:15-144:13; 166:20-168:15 attached to Plaintiffs' Exhibit A; Plaintiffs' Exhibit J).

20. *In response to Michelon's demands for documentation, Forschen prepared the*

---

[1] Thus, this admission regarding ¶¶ 1-18 does not apply to the Davis Defendants' concurrent Motion for Summary Judgment.

*promissory note attached as Exhibit "K." and arranged a meeting with Davis in the parking lot*

*of the Sandy City Library late in the evening of February 9, 2000. Forschen told Davis that he*

*needed Davis and his company to sign the note to "cover himself with Lynda" and "to show her*

*that, you know, I had the note guaranteed" by Davis and his company. (Davis Dep., p. 77,1. 13*

*through p. 78,1. 24; Forschen Dep., p. 150, 11. 7 through 17)*

RESPONSE:  Admitted.

21.  *Davis told Forschen that he would sign the note, but only if Forschen gave Davis a*

*similar note from Forschen to Davis and his company, to indemnify them in the event that they*

*had to pay on their note to MFT.* (Large deposition quotation omitted).

RESPONSE:  Disputed to the extent Plaintiffs assert that the second note executed by Forschen was

executed in his personal capacity rather than his capacity as the Michelon Family Trust trustee.  (See,

Plaintiffs' Exhibit M).  Forschen agreed to indemnify Davis pursuant to the hand-written agreement on

the back of the Davis Note.  (See, Plaintiffs' Exhibit L).  The second note executed by Forschen was

as a trust officer and contains a personal guaranty by Forschen, which explains how Forschen had the

authority to include the following provision in the second note:

> The Promissory Note is the final expression of the terms and conditions of this loan transaction
> between Jae Forschen and Frank Davis of Harvest Marketing/First Harvest.  This written
> agreement may not be contradicted by any evidence or any oral agreement.  This personal [sic]
> guaranteed note by Jae Forschen replaces the note of Frank Davis', his personal guarantee
> [sic] and the 2000,000 shares of Harvest Marketing/First Harvest dated 15 November 1999.

22. *Forschen agreed to give Davis his personal-indemnity note. On that basis, Davis signed the note to MFT personally and on behalf of his companies, and gave it to Forschen. Forschen gave Davis a copy of the note with a hand written promise to provide a note from Forschen personally to Davis and his companies. The hand-written promise reads:*

> *I Jae R. Forschen personal [sic] will sign take over this note with all responicbles[sic] and obligations that will be belong to Jae R. Forshen [sic] 2/9/2000*
>
> *[/s/] By Jae R. Forschen*
>
> *The note referrenced [sic] above is Promisory [sic] note between Michelon Family Trust and Harvest Marketing Dated 11/15/99 wherein Jae R. Forschen will execute a note with Frank Davis/Harvest Marketing taking over the liability of the note & all responsibilities associated with note.*
>
> *[/s/] By Jae R. Forschen*

*(Davis Dep., p.100, l.23 through p. 103, l. 7; a copy of the hand written promise is attached as Exhibit "L").*

RESPONSE:  Disputed. See response to ¶ 21 above.

23. *Within a few days, Forschen delivered to Davis his personal indemnity note, a copy of which is attached as Exhibit "M" (Davis Dep., p. 75, ll. 1 through 3; p. 76, l. 4 through p. 77, l.12; Forschen Dep., p. 148, l. 16 through p. 149, l. 16)*

RESPONSE: Disputed.  See response to ¶ 21 above.

24. *The Davis Note promised that "Harvest Marketing/First Harvest" would "pay [the]*

iv

*sum of One Hundred Seventy-five Thousand Dollars and zero cents, ($175,000.00) to Michelon*

*Family Trust" in one installment due on March 3, 2000. (Exhibit "M") It also provided that*

*"[t]his agreement is personally guaranteed by Frank Davis . . . ." (Id.) It is not conditioned upon*

*Davis receiving loan proceeds. Nor does it reference Forschen's indemnity note. (Davis Dep., p.*

*79, 11. 10 through 19)*

RESPONSE: Disputed.  See response to ¶ 21 above.  Further, the Davis Note speaks for itself and to

the extent Plaintiffs mischaracterize the Davis Note, the Davis Defendants dispute such

mischaracterizations.

25. *Davis admits that he did not intend to pay MFT under the terms of the note if the*

*loan did not fund. (Davis Dep., p. 84, 11. 5 though 23)*

RESPONSE: Disputed insofar as this paragraph ignores the fact that Plaintiff's trustee, Forschen, told

Davis that Davis would not have to pay back the Trust any money if the loan did not fund, which goes

to Davis' estoppel and fraud defenses.  (See, Forschen Dep. 145:20-24; 152:18-153:4 attached

hereto as Exhibit A).

26. *At the time that Mr. Davis signed the Davis Note he knew that Forschen was going*

*to show it to Lynda Michelon for the purpose of assuring her that she would receive a return on*

*her investment and that her investment was secured. (Davis Dep., p 77, 1. 13 through p. 79, 1. 1)*

RESPONSE: Disputed insofar as this paragraph mischaracterizes the Davis deposition testimony.

v

Davis's testimony is that he "understood from Jae that [Jae] needed this document to show the Michelon Family Trust people so that they could see – or some document showing them they were going to get their money back? * * * A.  As I understand it, correct."  (See, Davis Dep. 78:20-25 attached hereto as Exhibit B).

27. *Davis also knew that Forschen would conceal from Michelon the fact that Davis and/or his entities ultimately had no intention of ever paying the Davis Note to Michelon: In fact, Davis and Forschen executed duplicate originals of the Davis Note so that the version of the note with the hand-written agreement between Forschen and Davis on the back could be retained by Forschen and Davis. (Davis Dep., p. 80, 1. 24 through p. 82, 1. 11) When confronted with this deception in his deposition, Davis accounted for his actions as "stupidity" or "naivety" on his part and retreated from his prior deposition testimony that he knew Forschen would show the Davis Note to FMT:* (Large deposition quotation omitted).

RESPONSE:  Disputed.  Davis understood that Forschen intended to repay the Trust when the loan came through.  Further, Davis only understood that the Davis Note that he had contained writing on the back and that Forschen's version of the Davis Note did not contain the same handwriting.  (See, Davis Dep. 81:4-82:11 attached to Plaintiffs' Exhibit B).  Also, the deposition transcript testimony Plaintiffs cite in support of this paragraph does not support Plaintiffs' contentions in this paragraph.

28. *Forschen showed Michelon the Davis Note but did not disclose to her the Forschen*

*Note (either the hand-or type-written version). (Forschen Dep., p. 149, 11.17 though 25; p.*

*151,11.2 through 8) . Michelon was not aware of the Forschen-Davis side agreement. (Forschen*

*Dep., p. 152, 11. 4 though 6.)*

RESPONSE:  Admitted.

     29.  *Forschen and Davis continued to work together on their scheme to obtain the*

*Forschen-Davis Loan through at least October, 2000, and, perhaps, even as late as March,*

*2001. (Davis Dep., p. 94,1.24 through p. 95,1.. 4; p. 95, 1.25 through p. 96,1. 10; Forschen Dep.,*

*p. 97, 1. 14 through p. 98,1.11)*

RESPONSE:  Disputed insofar as Plaintiffs depict the efforts to obtain a loan as Davis' scheme.

Plaintiff's trustee, Forschen, was the one pushing the efforts to obtain a loan.  This was his idea in the

first place because of the "problem" he created with the Trust. (See, Forschen Dep. 54:14-55:2

attached hereto as Exhibit A).

     30.  *Even though Davis readily acknowledges that part of the consideration he received*

*for signing the Davis Note was the reciprocal promise embodied in the Forschen Note, Davis has*

*not asserted a cross-claim against Forschen because, according to Davis, "I don't think*

*[Forschen] has a pot to pee in . . . ." (Davis Dep., p. 84, 1.24 through p. 85, 1.7)*

RESPONSE: Disputed.  The deposition testimony cited by Plaintiffs in support of this paragraph does

not state that Davis readily acknowledge that part of the consideration he received for signing the Davis

Note was a reciprocal promise embodied in the second note.

31. *Forschen testified that the Davis Note was real and that he expected Davis to fulfill his obligation under the Davis Note.* (Large deposition quotation omitted).

RESPONSE: Disputed. Plaintiffs mischaracterize Forschen's deposition testimony and fail to reference the portion of his deposition testimony that supports this paragraph. Forschen never testified that the Davis Note was "real" or that he expected Davis to fulfill his obligation under the Davis Note. Instead, he testified that he expected the note to be fulfilled when the loan funded. (See, Forschen Dep. 152:18-153:4 attached hereto as Exhibit A).

32. *Although the March 3, 2000 maturity date under the Davis Note has long since expired, neither Forschen nor Davis or their entities paid MFT any amounts due under the Davis Note. (Forschen Dep., 153, 11. 21 through 24)*

RESPONSE: Disputed insofar as this paragraph implies that the Davis Defendants owed the Trust any obligation under the Davis Note. Davis Defendants did not fulfill whatever obligations they owed under the Davis Note because the loan never funded and because Plaintiff's trustee, Forschen, executed the second note which replaced the Davis Note. Further, even though the Davis Note contains no contingency language, it was Plaintiff's trustee's understanding that the Davis Note was conditioned upon "if everything went well" – i.e. if the loan funded. (See, Forschen Dep. 145:20-24 attached hereto as Exhibit A).

## DAVIS DEFENDANTS' STATEMENT OF ADDITIONAL FACTS

1. The Davis Note was made by Defendants Harvest Marketing/First Harvest on behalf of the Plaintiff, Michelon Family Trust (the "Trust"). (See, Plaintiffs' Exhibit K).

2. Defendant Frank Davis personally guaranteed the Davis Note. Id.

3. Defendant Jae Forschen, trustee for the Trust, drafted the Davis Note. (See, Davis Dep. 73:6-75:3 attached hereto as Exhibit B).

4. Plaintiffs chose Forschen to be the trustee of the Trust and gave him authority to invest the Trust's funds. (See, Forschen Dep. 132:3-7 attached hereto as Exhibit A).

5. The Trustee made a note to Davis Defendants in his capacity as Trustee. (See, Plaintiffs' Exhibit M).

6. The Trustee gave Davis Defendants an indemnity agreement which was written on the back of the Davis Note. (See, Plaintiffs' Exhibit L).

7. The Trustee told Davis that Davis would not have to pay back the Trust any money if the loan did not fund, which goes to Davis' estoppel and fraud defenses. (See, Forschen Dep. 145:20-24; 152:18-153:4 attached hereto as Exhibit A).

8. The Trustee was the one pushing the efforts to obtain a loan which was his idea in the first place because of the "problem" he created with the Trust. (See, Forschen Dep. 54:14-55:2 attached hereto as Exhibit A).

ix

9. The Trustee testified that he expected the Davis Note to be fulfilled when the loan in question funded. (See, Forschen Dep. 152:18-153:4 attached hereto as Exhibit A).

10. The Trustee understood that the Davis Note was conditioned upon "if everything went well" – i.e. if the loan funded. (See, Forschen Dep. 145:20-24 attached hereto as Exhibit A).

10. Only 8% of the loan was to go to the Davis Defendants; the remaining 92% was supposed to go to the Trust to be invested for "high-yield" purposes by the Trustee. (See, Davis Dep. 65:17-66:12 attached hereto as Exhibit B).

**ARGUMENT**

**I.    SUMMARY JUDGMENT IS NOT PROPER IF THERE IS ANY GENUINE ISSUE OF MATERIAL FACT**

Under the Utah Rules of Civil Procedure, a court may not grant summary judgment unless the moving party establishes "[1] that there is no genuine issue as to any material fact and [2] that the moving party is entitled to judgment as a matter of law." U.R.C.P. 56(c). When a court addresses a motion for summary judgment, the court's function is not to weigh disputed evidence or to decide which side has the stronger case. Rather, the court's "sole inquiry should be whether material issues of fact exist." Draper City v. Estate of Bernardo, 888 P.2d 1097, 1100 (Utah 1995).

The nonmoving party is not required to "prove" its case in order to defeat a summary judgment motion. Rather, the nonmoving party is only required to submit evidence "sufficient to raise a genuine issue of fact." Kleinert v. Kimball Elevator Co., 854 P.2d 1025, 1028 (Utah App. 1993). In addition, "If there is any doubt or uncertainty concerning questions of fact, the doubt should be resolved in favor of the opposing party [and] the court must evaluate all the evidence and all reasonable inferences fairly drawn from the evidence in a light most favorable to the party opposing summary judgment." Bowen v. Riverton City, 656 P.2d 434, 436 (Utah 1982). Finally, the nonmoving party's evidence is to be believed for purposes of the motion, and if there is a conflict in the evidence as to a material fact, the motion must be denied. See e.g. Draper City, 888 P.2d at 1100-01.

Plaintiff's cross-motion for partial summary judgment fails this standard.

1

## II.   ISSUES OF FACT EXIST REGARDING THE TRUST'S BREACH OF PROMISSORY NOTE CAUSE OF ACTION

Plaintiffs argue that the Davis Note is a valid and enforceable promise supported by consideration, and that the Court should thus grant the Trust summary judgment on this claim. Specifically, Plaintiffs claim that the Davis Defendants received consideration in the form of (a) an antecedent debt, (b) the indemnity Forschen provided the Davis Defendants, and (c) Michelon's forbearance on demanding her funds which Forschen transferred to Haldeman and Patterson. However, not only do these forms of consideration fail, but issues of fact exist as to the validity of the Davis Note. Further, the misrepresentations of Plaintiff's Trustee, estoppel, and the unconscionability of the Davis Note preclude the Court from enforcing the Promissory Note.

### A.   Issues of Fact Regarding the Validity of the Davis Note

In discussing the consideration issue, Plaintiffs conclusorily claim that the Davis Note is valid. On the contrary, the Davis Note is no longer valid against the Davis Defendants because the Trustee, Forschen, replaced it with the Trustee's Note.[2]  Specifically, the Trustee's Note states:

> The Promissory Note is the final expression of the terms and conditions of this loan transaction between Jae Forschen and Frank Davis of Harvest Marketing/First Harvest. This written agreement may not be contradicted by any evidence or any oral agreement. ***This personal [sic] guaranteed note by Jae Forschen replaces the note of Frank Davis', his personal guarantee [sic] and the 2000,000 shares of Harvest Marketing/First Harvest dated 15 November 1999.***

---

[2] Although Plaintiffs refer to this note as the "Forschen Note," as argued herein, this note was made by Forschen in his Trustee capacity.  Thus, Davis refers to it as the "Trustee's Note."

2

(See, Exhibit M submitted by Plaintiffs; emphasis added). The Trustee's Note – drafted by Forschen – is "personal[ly] guaranteed . . . by Jae Forschen" because it contains a personal guaranty provision in it: "This agreement is personally guaranteed by Jae Forschen." (See, Exhibit M). The existence of this personal guaranty provision within the Trustee's Note is one indication that Forschen executed the Trustee's Note in his trustee capacity. Otherwise, the personal guaranty provision makes no sense if the Trustee's Note is from Forschen personally, which would create a redundancy of Forschen's guaranty to Davis. Further, such an interpretation would render moot this personal guaranty provision in the Trustee's Note.

Another indication that the Trustee's Note is from Forschen in his official capacity as trustee of the Trust is from the above-quoted language: "This personal [sic] guaranteed note by Jae Forschen *replaces the note of Frank Davis*, his personal guarantee and the 200,000 shares of Harvest Marketing/First Harvest dated 15 November 1999." (Emphasis added). If Forschen was executing the Trustee's Note in his personal capacity, he could have no authority to replace the Davis Note with the Trustee's Note. Only in his trustee capacity did he have the authority to replace the Davis Note, which was made out to his principal, the Trust, with the Trustee's Note. In other words, if the Trustee's Note was a note made by Forschen personally, there is no way Forschen, acting in his personal capacity, could replace or do anything to the Davis Note which was made out to the Trust.

As far as Davis understood, he was dealing with the Trust itself, through its legal representative

3

and trustee, Forschen.  Clearly, Forschen had the authority to execute a note on behalf of the Trust. Plaintiffs cannot just pick and chose the times and situations when Forschen was acting as Trustee and when he was acting as himself personally.

Thus, the trustee replaced the Davis Note with the Trustee's Note, thereby eliminating the Davis Note and absolving the Davis Defendants of liability under the Davis Note.  At the very least, the Trustee's Note is ambiguous as to the intent of the parties thereto and as to whether Forschen made the Trustee's Note personally or as trustee.  These issues create a factual dispute ripe for the trier-of-fact to decide, rather than this Court on summary judgment.[3]

**B.    The Court Should Estop Plaintiffs From Enforcing the Davis Note Because of the Trustee's Representations and Promises to Davis, and Because the Davis Note is Unconscionable**

In addition to denying Plaintiffs' summary judgment motion based on the face of the two notes, the Court should also deny Plaintiffs' motion based on estoppel and fraudulent inducement by Plaintiff's Trustee, and because the Davis Note is unconscionable.

---

[3] "The underlying purpose in construing or interpreting a contract is to ascertain the intentions of the parties to the contract. 'In interpreting a contract, the intentions of the parties are controlling.'" WebBank v. American Gen. Annuity Serv. Corp., 2002 UT 88, ¶ 17 (citations omitted). Extrinsic evidence – including all the "attendant circumstances surrounding the execution of the document – "must be looked to in order to determine the intentions of the parties. If a contract is ambiguous, the court may consider the parties' actions and performance as evidence of the parties' true intentions." Id. at ¶¶ 19-20. "When ambiguity exists, the intent of the parties becomes a question of fact." Novell, Inc. v. Canopy Group, Inc., 499 Utah Adv. Rep. 27 at ¶ 20. "To demonstrate ambiguity, the contrary positions of the parties must each be tenable." R&R Energies v. Mother Earth Indus., Inc., 936 P.2d 1068, 1074 (Utah 1997).

### 1.   Plaintiffs' Trustee Misrepresented the Davis Note to Davis

Fraud is an affirmative defense to a contract enforcement action.[4]  U.R.C.P. 8.  When the Trustee presented Davis with the Davis Note, the Trustee represented to Davis that the Davis Defendants' obligations under the Davis Note were contingent upon the Trustee obtaining the loan in question.  In fact, the Trustee only intended to enforce the Davis Note once the loan funded.  Further, the Trustee represented that he needed the Davis Note simply to "cover himself with Lynda."  (See, Davis Dep., 78:20-25; 81:4-82:11; attached hereto as Exhibit A; see also Forschen Dep., 150:7-17; 152:18-153:4; 145:20-24 attached in Plaintiffs' Exhibit A).  In reliance on these representations from the Trustee, the Davis Defendants entered into the Davis Note which the Trust now intends to enforce to the detriment of the Davis Defendants and even though the loan has never funded (and never will).

The Trust's current actions form a fraud on the Davis Defendants.  Accordingly, the Court should deny the Trust's efforts to enforce the Davis Note.

---

[4] To establish fraud under Utah law, a party must prove by clear and convincing evidence each of the following elements:

'(1) That a representation was made; (2) concerning a presently existing material fact; (3) which was false; (4) which the representor either (a) knew to be false, or (b) made recklessly, knowing that he had insufficient knowledge upon which to base such representation; (5) for the purpose of inducing the other party to act upon it; (6) that the other party, acting reasonably and in ignorance of its falsity; (7) did in fact rely upon it; (8) and was thereby induced to act; (9) to his injury and damage.'

Franco v. Church of Jesus Christ of Latter-Day St.s, 2001 UT 25, ¶33 (citations omitted).

5

### 2.   Plaintiffs Should Be Estopped From Enforcing the Davis Note Due to Their Trustee's Own Representations to Davis

In addition to fraudulent inducement, the Court should preclude Plaintiffs from enforcing the Davis Note based on equitable estoppel. "In order to prevail on a claim for equitable estoppel a party must show that the party to be estopped acted in such a way as to induce reasonable reliance by the other party and that allowing the first party to act contrary to its earlier actions would work to the detriment of the relying party." IHC Health Servs. v. D & K Mgmt., Inc., 2003 UT 5, ¶ 10.

In the present case, the Trust should be estopped because through its Trustee it acted to induce reasonable reliance by the Davis Defendants on the Trustee's representations that the Davis Note would not be enforced until the loan funded. Davis Defendants relied on this representation when they entered into the Davis Note. To now allow Plaintiffs to act contrary to its earlier actions and representations would be inequitable and work a detriment on the Davis Defendants who have not received anything of value from the Trustee's attempts to secure a loan for the Trust's high-yield investments.

Accordingly, Plaintiffs should be estopped from enforcing the Davis Note.

### 3.   The Davis Note is Unconscionable

One final basis upon which the Court should deny Plaintiffs' efforts to enforce the Davis Note is because said note is unconscionable. "Our consideration of whether a contract provision is unconscionable is made 'in light of the twofold purpose of the doctrine, prevention of oppression and

6

unfair surprise.'" Ryan v. Dan's Food Stores, Inc., 972 P.2d 395, 402 (Utah 1998) (citation omitted)

Substantive unconscionability, which alone may support a finding of unconscionability:

> focuses on the contents of an agreement, examining the 'relative fairness of the obligations
> assumed.' [Citations omitted].  In determining substantive unconscionability, we consider
> whether a contract's terms are 'so one-sided as to oppress or unfairly surprise an innocent
> party or whether there exists an overall imbalance in the obligations and rights imposed by the
> bargain ... according to the mores and business practices of the time and place.' [Citations
> omitted].

Id. The Davis Note is miserably one-sided.  It depicts a loan of $100,000 based upon which the Trust

would realize $75,000 in interest.  The Davis Note was made February 15, 2000 as testified by Davis

(i.e. the date on the Davis Note is undisputably incorrect) and the Davis Note purports to be due

March 3, 2000 – approximately two weeks later.  Thus, that's $75,000 in interest over two weeks

which is a 75% return of investment in two weeks.  Calculated out to a per annum rate of return yields

1,950% per annum yield on the initial investment.  Such interest is unheard of, and to say it does not

oppress Davis or that it is fair is laughable.  And this return is for funds that Davis never saw!

And these calculations do not even take into consideration the $1000 per week late payment

fee contained in the Davis Note which creates an additional 52% annual return on the Trust's supposed

investment.  Accordingly, the Court should invalidate the Davis Note as being unconscionable.

### B.    No Consideration for the Davis Note

Plaintiffs assert that the Davis Note is supported by consideration in three ways: (1) the

antecedent debt evidenced in the Davis Note, (2) the indemnity provided in the Trustee's Note, and (3)

7

Michelon's inaction with respect to the funds.

    1.    **No Antecedent Debt Is Evidenced in the Davis Note**

    The Trust argues there was consideration for the Davis Note in the form of an antecedent debt Davis supposedly owed the Trust, as evidenced by the Davis Note. However, the Davis Note fails to state anything about any antecedent debt (i.e. presumably, the up-front fee Forschen paid to kick-start the loan). Such would explain Plaintiffs' failure to quote or cite the evidence in the Davis Note supporting the antecedent debt. To the contrary, the Davis Note states, "The Promissory Note is the final expression of the terms and conditions *of this loan transaction between Michelon Family Trust and Harvest Marketing/First Harvest*." (Emphasis added). At no time did the Trust loan the Davis' entities any money.

    Also, even though Plaintiffs are fond of characterizing the loan as the "Davis loan," the undisputed testimony is that 92% of the loan proceeds were to go to the Trust, and only 8% were to go to Davis if the loan funded. (See, Davis Dep. 65:17-66:12 attached to Plaintiffs' Exhibit A). Thus, to argue that the up-front fee was to benefit Davis by obtaining a loan for him greatly distorts the testimony.

    Further, Forschen first transferred the funds back-East for a high-yield investment which didn't work out. Just because Forschen then had the funds transferred to a loan program, in which he involved Davis (because the loan was required to go through an entity with accounts receivable), and

8

which could have benefitted Davis with 8% of the loan proceeds had the loan funded, does not equate to consideration to Davis for the Davis Note.

Thus, the alleged antecedent debt is not consideration for the Davis Note.

### 2.    Forschen's "Indemnity Note"

Plaintiff asserts that the "indemnity note" from Forschen was consideration to Davis for the Davis Note.

First, to the extent Plaintiffs are referring to Forschen's indemnity agreement written on the back of the Davis Note, that was consideration from Forschen personally to Davis, for doing Forschen the favor of signing the Davis Note.  It was not consideration from the Trust to Davis.

Second, to the extent Plaintiffs claim that the Trustee's Note was a personal indemnity from Forschen to Davis, again, such was personal from Forschen in exchange for Davis doing him the favor of signing the Davis Note.  It was part of their own agreement, and did not involve the Trust.

Third, to the extent Plaintiff claims that the Trustee's note was from Forschen in his role as the Trustee (which it must to extend the consideration of the Trustee's Note to the benefit of the Trust), then such might satisfy the Trust's consideration problem.  However, in this case, the Trustee's Note replaces the Davis Note (as set forth above) and so even if the Trustee's Note is valid consideration from the Trust, it effectively invalidates the Davis Note because it replaces the Davis Note.

9

### 3.    Michelon's Inaction Was No Consideration to Davis

Plaintiffs also assert that the inaction by Michelon, upon receiving the Davis Note, was Davis' consideration for entering into the Davis Note.  However, Michelon's inaction was no benefit to Davis. Instead, it benefitted the Trustee, Forschen, who was the target of Michelon's inquiries and demands. After all, Forschen was the one who drafted the notes and pushed Davis to sign the Davis Note because he was feeling the heat from Michelon.  As for Davis, Michelon's action or inaction would not have affected Davis.

### CONCLUSION

Based on the foregoing, issues of fact exist regarding whether Davis breached the Davis Note. Accordingly, the Court must deny Plaintiffs' Cross-Motion for Partial Summary Judgment.

DATED this 3 1 day of May, 2005.

HILL, JOHNSON & SCHMUTZ, L.C.

Stephen Quesenberry
J. Bryan Quesenberry
Attorneys for Davis Defendants

10

## CERTIFICATE OF MAILING

The undersigned hereby certifies that on the $3|$ day of May, 2005, they caused a true and

correct copy of the foregoing memorandum to be delivered to the following:

David M. Wahlquist
Kirton & McConkie
1800 Eagle Gate Tower
60 East South Temple
PO Box 45120
Salt Lake City, Utah 84145-0120

David J. Orr
5449 Suntree Avenue
West Valley, Utah 84120

Sent Via:
___✓___ Hand -Delivery
_____ Facsimile
_____ Mailed (postage prepaid)

11

**EXHIBIT "A"**

"BQ WORKING COPY"

**Page 1**

```
            IN THE UNITED STATES DISTRICT COURT
             STATE OF UTAH, CENTRAL DIVISION

JENNIFER STEIMKE, as trustee of )
The ODETTE GRAHAM TRUST, sole   )
Beneficiary of the MICHELON     )
FAMILY TRUST, and sole devisee  )  Deposition of:
And representative of the       )
ESTATE OF LYNDA STEIMKE MICHELON )  JAE R. FORSCHEN
                                )
                    Plaintiff,  )  Civil No. 2:03CV-0487
                                )
vs.                             )
                                )
JAE R. FORSCHEN, DAVID J. ORR,  )
Individually and dba WORLD      )
CONTRACTUAL SERVICES, HARVEST   )
MARKETING, L.L.C., FRANK L.     )
DAVIS, and JOHN DOES I-10,      )
                                )
                    Defendants. )


                June 4, 2004, 9:00 a.m.



    Location:       Kirton & McConkie
                    1800 Eagle Gate Tower
                    60 East South Temple
                    Salt Lake City, Utah 84111


    Reporter:       Peggy Grover, RMR
                    Notary Public in and for the State of Utah
```

**Page 2**

```
                  A P P E A R A N C E S

FOR THE PLAINTIFF:     David M. Wahlquist, Esq.
                       KIRTON & McCONKIE
                       1800 Eagle Gate Tower
                       60 East South Temple
                       Salt Lake City, Utah 84111
                       Phone (801) 328-3600

Also Present:          Adam Wahlquist

FOR THE DEFENDANT:     Stephen Quesenberry, Esq
                       HILL, JOHNSON & SCHULTZ
                       3319 North University Avenue
                       Provo, Utah 84604
                       Phone (801) 375-6600

Also Present:          Frank Davis

                    I N D E X
WITNESS                                           PAGE
JAE R. FORSCHEN
    Examination by Mr. Wahlquist                     3
    Examination by Mr. Quesenberry                 183

                 E X H I B I T S
No.                                              Page
 1 Fax to Frank Davis, Company Guaranty
   Promissory Note                                 83
 2 Commitment Letter                               87
 3 Fee Agreement, Harvest Marketing                92
 4 Fax Memo to Maralee Haldeman, 11/01/00          94
 5 Fax Memo to Maralee Haldeman, 11/01/00          95
 6 World Contractual Services Documents           116
 7 Wachovia Brokerage Funds Payout Debit          132
 8 Minutes of Trustee Meeting, Michelon Family    132
 9 Letter from Pinnacle Title to Kirton &
   McConkie, Checks                               136
10 Promissory Note Ageement                       140
11 Promissory Note, Jae R. Forschen, 2/9/2000     146
12 Promissory Note, Jae Forschen and Frank Davis  148
13 Copy Check Image Archive, $53,500              154
14 All Inclusive Promissory Note, 10/1/99         156
15 Note placed with Hulamon                       159
16 Fax to Jae Forschen from Lynda Michelon, 2/7/00 161
17 Fax to Jae Forschen from Lynda Michelon.       161
18 Letter from Lynda Michelon to WCS, 3/29/00     162
19 Letter from Charlotte Georges Enterprises      171
20 Letter to Jae from Lynda, 10/4/00              173
```

**Page 3**

```
 1
 2  SALT LAKE CITY, UTAH, FRIDAY, JUNE 4, 2004, 9:00 AM
 3                  JAE R. FORSCHEN,
 4          having first been duly sworn, was
 5          examined and testified as follows:
 6                   EXAMINATION
 7      Q. (By (Mr. Wahlquist) Please state your full
 8  name.
 9      A. Jae Richard Forschen, first name J-A-E, last
10  name F-O-R-S-C-H-E-N.
11      Q. Jae, my name is Dave Wahlquist. I am an
12  attorney representing the Michelon Family Trust and the
13  Odette Graham Family Trust in connection with an action
14  commenced against you and some others relating to funds
15  deposited by my clients. I have requested that you be
16  here today so that we can ask you questions regarding
17  what information you may have about those funds. You
18  understand that you have taken an oath to tell the
19  truth?
20      A. Yes.
21      Q. And you understand that the testimony that
22  you give in your deposition today may be presented to a
23  judge or jury in this matter?
24      A. Uh-huh.
25      Q. Is that yes?
```

**Page 4**

```
 1      A. Yes.
 2      Q. Do you understand that it's important that
 3  your testimony be as accurate as possible?
 4      A. Yes.
 5      Q. Will you agree that if any of the attorneys
 6  here today ask you any questions that are unclear to you
 7  that you will ask us to clarify our questions before you
 8  answer?
 9      A. Yes.
10      Q. May we clearly assume that if you answer a
11  question without asking for a clarification that you
12  believe you understand the question?
13      A. That would be my understanding, yes.
14      Q. Okay. Are you represented by counsel today?
15      A. No.
16      Q. So you are here by yourself?
17      A. Yes.
18      Q. Okay. Have you been deposed before?
19      A. No.
20      Q. You notice that we have a court reporter
21  present today?
22      A. Yes.
23      Q. And she's recording the proceedings of your
24  deposition. At the conclusion of the proceedings today she
25  will prepare a transcript of what is going on today. You
```

Page 53

1 me two answers. One was you said his company had some
2 needs and then you gave a statement about other
3 customers making money. And you have explained now that
4 the company you were referring to that had some needs
5 was Harvest Marketing that was looking for some funding?
6    A. Yes.
7    Q. So I am following up on the second part of
8 your answer.
9    A. Which?
10    Q. That part of the reason Mr. Liston was
11 introducing you to Mr. Davis was so that customers of
12 WCS could make some money.
13    A. My understanding of what transpired now,
14 thinking about it, was I am pretty sure Paul took
15 Harvest Marketing to Dave, and that's when the
16 transaction probably between S&L Family Trust happened.
17    Q. Okay.
18    A. And whether anything else transpired, because
19 in them talks I was not involved directly.
20    Q. Okay. Was this before you met Mr. Davis?
21    A. I would say yes.
22    Q. Okay. So at the time you first met Mr. Davis
23 he was already a customer of WCS?
24    A. He was?
25    Q. You are not saying he is a customer of WCS?

Page 54

1    A. I don't-- he never became a customer of WCS.
2    Q. Okay. But he had already done some
3 transaction with WCS?
4    A. He did some transaction would be my
5 understanding, yes.
6    Q. Okay. And that involved the S&L Trust?
7    A. Yes.
8    Q. And after that point in time he was
9 introduced to you?
10    A. Some time after that through Paul we got
11 introduced, yes.
12    Q. Why did Paul tell you he was making the
13 introduction?
14    A. I think persistence, or something else. I
15 don't remember if Paul made it. I talked to him about
16 an opportunity to get a company that had some
17 receivables that we could do something with. We might
18 be able to help Frank out and take care of this problem
19 that I created.
20    Q. So you told Paul that if you could find a
21 company that had some receivables--
22    A. Uh-huh.
23    Q. --that you might be able to help Frank out?
24    A. Uh-huh.
25    Q. And take care of a problem?

Page 55

1    A. Yes, a problem that I created with Ms.
2 Michelon and her trust, yes.
3    Q. Okay. When did you have this discussion with
4 Paul?
5    A. Fall of 1999.
6    Q. Okay. Did you have--
7    A. Or winter, I don't know, some time during
8 that time frame.
9    Q. How were you going to help Frank's company
10 out?
11    A. There was an organization back East that I
12 was consulting with that was doing something, and I sent
13 them some money, and they changed whatever it was they
14 were doing initially and would not return that money.
15 And they asked that if there was a company that had
16 receivables that there was an opportunity to get a
17 business loan on a debt elimination program.
18    Q. What's that?
19    A. It was a program that they said that they had
20 people that could invest in, and I did not get into all
21 the details on that, but they said that they needed
22 somebody that had the strength of receivables and
23 whatnot.
24    Q. So how was the debt supposed to be
25 eliminated?

Page 56

1    A. I am not sure how that was-- that that
2 transaction-- that was their side of the deal. I did not
3 check into that thoroughly.
4    Q. What was the name of the organization back
5 East you referenced?
6    A. I was dealing with a Maralee Haslam, I think
7 is her last name.
8    Q. Maralee Haldeman?
9    A. Yes, and Burt Patterson.
10    Q. Are you familiar with an enterprise called
11 Rehab Company L&M, Inc?
12    A. Yes.
13    Q. So back at the time you had this discussion
14 with Mr. Liston in the fall of 1999, you knew that Mr.
15 Davis was a customer, you knew Mr. Davis had done a
16 transaction with WCS and that his company was looking
17 for money?
18    A. Yes.
19    Q. And you thought you had a way whereby his
20 company could be helped?
21    A. I thought that we could help them on this
22 issue, we could.
23    Q. Because you had become aware of an
24 opportunity with this organization back East?
25    A. This was the second program they brought this

SITION OF:       Multi-Page™       STEIMKE vs. FORSCHEN
. Forschen                 June 4, 2004

Case 2:03-cv-00487-DAK   Document 53   Filed 05/31/05   Page 25 of 34

Page 129

1 there is a document entitled Duties of the Co-Trustee
2 and Protector.
3     A. Yes.
4     Q. Is that a document that was generated by
5 World Contractual Services?
6     A. Yes.
7     Q. And following those pages we have some bills.
8 Do you see that?
9     A. Yes.
10     Q. There is a bill to Charlotte Georges
11 Enterprises, August 31, 1999?
12     A. Yes.
13     Q. And then there is a trustee fee charge?
14     A. Yes.
15     Q. Do you see that?
16     A. Yes.
17     Q. Did World Contractual Services charge trustee
18 fees to the trusts for its services?
19     A. Yes.
20     Q. So if you were trustee of the Charlotte
21 Georges Enterprises Trust, then World Contractual
22 Services would charge a trustee fee for that service?
23     A. Correct. But on this one-- Go ahead. Excuse
24 me.
25     Q. And the money to pay the fees generally would

Page 130

1 come from the trust?
2     A. Yes.
3     Q. The final two pages appear to be an unsigned
4 form Managers's Agreement for Charlotte Georges
5 Enterprises; is that right?
6     A. Yes.
7     Q. Tell me what those are all about.
8     A. That was the management was supposed to be
9 paid a fee for their services and that was to be
10 determined and it sets some guidelines between the
11 lines, manager and the trust.
12     Q. So for the trust there was a trustee fee and
13 a manager fee that would be paid each month?
14     A. Yes. Or whenever the dates were set.
15     Q. Now, we have talked about two different
16 trusts that you did in connection with Lynda Michelon
17 and one referred to a $50,000 trust and which is also
18 the Charlotte Georges Enterprises investment; is that
19 right?
20     A. Yes, I believe so.
21     Q. What happened there was that the Odette
22 Graham Family Trust sent some money to the Charlotte
23 Georges Enterprises Trust; is that correct?
24     A. Say that question again. I am sorry. Could
25 you clarify it.

Page 131

1     Q. Well, Lynda's mother already had an existing
2 trust, didn't she?
3     A. Yes.
4     Q. And that was the Odette Graham Family Trust?
5     A. Uh-huh.
6     Q. Is your answer yes?
7     A. Yes.
8     Q. And so World Contractual Services formed a
9 trust for the investment by Odette Graham Family Trust.
10     A. Yes.
11     Q. And the name of that trust was the Charlotte
12 Georges Enterprises Trust?
13     A. I believe so.
14     Q. So the Odette Graham Family Trust sent some
15 money to the Charlotte Georges Enterprises Trust?
16     A. If that's how this transfer took place, I
17 guess that's correct. If you are making that a statement
18 I would have to say yes.
19     Q. Okay. Then World Contractual Services also
20 created the Michelon Family Trust for Lynda.
21     A. Yes.
22     Q. And there were funds sent from her IRA
23 account to the Michelon Family Trust?
24     A. Yes.
25     Q. Who was the initial trustee of the Michelon

Page 132

1 Family Trust?
2     A. I believe it was Dave.
3     Q. Were you a co-trustee?
4     A. I was co-trust officer, yes.
5     Q. Did that give you authority then to make
6 investments on behalf of this trust?
7     A. In this case, yes, it did.
8     Q. Who was the initial trustee of the Charlotte
9 Georges Enterprises Trust?
10     A. I imagine that was Dave.
11     Q. Were you a co-trustee as well?
12     A. Yes.
13     Q. You also had authority to make investments on
14 behalf of that trust?
15     A. Yes.
16           [EXHIBIT-7 MARKED.]
17     Q. You have been handed what has been marked as
18 Exhibit 7 this is a wire confirmation of money going
19 from Lynda Michelon's account to the Michelon Family
20 Trust in the amount of $108,170.11. Is this consistent
21 with your understanding that on or about October 22nd,
22 1999, Lynda had that money sent to the Michelon Family
23 Trust?
24     A. Yes.
25           [EXHIBIT-8 MARKED.]

A. Yes.

Q. And you presented him with this note?

A. Yes.

Q. And asked him to sign it?

A. Yes.

Q. And he read it?

A. Yes.

Q. And he signed it?

A. We discussed it and then he signed it, yes.

Q. Okay. Do you recall when he signed it?

A. I do not.

Q. Do you recall where the two of you were at the time that he signed it?

A. We met halfway-- well, not halfway. I think we met down in Sandy at the library.

Q. Okay. You indicate on this note that it's personally guaranteed by Frank Davis and 200,000 shares of Harvest Marketing?

A. Yes.

Q. And you understood by this note that Frank and his company were promising to pay the Michelon Family Trust in accordance with the terms of this note?

A. Under the terms he would pay if everything went well, yes.

Q. Well, the note didn't say anything about any

Page 146

condition, if everything went well, does it?

A. No. Right, no, it doesn't.

Q. So you understood the note itself said that he will make payments in accordance with its terms?

A. Yes.

Q. Now, at the time that Frank signed this note did he express some concern to you about repayment of it?

A. Yes.

Q. Did he explain to you that he wanted your personal guaranty that if he had to pay on this you would pay him?

A. Yes.

Q. You told him you would be willing to give that to him?

A. Yes.

[EXHIBIT-11 MARKED.]

Q. You have been handed what has been marked as Exhibit 11. Do you recognize this document?

A. Yes.

Q. Do you recognize any of the handwriting on the document?

A. Above is mine and I think Frank rewrote that and I signed both of them.

Q. Were they done at the same time?

Page 147

A. I would say yes.

Q. Okay. So in the part you wrote-- you are indicating: "I, Jae R. Forschen personal will sign take over this note with all responscibles--"

A. Responsibilities.

Q. Why don't you read what you wrote there.

A. "--all responsibilities and obligations that will belong to Jae R. Forschen. 2/9/2000."

Q. Is that the date you believe you signed that?

A. I would think I signed it that day, yes.

Q. Was this done at the same time that Frank signed the note?

A. I would only say that is probably true.

Q. Okay. So you were intending to tell Frank by this note that you were going to personally take over the responsibilities?

A. Yes.

Q. To pay the Michelon Family Trust?

A. Yes.

Q. And then Frank wrote the next paragraph which you also signed?

A. Yes.

Q. And in his clarification paragraph he indicates that you personally will execute a note with him and his company to take over the liability?

Page 148

A. Yes.

Q. Did you in fact do that?

A. Yes.

[EXHIBIT-12 MARKED.]

Q. In this note that we have just read on Exhibit 11, you don't sign in either place on behalf of Michelon Family Trust, do you?

A. No.

Q. In fact, you have used the word yourself in your paragraph, this is a personal obligation.

A. Yes.

Q. And similarly in the part that Frank writes, he indicates that you as an individual, not the Michelon Family Trust, was going to execute the note?

A. Yes.

Q. You have been handed Exhibit 12. This is also a document called Promissory Note Agreement; is that right?

A. Yes.

Q. Now, did you create this document?

A. Yes.

Q. And did you do it after February 9, 2000?

A. Yes.

Q. Okay. After getting Exhibit 10 signed by Jae and your signing Exhibit 11, you went back to the office

Page 149

some time later and made Exhibit 12?
2    A. Yes.
3    Q. And you signed it?
4    A. Yes.
5    Q. And you sent it to Frank?
6    A. Yes.
7    Q. And it indicates that Jae R. Forschen
8 promises to pay the sum of $175,000 and zero cents the
9 Michelon Family Trust on behalf of Harvest Marketing and
10 Frank Davis' personal guaranty of the note dated
11 November 15, 1999?
12    A. That's correct.
13    Q. And then you signed it personally?
14    A. Yes.
15    Q. On behalf of the Michelon Family Trust?
16    A. That's correct.
17    Q. Okay. When you got this note, Exhibit 10,
18 from Frank, did you send a copy of it to Lynda Michelon?
19    A. Yes.
20    Q. Your purpose was to show her what had
21 happened with her money?
22    A. Yes.
23    Q. And to give her some expectation of when she
24 will be repaid?
25    A. Right.

Page 150

1    Q. You must have thought at the time that
2 payment was imminent?
3    A. Yes.
4    Q. Because you have the due date being March
5 3rd?
6    A. Yes.
7    Q. At the time you approached Frank on February
8 9, 2000 to sign Exhibit 10, did you have any discussion
9 with him about why you needed the note signed?
10    A. Briefly we did.
11    Q. What did you tell him?
12    A. Just to cover myself with Lynda.
13    Q. Okay.
14    A. To show her that, you know, I had the note
15 guaranteed, I had that money guaranteed.
16    Q. By Frank Davis and his company?
17    A. Yes.
18    Q. Did you explain that to Frank?
19    A. I believe so.
20    Q. Now, at the time that you and Frank talked
21 about this, did the two of you intend to do this to fool
22 or defraud Lynda?
23    A. No.
24    Q. Was this a genuine deal as you understood it?
25    A. As far as I am concerned I am still obligated

Page 151

1 to pay her money back, Lynda.
2    Q. Well, okay. But this reads, however, as I
3 read it, we have got a note from Frank and his company
4 to the Michelon Family Trust?
5    A. Uh-huh.
6    Q. And then we have got another note basically
7 from you to Frank and his company. So you didn't send
8 Lynda a copy of Exhibit 11?
9    A. No.
10    Q. And you didn't send Lynda a copy of Exhibit
11 12, did you?
12    A. No, I did not.
13    Q. You sent her 10 so that she would be
14 satisfied that an investment had really been made, and
15 that it was real, and that it was guaranteed, and that
16 it was going to be repaid?
17    A. Yes.
18    Q. And you told Frank that?
19    A. Yes.
20    Q. And you asked him to sign it?
21    A. Yes.
22    Q. So, again, did you intend to trick her or to
23 fool her?
24    A. No, I did not.
25    Q. So did you intend Exhibit 10 to be real?

Page 152

1    A. Yes, I mean also my note, too.
2    Q. Well, yours would be real, too. Right?
3    A. Yes.
4    Q. Lynda was not aware of Exhibit 12?
5    A. She was not aware that I guaranteed Frank's
6 note.
7    Q. Okay. So with what you sent her you intended
8 her to understand that Frank Davis and his company had
9 signed a note to her?
10    A. Yes.
11    Q. Was that the way it was or were you trying to
12 deceive her?
13    A. I was not trying to deceive her. I just let
14 her know this is the way it was happening and this is
15 how it transpired.
16    Q. Okay.
17    A. Now, I could be-- Well, leave it there.
18    Q. So did you expect him to honor his note?
19    A. I expected that note to be fulfilled, yes.
20    Q. Okay. You anticipated that at that point in
21 time that the loan would issue?
22    A. I was ensured that it was about to be done,
23 completed.
24    Q. And that you are going to make sure that the
25 note obligation that you had to Frank and his company

Page 153

1 and also the note obligation from Frank and his company
2 to Lynda Michelon were satisfied when those proceeds
3 came through?
4    A. Correct.
5    Q. But they didn't come?
6    A. Correct.
7    Q. So now there is an action Michelon Family
8 Trust against Frank on his note?
9    A. Yes.
10   Q. Do you understand that?
11   A. Yes.
12   Q. You understand that Frank and his company
13 have an obligation to pay that note?
14   A. Yes.
15   Q. You also understand that you have an
16 obligation to Frank and his company to take care of that
17 obligation for him?
18   A. Correct.
19   Q. That's a personal obligation?
20   A. Yes.
21   Q. As far as you know Frank and his company have
22 not fulfilled their note obligation to the Michelon
23 Family Trust, have they?
24   A. No, they have not.
25   Q. Nor have you fulfilled your personal

Page 154

1 obligation to Frank and his company?
2    A. No, I have not.
3    Q. And because of those obligations you have
4 been trying for up until six months ago to get Maralee
5 Haldeman to send money to you so you could make those
6 payments?
7    A. Correct.
8    Q. And up until six months ago you had some hope
9 she was going to do that?
10   A. She was ensuring me something would
11 transpire, that she would take care of it.
12   Q. But she never did?
13   A. She never did, correct.
14   Q. Instead she told you that Burt Patterson had
15 taken out some of that money himself?
16   A. Yes.
17   Q. And it is gone?
18   A. Yes.
19   Q. That's what she told you?
20   A. Yes, I mean through varied conversations,
21 maybe not that one, but there are varied conversations.
22       [EXHIBIT-13 MARKED.]
23   Q. You have been handed what has been marked as
24 Exhibit 13. This is a letter for Odette Graham by Lynda
25 Michelon as trustee for the Charlotte Georges

Page 155

1 Enterprises Trust; do you see that?
2    A. Excuse me. Say that again.
3    Q. This is a copy of a check.
4    A. Okay.
5    Q. That's paid to the order of the Charlotte
6 Georges Enterprises Trust?
7    A. Yes.
8    Q. That's in the amount of $53,000?
9    A. Yes.
10   Q. Do you see the reference on the lower
11 left-hand side. It indicates Lynda S. Michelon, Trustee
12 for Odette Graham?
13   A. Yes.
14   Q. So this is the $50,000 trust that you were
15 talking about?
16   A. That was sent, yes. Money that was sent, yes.
17   Q. Actually $53,500?
18   A. Uh-huh.
19   Q. Is that a yes?
20   A. Yes. Excuse me.
21   Q. It was received in the Charlotte Georges
22 Enterprises account?
23   A. To my knowledge, it was, yes.
24   Q. And World Contractual Services formed the
25 Charlotte Georges Enterprises Trust?

Page 156

1    A. Yes.
2    Q. You mention that David Orr was trustee and
3 you were probably co-trustee?
4    A. Yes.
5    Q. All right.
6        [EXHIBIT-14 MARKED.]
7    Q. I am handing you what has been marked as
8 Exhibit 14, which is a promissory note from an entity
9 called Havelock to Charlotte Georges Trust dated October
10 1, 1999. Do you see that?
11   A. Yes.
12   Q. Tell me what this is all about?
13   A. The money that went internationally over to
14 Havesack under the supervision of Ted Widger and David
15 Orr.
16   Q. Okay. You said Havesack?
17   A. Havesack or Havelock. This says Havelock but
18 it may be Havesack. I will have to chick but it has got
19 Havelock here. I guess that would be correct.
20   Q. Do you know who prepared this document?
21   A. I have no idea who prepared it.
22   Q. Do you know who William Frearson is?
23   A. He is supposed to be the foreign trustee.
24   Q. For whom?
25   A. For Havelock, is my guess.

EXHIBIT "B"

Page

IN THE UNITED STATES DISTRICT COURT

STATE OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JENNIFER STEIMKE, as trustee of the ODETTE GRAHAM TRUST, sole beneficiary of the MICHELON FAMILY TRUST, and sole devisee and representative of the ESTATE OF LYNDA STEIMKE MICHELON, | ) CIVIL NO. 2:03CV-0487<br>)<br>) DEPOSITION OF:<br>) FRANK L. DAVIS<br>)<br>) TAKEN: MAY 13, 2004<br>) |
| Plaintiff, | ) REPORTED BY:<br>) CARILEE DUSTIN, RPR<br>)<br>) |
| v. | )<br>) |
| JAE FORSCHEN, DAVID J. ORR, individually and dba WORLD CONTRACTUAL SERVICES, HARVEST MARKETING, L.L.C., FIRST HARVEST, L.L.C., FRANK L. DAVIS, and JOHN DOES 1 through 10, | )<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>)<br>) JUDGE DALE A. KIMBALL |

Deposition of FRANK L. DAVIS, taken

on behalf of the Plaintiff, at 60 East South Temple,

Suite 1800, Salt Lake City, Utah, before CARILEE B.

DUSTIN, Certified Shorthand Reporter and Notary

Public in and for the State of Utah, pursuant to

Notice.

reporters inc.

Page 65

1 that named him Jae Friday.
2    Q. You never got the loan proceeds?
3    A. No.  Never got a dime.
4    Q. Do you know how much it was supposed to be?
5    A. Well, I think originally it was like $12
6 million.  At least one of the documents was somewhere in
7 that neighborhood.
8    Q. You said you created a business plan to show
9 where the loan proceeds were going to go and how they
10 were going to be used.  Do you still have that business
11 plan?
12    A. You know, most of the stuff I had, I moved all
13 of the stuff into a shed.  And I tried to go through and
14 find everything that I could find.  I -- I have -- don't
15 have a lot of documents left over.  I don't know where
16 everything's gone.
17    Q. Now, the real intent was to use the proceeds
18 from that loan for one of these high yield programs,
19 right?
20    A. His intent, yes.
21    Q. Well, that's what the plan was that you and
22 Jae had.
23    A. My plan had nothing to do with what he was
24 going to do.
25    Q. Well, wasn't he going to use the proceeds from

Page 66

1 the loan to --
2    A. No.
3    Q. -- to generate enough money to pay off the
4 loan and then give you some money?
5    A. No.  He was going to leave with me a portion
6 of the loan so if it were -- I think it was eight
7 percent -- you know, it was like a million dollars was
8 going to be left with me out of the -- the balance went
9 to him.  He did whatever he was going to do with it,
10 paid off the loan, et cetera, but I was getting -- I was
11 getting money out of the proceeds, not out of what he
12 did.
13    Q. But you were the borrower?
14    A. Correct.
15    Q. So you'd have to rely on him to repay the
16 loan?
17    A. That's correct.
18    Q. So the real use of the loan proceeds, I guess
19 a million of it was going to stay with you, or whatever
20 eight percent came out to, and the rest of it was going
21 to be used by Jae for investment in his high yield
22 program?
23    A. That's correct.
24    Q. Did you disclose that on the business plan
25 that you submitted to the proposed lenders?

Page 67

1    A. No.  No, I didn't.  There wasn't -- in the
2 business plan itself, there was not a call to detail out
3 the use of proceeds.  All I had to show was I had a
4 business purpose.  And, you know, it wasn't a use of
5 proceeds type of request.
6    Q. Do you recall any of the lenders to whom you
7 submitted documents in connection with your attempts to
8 obtain a loan?
9    A. Do I recall them?
10    Q. Yes.
11    A. Only when I've looked at the documents.  I
12 couldn't tell you offhand any one of them except Ammon,
13 I think, is one of them, as you alluded to earlier,
14 but --
15    Q. You thought Ammon was a lender?
16    A. They're not?  I don't know.  I mean, I
17 remember the name.
18    Q. Okay.
19    A. But, you know, there was banks, a couple of
20 banks.  I do -- well, that's all I remember as far as
21 that goes.
22    Q. Did you do any other transactions with Jae
23 Forschen or World Contractual Services?
24    A. Did I?  I did nothing -- well, nothing with
25 World Contractual Services.  I was contacted late in

Page 68

1 '99, asked to do a favor because of -- for David Orr.
2 He had a client that he wanted to ship some food to for
3 Y2K.  And we shipped a year's supply of food out on
4 December 31st or December 30th to some guy in
5 Washington, overnighted it, Federal Express.  That's --
6 I don't think I ever had any other interface or even
7 heard per se about David Orr, other than that this was
8 somebody he wanted to take care of.
9    Q. How about Jae Forschen?
10    A. Jae, the only thing that I did with him is I
11 got caught up a little bit in this high yield stuff and
12 was introduced from a friend of mine out of California,
13 Tony Fairchild, to two individuals back in Peoria,
14 Illinois, both of them preachers, and they got me on a
15 conference call and explained to me what they were doing
16 about these high yield programs.  I ended up meeting
17 them in Las Vegas -- or, no, in California.  They took
18 me to meet some people, showed me documentation of what
19 they had done in the past, what these people had done,
20 and I ended up putting some personal money with them,
21 wiring them some money for one of these high yield
22 transactions.  I had another friend and a brother-in-law
23 that wanted to put some money in, and ultimately, I
24 think in dialogue with Jae, he wanted to do some, so he
25 put some money into that group.

Page 73

1  with him.  I told him where I was going, in Sandy, and I
2  said, "I could probably sneak out for a little bit and
3  meet you."  And so we decided to meet at the Sandy City
4  Library off -- whatever it is, 100th South and 13th
5  East.
6      So late that, you know, evening, I don't know
7  what time, maybe eight o'clock in the evening, it was
8  dark, in the parking lot at the Sandy City Library, he
9  pulled up, or he was there when I went there, and we
10  just got in -- I can't remember whether we got in my car
11  or -- I think he got in my car.  And he -- I'm sure he
12  had told me something about this before this time, but
13  he explained to me that the monies that he had advanced
14  to this Bert and Maralee in Ohio for, quote -- what I
15  understood initially was for some high yield program,
16  that he was getting some pressure from the trust, and
17  that's when he was planning on repaying the trust out of
18  this loan that they were generating and asked me, you
19  know, basically, just to -- said, "I've got to show them
20  that the proceeds coming out of this loan is going to
21  pay off the trust."
22      Q. Show "them," meaning whom?
23      A. The trust, whoever.
24      Q. Okay.
25      A. The trustees or whoever he's dealing with.

Page 74

1      And, you know, I -- of course it was dark,
2  we're sitting in a car, and by that time I had developed
3  a friendship with Jae.  I did not mistrust him.
4      Q. He was working regularly on trying to get you
5  this big loan?
6      A. Right.  So I just said, you know, "There's no
7  way I'm going to sign a note and obligate myself because
8  I have no idea this loan is going to materialize or
9  not."  And, you know, of course he assured me every
10  which way but loose that the money was coming, that if
11  it didn't come that way, it was coming another way,
12  whatever, so -- and I said, "The only way I'll do this
13  is if you sign a note, you know, equal, identical note,
14  saying that this is your responsibility," whatever.
15  "The fact that you want the money that's coming into the
16  corporation, or the money that's coming in to Harvest
17  Consulting on this loan, if you want to pay this money
18  back out of that, I don't have a problem with it."  You
19  know, and he wanted to do -- have some document to
20  evidence that that was going to happen.
21      But I just said, "I'm unwilling to do it
22  unless you indemnify me, or whatever, because I have
23  no -- I don't have the same level of confidence and
24  faith you do that the loan's going to materialize."
25      So he took the original note and we wrote on

Page 75

1  the back of that, you know, that he was going to execute
2  an identical note and do that, which he did a few days
3  later.
4      Q. Later?
5      A. A couple, two or three days later.  And
6  candidly, you know, I don't know -- I don't believe I
7  really even registered or thought about the fact that
8  the date was not the date we were doing it.  And I
9  didn't even ask him about it, you know, when he had
10  drafted the note, or what the purpose -- but, you know,
11  I know that we signed this in February, on February 9th.
12  That's one of the few dates I know exactly when we did
13  it.
14      Q. Why do you know that date?
15      A. It was because it was my sister-in-law's
16  birthday.  That's when I was up there.  And my wife
17  wrote it down in her Day-Timer.
18      Q. You note on this document you apparently are
19  signing as president of Harvest Marketing/First Harvest.
20      A. I notice that.
21      Q. You note that the lender is the Michelon
22  Family Trust.
23      A. That's correct.
24      Q. And Jae is apparently signing it as a trust
25  officer.

Page 76

1      A. Correct.
2      Q. Not as himself individually?
3      A. Right.
4      Q. Now, if you'll take a look at the next page,
5  is this next page the note that you were talking about
6  that Jae prepared as your indemnity note?
7      A. Correct.
8      Q. You'll notice it's dated February 15, 2000.
9      A. That's correct.
10      Q. And Jae himself is promising to pay the sum of
11  $175,000 and zero cents to the Michelon Family Trust on
12  behalf of Harvest Marketing/First Harvest and Frank
13  Davis' personal guaranteed of the note dated 15 November
14  1999.
15      A. Correct.
16      Q. And then if you look down, at the bottom, it's
17  got Jae signing personally.
18      A. That's correct.
19      Q. Not as a trust officer or on behalf of
20  Michelon, right?
21      A. Correct.
22      Q. In fact, his promise in this document was to
23  pay Michelon on your behalf?
24      MR. QUESENBERRY:  And I'll object.  That calls
25  for a legal conclusion.  Speaks for itself.

DEPOSITION OF:
FRANK L. DAVIS

Case 2:03-cv-00487-DAK   Document 55   Filed 05/31/05   Page 33 of 34

Multi-Page™

Steinke v. Forschen
May 13, 2004

Page 77

1   Go ahead and answer.
2   THE WITNESS: I mean, yeah, I can -- that's
3   what the document says, right.
4   Q. (By Mr. Wahlquist)  Right. And again, up at
5   the top right-hand corner of the document, it lists Jae
6   Forschen individually, not representing some other
7   person or entity; is that right?
8   A. That's correct.
9   Q. Did he give you this document?
10  A. Yes.
11  Q. And you signed it?
12  A. I did.
13  Q. Now, returning to the promissory note
14  agreement dated November 15, 1999, you knew that you
15  were signing a document at that time which by its terms
16  said that Harvest Marketing/First Harvest promised to
17  pay $175,000 to Michelon Family Trust?
18  A. Did I know I was signing a document?
19  Q. That said that.
20  A. Yes.
21  Q. Jae asked you to sign it?
22  A. That's correct.
23  Q. He said that he needed this document so that
24  he could satisfy some concern of the Michelon Family
25  Trust people?

Page 78

1   A. As far as I understand it, yes.
2   Q. So you signed it so he would have some
3   document to show them to satisfy them?
4   A. He wanted to show them that the monies, quote,
5   there were, as he -- I was confident was coming through
6   this loan was going to be paid back -- or money out of
7   that was going to be paid to Michelon Family Trust,
8   right.
9   Q. Well, this promissory note agreement doesn't
10  say anything about some loan somewhere, does it?
11  A. No.
12  Q. It doesn't talk about any high yield
13  investment program?
14  A. That's correct.
15  Q. This simply, as you understand it, is a
16  straight-up promissory note saying Harvest
17  Marketing/First Harvest would pay Michelon Family Trust
18  $175,000 on March 3, 2000; is that right?
19  A. That's right.
20  Q. You understood from Jae that he needed this
21  document to show the Michelon Family Trust people so
22  that they could see -- or some document showing them
23  they were going to get their money back?
24  A. As I understand it, correct.
25  Q. So you accommodated that request?

Page 79

1   A. That's right, based on him signing.
2   Q. At the time you signed this document, you did
3   not intend for Harvest Marketing or First Harvest to pay
4   the Michelon Family Trust any amount, did you?
5   A. If money came in and that's what -- that Jae
6   was facilitating, I mean, that's where he wanted it to
7   go, that would be fine with me.
8   Q. If the money came in?
9   A. Sure.
10  Q. Does this document say that it's conditional
11  upon whether the money comes in or not?
12  A. The only condition that I required is that he
13  sign it to take that obligation.
14  Q. I'm talking about the promissory note
15  agreement.
16  A. No.
17  Q. It doesn't say anything about any condition,
18  does it?
19  A. No.
20  Q. And it doesn't say that Jae is signing another
21  note at the same time personally promising to pay off
22  this obligation?
23  A. It does on the back of it.
24  Q. Okay.
25  A. That original note.

Page 80

1   Q. Do you have that?
2   MR. QUESENBERRY:  You have it.  It's right
3   there, Exhibit 1, page 28.
4   MR. WAHLQUIST:  I have the original note?
5   MR. QUESENBERRY:  No.  You have this language
6   on the back of it.
7   Q. (By Mr. Wahlquist)  Do you have the original
8   note?
9   THE WITNESS:  I think you have it, don't you?
10  MR. QUESENBERRY:  It's Exhibit 28.
11  MR. WAHLQUIST:  I've got a copy.
12  Q. (By Mr. Wahlquist)  I'm asking, where is the
13  original note?
14  THE WITNESS:  I believe I delivered it to you
15  last time.
16  MR. QUESENBERRY:  Oh, yeah.  And we provided
17  copies pursuant to your request.
18  MR. WAHLQUIST:  Thank you for providing those.
19  Q. (By Mr. Wahlquist)  Do you believe
20  Mr. Quesenberry has the original copy?
21  A. I do.
22  MR. QUESENBERRY:  I do.  I have it in my file,
23  I believe.  I'm very confident.
24  Q. (By Mr. Wahlquist)  So is it your testimony
25  that you signed the original of this note at Jae's

Page 81

1  request and then he turned it over and wrote on the back
2  and gave it back to you?
3      A. That's correct.
4      Q. So how would he then have a document to show
5  the Michelon Trust people?
6      A. There's two of them.
7      Q. There were two originals?
8      A. Yeah, one for me, one for him.
9      Q. Are you talking about two originals of the
10 promissory note agreement that is the third page behind
11 the initial disclosures?
12     A. Yes.
13     Q. You're not talking about an original of the
14 third page and then an original of the fourth page?
15     A. No.
16     Q. Okay.  So he had you sign two documents, two
17 originals of the promissory note agreement, dated
18 November 15, 1999?
19     A. Correct.
20     Q. And then on one of those he wrote a note on
21 the back, which we'll look at in a minute, and then gave
22 that original to you?
23     A. That's correct.
24     Q. And then he took the other original?
25     A. Correct.

Page 82

1      Q. So you understood that the document that he
2  had to show the Michelon Family Trust did not have his
3  handwritten note on the back?
4      A. Right.
5      Q. Because you had it?
6      A. Right.
7      Q. And you understood that he was going to show
8  this original note you had just signed to the Michelon
9  Family Trust people?
10     A. I believe that's what he told me.  I don't
11 remember the details.
12     Q. You knew at the time that you delivered that
13 note to Mr. Forschen that if this money did not come
14 through from this big loan that Harvest Marketing was
15 applying for, that you would not be paying the Michelon
16 Family Trust any amount?
17     A. That's correct.
18     Q. Did you not feel at the time that you were
19 signing this document that you were assisting Jae to
20 deceive the Michelon Family Trust people?
21     A. Really, let's say -- call it stupidity, I
22 mean, or the fact that I believed what Jae was, you
23 know, telling me, and he was -- his level of confidence
24 and he was the trustee.  And I don't know what he was
25 going to do with the document.  He just, you know,

Page 83

1  convinced me that it would be beneficial.
2          And in retrospect, it was probably one of the
3  dumbest things I did is to sign it.  But I did it.  And
4  I did it because I felt that -- you know, a little
5  pressure.  You know, at the time, he was saying, "I'm
6  going to do this."  And he's trying to help me and so if
7  I could help him, I thought I'd do it.  I didn't think
8  of it in terms of deceiving anybody or -- he was -- he
9  wanted to evidence a note.  This is how he was going to
10 pay somebody back.
11     Q. But you knew that wasn't how it was happening?
12     A. No.  I mean, he's telling me, the loan, that
13 it's done, it's going to happen, and the money's going
14 to come in and we're going to pay it back.  So I'm
15 taking for face value that, yes, the money's coming in,
16 and before -- whether he writes it out of his or whether
17 it comes out of that, that he's going to have the money
18 to me.  And if he wants to go out there, then that's
19 where it went.
20     Q. So what you're saying is at the time you
21 signed the document, you fully anticipated the loan
22 would be funded?
23     A. Based on his representations, I was very
24 hopeful and optimistic.
25     Q. But not sure?

Page 84

1      A. No.  Never sure.
2      Q. But you were optimistic that it would be
3  funded?
4      A. Yeah.
5      Q. And you knew at the time that you signed the
6  promissory note agreement dated November 15, 1999, that
7  this wasn't a straight-up deal but hoped that the money
8  would be coming in so that the obligation would be paid
9  in any event?
10     A. I don't know what you mean by "straight-up
11 deal."
12     Q. Well, Harvest Marketing/First Harvest didn't
13 intend to pay these people $175,000, did they?
14     A. Only if the money came in that he was saying
15 was coming.  That's what he was representing, that this
16 loan was going through First Harvest, and when that
17 money hit, it was going to be paid back through First
18 Harvest, that's the representation, and I didn't see --
19     Q. And if it didn't hit, it wouldn't be paid?
20     A. That's right.  And if it didn't hit, that's
21 why I had him sign on the back to say you -- if it
22 doesn't materialize as you're telling me, it's your
23 problem.
24     Q. Have you filed a cross-claim against him in
25 this case?