STEPHEN QUESENBERRY (8073)
J. BRYAN QUESENBERRY (9156)
HILL, JOHNSON & SCHMUTZ, L.C.
Jamestown Square
3319 North University Avenue
Provo, Utah 84604
Telephone (801) 375-6600

**Attorneys for Defendants Frank L. Davis, Harvest Marketing, LLC, and**
**First Harvest, LLC**

IN THE UNITED STATES DISTRICT COURT
STATE OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JENNIFER STEIMKE, as trustee of the ODETTE GRAHAM TRUST, sole beneficiary of the MICHELON FAMILY TRUST, and sole devisee and representative of the ESTATE OF LYNDA STEIMKE MICHELON, <br><br> Plaintiffs, <br><br> JAE FORSCHEN, DAVID J. ORR, individually and dba WORLD CONTRACTUAL SERVICES, HARVEST MARKETING, L.L.C., FIRST HARVEST MARKETING, L.L.C., FRANK L. DAVIS, and JOHN DOES 1 through 10, <br><br> Defendants. | **REPLY TO MEMORANDUM IN OPPOSITION TO THIRD MOTION FOR SUMMARY JUDGMENT** <br><br><br><br><br><br><br><br><br><br> Case No. 2:03CV00487 DAK <br><br> Judge Dale A. Kimball |

Defendants Frank L. Davis, Harvest Marketing, LLC, and First Harvest, LLC (collectively,

"Davis"), by and through counsel, hereby reply to Plaintiffs' Memorandum in Opposition to Third

Motion for Summary Judgment ("Opposition Memorandum").

## **TABLE OF CONTENTS**

STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.     SECOND CLAIM FOR RELIEF: AIDER AND ABETTER LIABILITY –
       FEDERAL LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

       A.    The Initial High-Yield Investment Program . . . . . . . . . . . . . . . . . . . . 2

       B.    The Debt-Elimination Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       C.    There Was No Federal Securities Fraud Violation with Using the Trust
             Funds as an Up-front Fee, or with the Davis Note . . . . . . . . . . . . . . . . 4

II.    FOURTH CLAIM FOR RELIEF: AIDER AND ABETTER LIABILITY – STATE
       LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.   SEVENTH CLAIM FOR RELIEF: CONSPIRACY TO DEFRAUD . . . . . . . . . . 7

IV.    EIGHTH CLAIM FOR RELIEF: NEGLIGENT MISREPRESENTATION . . . . . 8

       A.    Davis Made No Representations to Plaintiffs . . . . . . . . . . . . . . . . . . . . 9

             1.    The Davis Note . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

             2.    Davis' Supposed Failure to Disclose the Forschen Note, the Forschen
                   Loan, and Certain Material Facts Prior to the Diversion of Plaintiffs'
                   Funds to the Debt Elimination Program . . . . . . . . . . . . . . . . . . . . 9

       B.    Economic Loss Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

V.     ELEVENTH CLAIM FOR RELIEF: CONVERSION . . . . . . . . . . . . . . . . . . . 11

VI.    TWELFTH CLAIM FOR RELIEF: MONEY HAD AND RECEIVED . . . . . . . 12

VII.    SEVENTEENTH CLAIM FOR RELIEF: BREACH OF FIDUCIARY
DUTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

VIII.    EIGHTEENTH CLAIM FOR RELIEF: BREACH OF PROMISSORY
NOTE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

       A.    No Consideration for the Davis Note . . . . . . . . . . . . . . . . . . . . . . . . . . 14

            1.    No Antecedent debt Is Evidenced in the Davis Note . . . . . . . . . 14

            2.    Forschen's "Indemnity Note" . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            3.    Michelon's Inaction Was No Consideration to Davis . . . . . . . . . 16

       B.    The Trust Failed to Perform When it Tendered No Money to Davis . . . 16

       C.    The Davis Note Was Replaced by the Trustee's Note . . . . . . . . . . . . . . 17

       D.    The Davis Note is Unconscionable . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## STATEMENT OF ISSUES

1. Is Davis liable under federal and state securities statutes for aiding and abetting Forschen to allegedly defraud Plaintiffs when there was no "sale" by Forschen or Davis of a "security"?

2. Did Davis conspire with Forschen under Utah law to defraud Plaintiffs?

3. Did Davis make any negligent misrepresentations to the Trust that survive the economic loss rule, and that are based on a duty of Davis to disclose certain facts to the Trust?

4. Is Davis liable for money had and received when he never possessed or exercised dominion or control over the Trust's money?

5. Is Davis liable for breach of fiduciary duty to the Trust when he was never their trustee and there is no legal duty he owed them?

6. Is the Davis Note valid?

## ARGUMENT

Plaintiffs assert twelve causes of action against Defendants: (1) Second Claim for Relief: aider and abetter liability – federal law; (2) Fourth Claim for Relief: aider and abetter liability – state law; (3) Seventh Claim for Relief: conspiracy to defraud; (4) Eighth Claim for Relief: negligent misrepresentation; (5) Eleventh Claim for Relief: conversion; (6) Twelfth Claim for Relief: money had and received; (7) Seventeenth Claim for Relief: breach of fiduciary duty; and (8) Eighteenth Claim for Relief: breach of promissory note. Plaintiffs are unable to establish the requisite elements to these claims to survive summary judgment.

## I.    SECOND CLAIM FOR RELIEF: AIDER AND ABETTER LIABILITY – FEDERAL LAW

Plaintiffs' federal aider and abetter liability cause of action fails because there are no issues of fact regarding Plaintiffs' inability to establish the first element required in this claim – i.e. that Forschen defrauded Plaintiffs in the sale of securities.

The Tenth Circuit has held that under 10(b) of the Securities Exchange Act of 1934 and SEC

1

Rule 10b-5, to establish aider and abettor liability a plaintiff must "show [1] *fraud in the sale of securities by the primary violator*, [2] knowledge of that fraud by an aider and abettor, and [3] 'substantial assistance' by the aider and abettor." Farlow v. Peat, Marwick, Mitchell & Co., 956 F.2d 982, 986 (10th Cir. 1992) (emphasis added).

The fraud alleged by Plaintiffs could have occurred only in the two investment plans[1] pursued by Forschen: (1) his initial investment of Plaintiff Michelon Family Trust's ("the Trust") money into a high-yield program with some people "back East," and (2) the subsequent diversion of those funds to the debt elimination program

**A.      The Initial High-Yield Investment Program**

After Forschen initially informed Lynda Michelon that he would invest the Trust's money in a high-yield program to which she approved, he transferred the money to the "back East" people – Haldeman and Patterson – for that purpose.  Plaintiffs assert that sometime after the transfer, the back East people told Forschen that the high-yield program would not work and that the Trust's monies could be used to invest in anther program – the debt elimination program.  (See, Davis Depo. 55:11-17; 66:21-67:8; 68:19-23; 69:16-24; 74:12-75:2; 78:14-20 attached hereto as Exhibit A).

---

[1] Plaintiffs's Opposition Memorandum refers to Forschen using Plaintiffs' money to "buy in to" the debt elimination program, perhaps to make the two programs sound more like securities under 15 U.S.C. § 78c(a)(10). However, Forschen refers over and over in his deposition to "investing" the Trust's money in the two programs. (See, Davis Dep. submitted by Plaintiffs and attached hereto).  Nowhere in their depositions does Forschen or Davis refer to "buying in to" the two programs.

As Plaintiffs admit in ¶ 9 on page x of the Opposition Memorandum that Forschen discussed this initial high-yield investment program with Michelon.  The alleged debt-elimination program, however, was not even an option at this point because Forschen (and Davis) did not even know about the alleged debt-elimination program until after the Trust transferred the money to Forschen who transferred it to the back-East people.  Id.  Thus, there could have been no fraudulent misrepresentation associated with the initial transfer of the Trust's money to the back-East people *vis-a-vis* the initial high-yield program.

The second problem for Plaintiffs to establish this first element of aider and abetter liability *vis-a-vis* the initial high-yield program is that Forschen did not sell any securities – he invested the Trust's money.  Investment of money is not a "security" under 15 U.S.C. § 78c(a)(10), which states:

> The term 'security' means any note, stock, treasury stock, security future, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a 'security'; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance, which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

Plaintiff cannot establish that Forschen's investment of the Trust's money in the high-yield program was

a sale of a "security" as defined in this statute. Accordingly, because the transfer of the Trust's money to the back-East people was disclosed to Plaintiffs, and such an investment is not a "security" under 15 U.S.C. § 78c(a)(10), Plaintiffs cannot establish the first element to proving federal aider and abetter liability against Davis.

**B.      The Debt-Elimination Program**

Just as the high-yield investment program was not a "sale," neither was the debt-elimination program. The diversion of the Trust's funds to the debt-elimination program was not a "sale" of anything, it was a transfer of an investment. Further, the invested funds were not a "security" pursuant to 15 U.S.C. § 78c(a)(10) (quoted above). Thus, the debt-elimination program would be an investment of money, not a sale of securities. Accordingly, this second program cannot be the basis for the first element of Plaintiffs' aider and abetter liability cause of action.

**C.      There Was No Federal Securities Fraud Violation with Using the Trust Funds
as an Up-front Fee, or with the Davis Note**

Plaintiffs argue that the fraud in question was Forschen's use of the trust funds to pay the up-front loan fees, or Forschen's use of the Davis Note to appease Plaintiffs' concern over the whereabouts of the Trust's monies. Again, neither of these alleged fraudulent dealings is the sale or offering of a security. Federal securities fraud just does not apply to these facts.

In sum, neither the initial high-yield investment program nor the alleged debt-elimination program satisfy the first element of Plaintiffs' aider and abetter liability claim. Nor does Forschen's use

4

of the Trust's money in paying the up-front fees, or use of the Davis Note to appease Plaintiffs,

constitute federal securities fraud.

## II. FOURTH CLAIM FOR RELIEF: AIDER AND ABETTER LIABILITY – STATE LAW

Plaintiffs do not appear to address their state aider and abetter liability cause of action in their

Opposition Memorandum, even though Defendants asserted in their summary judgment memorandum

that said claim was without merit and should be dismissed.  In any event, as discussed herein, said claim

is without merit.

Plaintiffs' state securities violation claim (third claim for relief) against Forschen (and thus the

premise for Plaintiffs' state aider and abetter liability claim against Davis) is based on

U.C.A. § 61-1-22(1) (a), according to the Complaint, which states:

> A person who ***offers or sells a security*** . . . ***is liable to the person selling the security to or buying the security from him***, who may sue either at law or in equity to recover ***the consideration paid for the security*** . . .

(Emphasis added).  As stated above, Forschen and/or Davis did not offer or sell any security.

Forschen invested the Trust's money, which did not involve an offer or a sale.  Further, Forschen did

not pay any consideration to Plaintiffs for the money.  Thus, Forschen's use of the Trust's money does

not fit the statute which is Plaintiffs' basis for the underlying state securities law violation claim against

Forschen.

Additionally, Forschen's investments do not qualify as a "security" under U.C.A. § 61-1-

13(24)(a).[2]

Finally, Plaintiffs' state aider and abetter claim against Davis, according to the Complaint, is

premised on U.C.A. § 61-1-22(4)(a).[3]  It is undisputed that Davis did not indirectly or directly control

Forschen or anyone else in this case.  Plaintiffs have certainly made no such claim.  In fact, Forschen

was the trustee in charge of the Trust and made the decisions regarding where to invest the Trust's

---

[2] U.C.A. § 61-1-13(24)(a) defines "Security" as any:

(i) note;
(ii) stock;
(iii) treasury stock;
(iv) bond;
(v) debenture;
(vi) evidence of indebtedness;
(vii) certificate of interest or participation in any profit-sharing agreement;
(viii) collateral-trust certificate;
(ix) preorganization certificate or subscription;
(x) transferable share;
(xi) investment contract;
(xii) burial certificate or burial contract;
(xiii) voting-trust certificate;
(xiv) certificate of deposit for a security;
(xv) certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production
under such a title or lease;
(xvi) commodity contract or commodity option;
(xvii) interest in a limited liability company;
(xviii) viatical settlement interest; or
(xix) in general, any interest or instrument commonly known as a "security," or any certificate of interest or
participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or
purchase any of the foregoing.

[3] U.C.A. § 61-1-22(4)(a) states: "*Every person who directly or indirectly controls a seller or buyer liable
under Subsection (1)*, every partner, officer, or director of such a seller or buyer, every person occupying a similar
status or performing similar functions, every employee of such a seller or buyer who materially aids in the sale or
purchase, and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with
and to the same extent as the seller or purchaser, unless the nonseller or nonpurchaser who is so liable sustains the
burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of
the facts by reason of which the liability is alleged to exist." (Emphasis added).

money.  Thus, Plaintiffs' state aider and abetter claim against Davis fails to comply with this statute.

Accordingly, because Plaintiffs' state aider and abetter claim against Davis fails the relevant

Utah securities statutes, this claim is without merit and must be dismissed.

**III.    SEVENTH CLAIM FOR RELIEF: CONSPIRACY TO DEFRAUD**

Plaintiffs support their conspiracy to defraud claim by ignoring controlling Utah caselaw in favor

of caselaw from other states and jurisdictions.  Utah caselaw, however, controls this issue.  The Utah

Supreme Court recently held in Gildea v. Guardian Title Co., 980 P.2d 1265, 1271 (1998) that:

> conspiracy to defraud requires proof of the underlying fraud. See DeBry v. Cascade Enters.,
> 879 P.2d 1353, 1359 (Utah 1994) ("A conspiracy to defraud is *fraud committed by two or
> more persons* who share an intent to defraud another." (emphasis added)).

(Emphasis added).  Thus, according to Gildea and DeBry, Davis must have committed a fraud against

Plaintiffs to be held for conspiracy to defraud.  Eschewing this Utah controlling precedent, Plaintiffs rely

on Deere & Co. v. Zahm, 837 F.Supp. 346 (D. Kan. 1993) (interpreting Kansas law), Dixon v. City

of Lawton, 898 F.2d 1443 (10th Cir. 1990) (interpreting Oklahoma law), Singer v. Wadman, 745 F.2d

606 (10th Cir. 1984) (interpreting federal caselaw), Snell v. Turner, 920 F.2d 673 (10th Cir. 1990)

(interpreting federal caselaw), Singer v. Wadman, 595 F.Supp. 188 (D. Utah 1982) (interpreting

federal caselaw), Clulow v. State, 700 F.2d 1291 (10th Cir. 1983) (interpreting Oklahoma law) and

Fisher v. Shamburg, 624 F.2d 156 (10th Cir.) (interpreting Kansas law) to support their claim that

Davis did not have to commit the fraud in order to be held liable for conspiracy to defraud.  However,

7

all of the above cases interpret conspiracy caselaw from other states or jurisdictions.  Clearly, Utah

conspiracy law governs.

Thus, pursuant to <u>Gildea</u> and <u>DeBry</u>, Plaintiffs' conspiracy to defraud claim fails because there

is no evidence that Davis made any representations to the Trust (or even spoke, met or saw Plaintiffs

during the relevant time).

In response, Plaintiffs argue that Davis did defraud the Trust – to wit, Davis participated in

diversion of the Trust's funds "without telling" the Trust, and Davis signed and back-dated a note he

knew Forschen would give to Michelon to appease her concerns over the funds.  As to Davis not

telling the Trust about the diversion of its funds, Davis was not the Trustee; Forschen was.  As such,

Davis owed the Trust no duty to tell it anything.  As to the Davis Note, Forschen represented that note

to Michelon, not Davis.  Further, Davis signed and back-dated the Davis Note pursuant to the

Trustee's (Forschen) instructions.  The Trustee drafted the Davis Note and proposed the whole idea,

not Davis.

Accordingly, Plaintiffs' conspiracy to defraud claim against Davis fails as a matter of law.

## IV.    EIGHTH CLAIM FOR RELIEF: NEGLIGENT MISREPRESENTATION

As set forth in Davis' summary judgment memorandum, Plaintiffs' negligent misrepresentation

claim fails because (a) Davis made no representations to Plaintiffs, and (b) because of the economic

loss rule.

## A.    Davis Made No Representations to Plaintiffs

In their Opposition Memorandum, Plaintiffs assert that Davis made a representation to them *via* (1) the Davis note, and (2) by failing to disclose the Forschen note, the Forschen loan and certain information prior to the diversion of Plaintiffs' funds to the debt elimination program. These putative representations are without merit.

### 1.    The Davis Note

To the extent that Plaintiffs claim the Davis note is an affirmative representation by Davis, said claim is barred by the economic loss rule, as discussed in the next section (i.e. § IV(B) below).

### 2.    Davis' Supposed Failure to Disclose the Forschen Note, the Forschen Loan, and Certain Material Facts Prior to the Diversion of Plaintiffs' Funds to the Debt Elimination Program

The other alleged misrepresentations stem from Davis' supposed failure to disclose certain material facts to Plaintiffs.  This category of representations, however, presupposes that Davis owed Plaintiffs a duty to disclose the Trustee's note to Davis, the loan program, and the debt elimination program.  Smith v. Frandsen, 2004 UT 55, ¶ 11 (holding, "we have found that in addition to affirmative misstatements, an omission may be actionable as a negligent misrepresentation *where the defendant has a duty to disclose*") (emphasis added).

The only source of the duty Plaintiffs claim Davis owed to the Trust is based on Davis' supposed joint venture with Forschen, pursuant to which Plaintiffs claim that Davis "voluntarily agreed

9

to assume the liabilities arising from the breach of the duties that Davis had to Ms. Michelon as trustee

of the Michelon Family Trust." (See, Opposition Memorandum at 11). While Forschen undoubtedly

owed Plaintiffs certain duties based on his status as the trustee, Plaintiffs provide the Court absolutely

no caselaw that a joint venture imputes the duties of one party of the joint venture to another party of

the joint venture *vis-a-vis* third parties. Further, it is undisputed that there was no joint venture

agreement, and Plaintiffs fail to cite to any deposition testimony supporting their theory that Davis

"voluntarily agreed to assume" Forschen's liabilities arising from his role as trustee to Plaintiffs.

Because Plaintiffs cannot establish as a matter of law that Davis owed the Trust a duty, or

establish with facts that Davis voluntarily agreed to assume Forschen's duties to Plaintiffs, Davis could

not have failed to disclose anything to Plaintiffs.

### B.   Economic Loss Rule

Plaintiffs claim that the economic loss rule does not apply to bar their negligent

misrepresentation claim because (1) Davis asserts in his summary judgment memorandum that the Davis

Note was never valid and that without a contract there is no economic loss rule, and (2) Davis owed

the Trust a duty independent of the Davis Note based on his supposed joint venture with Forschen.

As for the first claim, to the extent that the Court affirms the validity of the Davis Note,

Plaintiffs' negligent misrepresentation claim is barred by the economic loss rule. If the Court invalidates

the Davis Note, then the economic loss rule would not apply as a bar to Plaintiffs' negligent

10

misrepresentation claim.

As for the second claim, Plaintiffs absolutely fail to provide any legal support – statute, caselaw, rule, etc. – supporting their novel claim that joint venturers take on and assume each others' duties *vis-a-vis* third parties they have never dealt with. Further, there is no factual support for Plaintiffs' claim that Davis voluntarily agreed to assume the duties Forschen owed the Trust based on his role as the trustee. Thus, the Trust's claim that Davis owed it a duty is wholly without legal or factual support.

## V.    ELEVENTH CLAIM FOR RELIEF: CONVERSION

Davis moved the Court to dismiss this claim because Davis never exercised dominion or control over Plaintiffs' money. Plaintiffs responded in their Opposition Memorandum: "MFT has demonstrated, at a minimum, a genuine issue of fact regarding Davis' participation in a scheme to convert MF's funds to their own use." (See, Opposition Memorandum at 15). Nowhere, however, do Plaintiffs bother to cite any caselaw, statute or rule establishing a cause of action for conspiracy to convert. To the contrary, the Complaint alleges only conversion.

"A conversion is an act of wilful interference with a chattel, done without lawful justification by which the person entitled thereto is deprived of its use and possession." Allred v. Hinkley, 328 P.2d 726, 728 (Utah 1958). *"Conversion is concerned with possession*, not title." Fibro Trust, Inc. v. Brahman Fin., Inc., 974 P.2d 288, 296 (Utah 1999) (citation omitted) (emphasis added). Plaintiffs must thus explain (which they failed to do in their Opposition Memorandum) the specific "act of wilful

interference" that Davis himself did – i.e. when was his "possession" of the money?

Thus, because there are no issues of fact regarding this claim and Plaintiffs have not provided any facts indicating Davis possessed or exercised dominion or control over the Trust's money, this claim should be dismissed.

## VI.    TWELFTH CLAIM FOR RELIEF: MONEY HAD AND RECEIVED

Plaintiffs' Opposition Memorandum correctly cites the requisite elements for the Trust's claim of money had and received: i.e. it must "show that ***defendant obtained money from plaintiff***, under such circumstances that in equity and good conscience it should be returned." Helper State Bank v. Crus, 90 Utah 207, 211 (1936) (emphasis added).  However, Plaintiffs distort the requirement that Davis "obtained money" from the Trust by claiming that Davis "***received the benefit*** of $100,000.00 of Ms. Michelon's trust monies . . ."  (See, Opposition Memorandum at 15) (emphasis added).  This argument fails for two reasons.

First, it is undisputed that Davis never "obtained" a dime of the $100,000 from the Trust. Plaintiffs brush aside this requirement by claiming the money was transferred on Davis' behalf – i.e. for Davis' benefit.  However, this cause of action is not "money had and benefitted from," it is "money had and received."

Second, Plaintiffs fail to explain how exactly Davis benefitted from the transfer of the $100,000 from the Trust to Forschen.  The key question Plaintiffs are unable to answer is, what benefit did Davis

actually receive from Forschen's transfer of the Trust's money to the back East people?  The question is not, what benefit did he want to receive, what benefit should he have received, what benefit did he think he would receive, or what benefit could he have received.  The critical question is, what money of the Trust did Davis receive?  The answer: none.

Thus, there are no issue of fact as to the Trust's inability to support this cause of action.  The Court should thus dismiss it as a matter of law.

## VII.   SEVENTEENTH CLAIM FOR RELIEF: BREACH OF FIDUCIARY DUTY

Plaintiffs attempt to establish the validity of the Trust's breach of fiduciary duty cause of action by arguing that Forschen owed the Trust a duty based on his status as trustee of the Trust, and that because Davis was supposedly a joint venturer with Forschen he "voluntarily agreed to assume the liabilities arising out of the breach of Forschen's duties to Mrs. Michelon as trustee of the Michelon Family Trust."  (See, Opposition Memorandum at 16).  Glaringly absent from this argument is any caselaw whatsoever that creates a duty from Davis to the Trust even assuming Davis partnered up with the Trustee, Forschen, to obtain a loan.  Further absent is any testimony from Davis whereby he voluntarily agreed to assume Forschen's liabilities to the Trust.

Thus, because there is no legal or factual basis for this cause of action, it should be dismissed.

13

## VIII.   EIGHTEENTH CLAIM FOR RELIEF: BREACH OF PROMISSORY NOTE

### A.      No Consideration for the Davis Note

Davis first argued in his summary judgment motion that the Davis Note was invalid (and thus the

Trust's breach of promissory note fails) because of a lack of consideration.  Plaintiffs responded by

asserting three forms of consideration that Davis allegedly received in exchange for the Davis Note: (1)

an antecedent debt evidenced in the Davis Note, (2) the indemnity provided in the Trustee's Note, and

(3) Michelon's inaction with respect to the funds.

### 1.      No Antecedent Debt Is Evidenced in the Davis Note

The Trust argues there was consideration for the Davis Note in the form of an antecedent debt

Davis supposedly owed the Trust, as evidenced by the Davis Note.  However, the Davis Note fails to

state anything about any antecedent debt (i.e. presumably, the up-front fee Forschen paid to kick-start

the loan).  Such would explain Plaintiffs' failure to quote or cite the evidence in the Davis Note

supporting the antecedent debt.  To the contrary, the Davis Note states, "The Promissory Note is the

final expression of the terms and conditions *of this loan transaction between Michelon Family*

*Trust and Harvest Marketing/First Harvest*."  (Emphasis added).  At no time did the Trust loan the

Davis' entities any money.

Also, even though Plaintiffs are fond of characterizing the loan as the "Davis loan," the

undisputed testimony is that 92% of the loan proceeds were to go to the Trust, and only 8% were to go

14

to Davis if the loan funded.  (See, Davis Dep. 65:17-66:12 attached to Plaintiffs' Exhibit A).  Thus, to

argue that the up-front fee was to benefit Davis by obtaining a loan for him greatly distorts the

testimony.

Further, Forschen first transferred the funds back-East for a high-yield investment which didn't

work out.  Just because Forschen then had the funds transferred to a loan program, in which he

involved Davis (because the loan was required to go through an entity with accounts receivable), and

which could have benefitted Davis with 8% of the loan proceeds had the loan funded, does not equate

to consideration to Davis for the Davis Note.

Thus, the alleged antecedent debt is not consideration for the Davis Note.

 2. **Forschen's "Indemnity Note"**

Plaintiff asserts that the "indemnity note" from Forschen was consideration to Davis for the

Davis Note.

First, to the extent Plaintiffs are referring to Forschen's indemnity agreement written on the

back of the Davis Note, that was consideration from Forschen personally to Davis, for doing Forschen

the favor of signing the Davis Note.  It was not consideration from the Trust to Davis.

Second, to the extent Plaintiffs claim that the Trustee's Note was a personal indemnity from

Forschen to Davis, again, such was personal from Forschen in exchange for Davis doing him the favor

of signing the Davis Note.  It was part of their own agreement, and did not involve the Trust.

15

Third, to the extent Plaintiff claims that the Trustee's note was from Forschen in his role as the

Trustee (which it must to extend the consideration of the Trustee's Note to the benefit of the Trust),

then such might satisfy the Trust's consideration problem.  However, in this case, the Trustee's Note

replaces the Davis Note and so even if the Trustee's Note is valid consideration from the Trust, it

effectively invalidates the Davis Note because it replaces the Davis Note.

### 3.    Michelon's Inaction Was No Consideration to Davis

Plaintiffs also assert that the inaction by Michelon, upon receiving the Davis Note, was Davis'

consideration for entering into the Davis Note.  However, Michelon's inaction was no benefit to Davis.

Instead, it benefitted the Trustee, Forschen, who was the target of Michelon's inquiries and demands.

After all, Forschen was the one who drafted the notes and pushed Davis to sign the Davis Note

because he was feeling the heat from Michelon.  As for Davis, Michelon's action or inaction would not

have affected Davis.

### B.    The Trust Failed to Perform When it Tendered No Money to Davis

Another reason the Davis Note is invalid is because Davis never received a dime of the Trust's

money that it supposedly lent him pursuant to the Davis Note.  As quoted above, the Davis Note refers

to a "loan transaction between Michelon Family Trust and Harvest Marketing/First Harvest."

However, it is undisputed that the Trust never paid Davis any money.

The Trust will argue that it invested $100,000 in a loan that would have brought Davis 8% of

16

the loan proceeds had the loan funded.  However, just because the loan never funded, the Trust cannot

try to recoup the lost $100,000 from Davis just because he would have received a fraction of the loan

proceeds.  It is certainly not Davis' fault that the loan did not fund.  Plaintiffs thus are trying to cast

blame at Davis when they were responsible for choosing Forschen to be the Trustee of their funds.

Thus, the fact remains that the Trust never paid Davis a dime and thus the Trust has failed to

perform under the Davis Note, which renders the Trust's breach of promissory note claim invalid.

### C.    The Davis Note Was Replaced by the Trustee's Note

Third, the Davis Note is invalid because it was replaced by the Trustee's Note.  Specifically,

the Trustee's Note[4] states:

> The Promissory Note is the final expression of the terms and conditions of this loan transaction
> between Jae Forschen and Frank Davis of Harvest Marketing/First Harvest.  This written
> agreement may not be contradicted by any evidence or any oral agreement.  ***This personal
> [sic] guaranteed note by Jae Forschen replaces the note of Frank Davis', his personal
> guarantee [sic] and the 2000,000 shares of Harvest Marketing/First Harvest dated 15
> November 1999.***

(See, Exhibit M submitted by Plaintiffs; emphasis added).  The Trustee's Note – drafted by Forschen –

is "personal[ly] guaranteed . . . by Jae Forschen" because it contains a personal guaranty provision in it:

"This agreement is personally guaranteed by Jae Forschen."  The existence of this personal guaranty

provision is one indication that Forschen executed the Trustee's Note in his trustee capacity.

---

[4] Although Plaintiffs refer to this note as the "Forschen Note," as argued herein, this note was made by
Forschen in his Trustee capacity.  Thus, Davis refers to it as the "Trustee's Note."

Otherwise, the personal guaranty provision makes no sense if the Trustee's Note is from Forschen personally, which would create a redundancy of Forschen's guaranty to Davis. Further, such an interpretation would render moot the personal guaranty provision in the Trustee's Note.

Another indication that the Trustee's Note is from Forschen in his official capacity as trustee of the Trust is from the above-quoted language: "This personal guaranteed note by Jae Forschen replaces the note of Frank Davis, his personal guarantee and the 200,000 shares of Harvest Marketing/First Harvest dated 15 November 1999." If Forschen was executing the Trustee's Note in his personal capacity, he could have no authority to replace the Davis Note with the Trustee's Note. Only in his trustee capacity did he have the authority to replace the Davis Note, made out to his principal, the Trust, with the Trustee's Note. In other words, if the Trustee's Note was a note made by Forschen personally, there is no way Forschen, acting in his personal capacity, could replace or do anything to the Davis Note which was made out to the Trust.

As far as Davis understood, he was dealing with the Trust itself, through its legal representative and trustee, Forschen. Clearly, Forschen had the authority to execute a note on behalf of the Trust. Plaintiffs cannot just pick and chose the times and situations when Forschen was acting as Trustee and when he was acting as Forschen personally. Thus, the trustee replaced the Davis Note with the Trustee's Note, thereby invalidating the Davis Note and absolving the Davis Defendants of liability under the Davis Note.

18

**D.      The Davis Note is Unconscionable**

One final basis upon which the Court should deny Plaintiffs' efforts to enforce the Davis Note is

because said note is unconscionable.[5] "Our consideration of whether a contract provision is

unconscionable is made 'in light of the twofold purpose of the doctrine, prevention of oppression and

unfair surprise.'" Ryan v. Dan's Food Stores, Inc., 972 P.2d 395, 402 (Utah 1998) (citation omitted)

Substantive unconscionability, which alone may support a finding of unconscionability:

> focuses on the contents of an agreement, examining the 'relative fairness of the obligations
> assumed.' [Citations omitted].  In determining substantive unconscionability, we consider
> whether a contract's terms are 'so one-sided as to oppress or unfairly surprise an innocent
> party or whether there exists an overall imbalance in the obligations and rights imposed by the
> bargain ... according to the mores and business practices of the time and place.' [Citations
> omitted].

Id.  The Davis Note is miserably one-sided.  It depicts a loan of $100,000 based upon which the Trust

would realize $75,000 in interest.  The Davis Note was made February 15, 2000 as testified by Davis

(i.e. the date on the Davis Note is undisputably incorrect) and the Davis Note purports to be due

March 3, 2000 – approximately two weeks later.  Thus, that's $75,000 in interest over two weeks (a

75% return of investment in two weeks).  Calculated out to a per annum rate of return yields 1,950%

per annum yield on the initial investment.  Such interest is unheard of, and to say it does not oppress

---

[5] Although the Davis Defendants did not necessarily raise this argument in their opening summary
judgment brief, they have raised this issue in their Memorandum in Opposition to Plaintiff's Motion for Partial
Summary Judgment which will presumably be argued at the same hearing as this motion.  Thus, Plaintiffs will have
had a chance to brief this argument.

Davis or that it is fair is laughable.  Furthermore, this return is for funds that Davis never saw!

Also, these calculations do not even take into consideration the $1000 per week late payment fee contained in the Davis Note which creates an additional 52% annual return on the Trust's supposed investment.  Accordingly, the Court should invalidate the Davis Note as being unconscionable.

In sum, the Trust's breach of promissory note claim fails for lack of consideration, it was replaced by the Trustee's Note, and because it is unconscionable.

## CONCLUSION

Based on the foregoing, the Court should grant Davis' Third Motion for Summary Judgment.

DATED this _30_ day of May, 2005

HILL, JOHNSON & SCHMUTZ L.C.

Stephen Quesenberry
J. Bryan Quesenberry
Attorneys for Defendants

20

## CERTIFICATE OF MAILING

The undersigned hereby certifies that on the 31 day of May, 2005, they caused a true and

correct copy of the foregoing brief to be delivered to the following:

David M. Wahlquist
Kirton & McConkie
1800 Eagle Gate Tower
60 East South Temple
PO Box 45120
Salt Lake City, Utah 84145-0120

David J. Orr
5449 Suntree Avenue
West Valley, Utah 84120

Sent Via:
___✓___ Hand -Delivery
_____ Facsimile
_____ Mailed (postage prepaid)

21

**EXHIBIT "A"**

Page

IN THE UNITED STATES DISTRICT COURT

STATE OF UTAH, CENTRAL DIVISION

JENNIFER STEIMKE, as trustee ) CIVIL NO. 2:03CV-0487
of the ODETTE GRAHAM TRUST, )
sole beneficiary of the ) DEPOSITION OF:
MICHELON FAMILY TRUST, and ) FRANK L. DAVIS
sole devisee and )
representative of the ESTATE ) TAKEN: MAY 13, 2004
OF LYNDA STEIMKE MICHELON, )
) REPORTED BY:
         Plaintiff, ) CARILEE DUSTIN, RPR
)
v. )
)
JAE FORSCHEN, DAVID J. ORR, )
individually and dba WORLD )
CONTRACTUAL SERVICES, HARVEST )
MARKETING, L.L.C., FIRST )
HARVEST, L.L.C., FRANK L. )
DAVIS, and JOHN DOES 1 )
through 10, )
)
         Defendants. )
) JUDGE DALE A. KIMBALL

         Deposition of FRANK L. DAVIS, taken

on behalf of the Plaintiff, at 60 East South Temple,

Suite 1800, Salt Lake City, Utah, before CARILEE B.

DUSTIN, Certified Shorthand Reporter and Notary

Public in and for the State of Utah, pursuant to

Notice.

Page 53

1    A. I think it was about $350,000.
2    Q. How much did you pay Mr. Berry's outfit for
3  the raw materials?
4    A. Totally, I think it was about -- there was
5  over a half a million dollars of raw materials that were
6  purchased.
7    Q. Did you convert those to finished product?
8    A. No.
9    Q. Why not?
10   A. The sale didn't go through.
11   Q. When did you find out the sale did not go
12 through?
13   A. It was in December of that year that I finally
14 gave up.
15   Q. Did you ever take any action against him?
16   A. Wished I had, could, you know, but didn't.
17 I'm convinced I would have been throwing good money
18 after bad. He stays out of the country, lives in
19 Canada, has homes in the Bahamas, and it would have been
20 really difficult at best, and I did not have financial
21 wherewithal to do that anyway.
22   Q. Did you repay the loan to World Contractual
23 Services?
24   A. Ultimately, I ended up paying it back to Shaed
25 Ghaderi, who apparently it was his trust the money came

Page 54

1  from.
2        MR. QUESENBERRY: Can you spell that?
3        THE WITNESS: S -- I don't know. S-H-A-E-D
4  G-H-A-D-E-R-I, I believe.
5    Q. (By Mr. Wahlquist) When did you repay
6  Mr. Ghaderi?
7    A. In 2003. No, excuse me, in 2002, I think.
8    Q. Did you pay him out of the proceeds you
9  received from the sale of First Harvest Foods?
10   A. I did.
11   Q. So you did not lose your building through
12 foreclosure?
13   A. I lost the building before that, you know,
14 basically.
15   Q. Did Mr. Ghaderi sue you?
16   A. No. No. He was -- he was a real gentleman.
17 I mean, really, he got -- he lost a lot, from what I
18 understand, with David Orr's group. And I was literally
19 his only hope of recapturing some money, so I just
20 worked as closely as I could with him and assured him
21 that, one way or another, I'd get him his money back.
22   Q. So you did your initial loan transaction with
23 World Contractual Services in mid-1999?
24   A. Correct.
25   Q. Have you done any other transactions through

Page 55

1  World Contractual Services?
2    A. No.
3    Q. How did you meet Jae Forschen?
4    A. Jae was an employee of World Contractual
5  Services, and he's the individual that I ended up going
6  to the bank with. And he was the person, I guess, that
7  did the delivery of the funds and had some personal
8  relationship with Paul Liston, who I developed a
9  friendship with at this time.
10   Q. So you met him in mid-1999 as well?
11   A. Correct, uh-huh.
12   Q. Aside from the transaction you've described
13 relating to Mr. Ghaderi, did Jae involve you in any
14 other transactions or attempts to obtain financing?
15   A. He did.
16   Q. When did that occur?
17   A. Well, it would have been in late '99, I
18 believe, early 2000.
19   Q. What happened in late '99 involving Jae
20 Forschen?
21   A. Well, Jae was -- and Paul both would come down
22 and they had, you know -- one, I was struggling to pay
23 interest on this loan, let alone pay it off.
24   Q. The Ghaderi loan?
25   A. The Ghaderi loan. And Paul, as I say, had

Page 56

1  become a good friend, and most of the time that -- when
2  I would see Jae, he was with Paul. And they would tell
3  me about these high yield programs that they were
4  involved in where it was an extremely high return for
5  their investment.
6        Paul was actively involved in it. He had gone
7  to Los Angeles, was a hundred percent convinced it was
8  real. And Jae, I felt, you know, was a nice guy. And
9  he -- you know, whether it was out of a friendship that
10 we'd developed since that time with Paul or whether
11 there was any other reason, he would always allude to,
12 you know, "These deals are coming to pass. I'll help
13 you out."
14   Q. Jae did that?
15   A. Right. That, you know, he was going to come
16 into a lot of money, and so was Paul, and both of them
17 were going to put money into Harvest Marketing and help
18 me make that business go, take care of obligations.
19 And Paul had put a little bit of money in
20 already. But he was convinced that within weeks or
21 months, you know, a short period of time, he was going
22 to make a very significant amount of money, get a
23 payday. And Jae was part of that. So that was, you
24 know, the dialogue at that point.
25   Q. When Paul first recommended World Contractual

Page 65

1  that named him Jae Friday.
2    Q. You never got the loan proceeds?
3    A. No.  Never got a dime.
4    Q. Do you know how much it was supposed to be?
5    A. Well, I think originally it was like $12
6  million. At least one of the documents was somewhere in
7  that neighborhood.
8    Q. You said you created a business plan to show
9  where the loan proceeds were going to go and how they
10  were going to be used.  Do you still have that business
11  plan?
12    A. You know, most of the stuff I had, I moved all
13  of the stuff into a shed.  And I tried to go through and
14  find everything that I could find.  I -- I have -- don't
15  have a lot of documents left over.  I don't know where
16  everything's gone.
17    Q. Now, the real intent was to use the proceeds
18  from that loan for one of these high yield programs,
19  right?
20    A. His intent, yes.
21    Q. Well, that's what the plan was that you and
22  Jae had.
23    A. My plan had nothing to do with what he was
24  going to do.
25    Q. Well, wasn't he going to use the proceeds from

Page 66

1  the loan to --
2    A. No.
3    Q. -- to generate enough money to pay off the
4  loan and then give you some money?
5    A. No.  He was going to leave with me a portion
6  of the loan so if it were -- I think it was eight
7  percent -- you know, it was like a million dollars was
8  going to be left with me out of the -- the balance went
9  to him.  He did whatever he was going to do with it,
10  paid off the loan, et cetera, but I was getting -- I was
11  getting money out of the proceeds, not out of what he
12  did.
13    Q. But you were the borrower?
14    A. Correct.
15    Q. So you'd have to rely on him to repay the
16  loan?
17    A. That's correct.
18    Q. So the real use of the loan proceeds, I guess
19  a million of it was going to stay with you, or whatever
20  eight percent came out to, and the rest of it was going
21  to be used by Jae for investment in his high yield
22  program?
23    A. That's correct.
24    Q. Did you disclose that on the business plan
25  that you submitted to the proposed lenders?

Page 67

1    A. No.  No, I didn't.  There wasn't -- in the
2  business plan itself, there was not a call to detail out
3  the use of proceeds.  All I had to show was I had a
4  business purpose.  And, you know, it wasn't a use of
5  proceeds type of request.
6    Q. Do you recall any of the lenders to whom you
7  submitted documents in connection with your attempts to
8  obtain a loan?
9    A. Do I recall them?
10    Q. Yes.
11    A. Only when I've looked at the documents.  I
12  couldn't tell you offhand any one of them except Ammon,
13  I think, is one of them, as you alluded to earlier,
14  but --
15    Q. You thought Ammon was a lender?
16    A. They're not?  I don't know.  I mean, I
17  remember the name.
18    Q. Okay.
19    A. But, you know, there was banks, a couple of
20  banks.  I do -- well, that's all I remember as far as
21  that goes.
22    Q. Did you do any other transactions with Jae
23  Forschen or World Contractual Services?
24    A. Did I?  I did nothing -- well, nothing with
25  World Contractual Services.  I was contacted late in

Page 68

1  '99, asked to do a favor because of -- for David Orr.
2  He had a client that he wanted to ship some food to for
3  Y2K.  And we shipped a year's supply of food out on
4  December 31st or December 30th to some guy in
5  Washington, overnighted it, Federal Express.  That's --
6  I don't think I ever had any other interface or even
7  heard per se about David Orr, other than that this was
8  somebody he wanted to take care of.
9    Q. How about Jae Forschen?
10    A. Jae, the only thing that I did with him is I
11  got caught up a little bit in this high yield stuff and
12  was introduced from a friend of mine out of California,
13  Tony Fairchild, to two individuals back in Peoria,
14  Illinois, both of them preachers, and they got me on a
15  conference call and explained to me what they were doing
16  about these high yield programs.  I ended up meeting
17  them in Las Vegas -- or, no, in California.  They took
18  me to meet some people, showed me docum---
19  they had done in the past, what ---
20  and I ended up putting som---
21  wiring them some money f---
22  transactions.  I had another ---
23  that wanted to put some mon---
24  think in dialogue with Jae, he               --- that
25  put some money into that group        --- could meet

Page 69

1 This is one of these that if I could -- if I
2 could have saved all the tape recordings that I had on
3 the phone of "The money's on its way, it's here," I'd
4 have some documents of "It's done, we're getting it,"
5 but it was a 25 percent a month type of return.
6 After about, I don't know, six, eight months
7 of that, I ended up, you know, getting all my money
8 back, basically, and -- I mean, he offered to send all
9 the money back.
10 Q. Who did?
11 A. This Les Strong, the principal guy. It was
12 supposedly going in a bank, never going to be touched.
13 I don't know. I can't explain all the details of what
14 they were doing, but totally secure. And anyway, you
15 know, that was -- Jac would call me and I'd -- whatever.
16 And I finally got tired of it and I just said, "I'm
17 getting my money back. You deal with them whatever you
18 want."
19 Q. What were the names of the two individuals you
20 met in California?
21 A. Les Strong and Dennis Moore.
22 Q. Any other transactions with Jac?
23 A. No.
24 (Exhibit 2 marked.)
25 Q. (By Mr. Wahlquist) I hand you what's been

Page 70

1 marked as Exhibit 2, which is a document entitled
2 "Defendant Frank L. Davis' Initial Disclosure
3 Statement." Have you seen this document before?
4 A. I don't remember.
5 Q. As of March 31, 2004, was Stephen Quesenberry
6 your attorney?
7 A. Yes.
8 Q. Was he authorized to act on your behalf in
9 connection with this litigation?
10 A. He is.
11 Q. At the end of the disclosures themselves,
12 which constitute the first three pages, there are four
13 pages of documents attached.
14 A. Okay.
15 Q. Is that correct?
16 A. That's correct.
17 Q. I'd like you to turn to the third of those
18 pages, which is a document entitled "Promissory Note
19 Agreement."
20 A. Okay.
21 Q. Have you seen this document before?
22 A. I have.
23 Q. Is that your signature at the bottom of the
24 page on the right-hand side?
25 A. It is.

Page 71

1 Q. This document indicates it's dated on November
2 15, 1999; is that correct?
3 A. Correct.
4 Q. And it shows that there is a lender, Michelon,
5 M-I-C-H-E-L-O-N, Family Trust; is that right?
6 A. Correct.
7 Q. And the borrower, Harvest Marketing/First
8 Harvest; is that right?
9 A. Correct.
10 Q. At the time this document was signed, you had
11 newly acquired First Harvest Foods; is that right?
12 A. I had not acquired it by 11/15/99, no.
13 Q. You had not?
14 A. No. But that's the problem with this thing,
15 that First Harvest has always -- let's see, 99 percent's
16 Harvest Marketing. I'm not aware of when that First
17 Harvest came in, because it was First Harvest Foods we
18 were selling, and we just kept transposing some stuff in
19 there.
20 Q. Maybe I misunderstood. I thought from your
21 prior testimony that you had indicated that --
22 A. I acquired First Harvest Foods --
23 MR. QUESENBERRY: Let him finish his question.
24 Q. (By Mr. Wahlquist) I thought you had
25 indicated that by the end of the year you had acquired

Page 72

1 First Harvest Foods.
2 A. It was in December, late December, early
3 January.
4 MR. QUESENBERRY: His testimony was end of
5 '99, beginning of 2000, according to my notes.
6 MR. WAHLQUIST: Okay.
7 Q. (By Mr. Wahlquist) In any event, by November
8 15, 1999, you had not acquired those shares?
9 A. No.
10 Q. However, by that date, Harvest Marketing, LLC
11 had been formed?
12 A. Correct.
13 Q. Who prepared this document?
14 A. Jac.
15 MR. QUESENBERRY: That's J-A-E, right?
16 THE WITNESS: To my knowledge. He produced it
17 anyway. I don't know who prepared it.
18 Q. (By Mr. Wahlquist) When did you first see
19 this document?
20 A. February 9, 2000.
21 Q. Explain to me the circumstances under which
22 you saw this document.
23 A. My wife and I went to Salt Lake to her
24 sister's house for her birthday. Jac called me that
25 afternoon and asked if there was any way I could meet

DEPOSITION OF:
FRANK L. DAVIS
Case 2:03-cv-00487-DAK   Document 54   Filed 05/31/05   Page 30 of 31
Multi-Page TM
Steimke v. Forschen
May 13, 2004

Page 73

1  with him. I told him where I was going, in Sandy, and I
2  said, "I could probably sneak out for a little bit and
3  meet you." And so we decided to meet at the Sandy City
4  Library off -- whatever it is, 100th South and 13th
5  East.
6        So late that, you know, evening, I don't know
7  what time, maybe eight o'clock in the evening, it was
8  dark, in the parking lot at the Sandy City Library, he
9  pulled up, or he was there when I went there, and we
10 just got in -- I can't remember whether we got in my car
11 or -- I think he got in my car. And he -- I'm sure he
12 had told me something about this before this time, but
13 he explained to me that the monies that he had advanced
14 to this Bert and Maralee in Ohio for, quote -- what I
15 understood initially was for some high yield program,
16 that he was getting some pressure from the trust, and
17 that's when he was planning on repaying the trust out of
18 this loan that they were generating and asked me, you
19 know, basically, just to -- said, "I've got to show them
20 that the proceeds coming out of this loan is going to
21 pay off the trust."
22    Q. Show "them," meaning whom?
23    A. The trust, whoever.
24    Q. Okay.
25    A. The trustees or whoever he's dealing with.

Page 74

1        And, you know, I -- of course it was dark,
2  we're sitting in a car, and by that time I had developed
3  a friendship with Jae. I did not mistrust him.
4     Q. He was working regularly on trying to get you
5  this big loan?
6     A. Right. So I just said, you know, "There's no
7  way I'm going to sign a note and obligate myself because
8  I have no idea this loan is going to materialize or
9  not." And, you know, of course he assured me every
10 which way but loose that the money was coming, that if
11 it didn't come that way, it was coming another way,
12 whatever, so -- and I said, "The only way I'll do this
13 is if you sign a note, you know, equal, identical note,
14 saying that this is your responsibility," whatever.
15 "The fact that you want the money that's coming into the
16 corporation, or the money that's coming in to Harvest
17 Consulting on this loan, if you want to pay this money
18 back out of that, I don't have a problem with it." You
19 know, and he wanted to do -- have some document to
20 evidence that that was going to happen.
21       But I just said, "I'm unwilling to do it
22 unless you indemnify me, or whatever, because I have
23 no -- I don't have the same level of confidence and
24 faith you do that the loan's going to materialize."
25       So he took the original note and we wrote on

Page 75

1  the back of that, you know, that he was going to execute
2  an identical note and do that, which he did a few days
3  later.
4     Q. Later?
5     A. A couple, two or three days later. And
6  candidly, you know, I don't know -- I don't believe I
7  really even registered or thought about the fact that
8  the date was not the date we were doing it. And I
9  didn't even ask him about it, you know, when he had
10 drafted the note, or what the purpose -- but, you know,
11 I know that we signed this in February, on February 9th.
12 That's one of the few dates I know exactly when we did
13 it.
14    Q. Why do you know that date?
15    A. It was because it was my sister-in-law's
16 birthday. That's when I was up there. And my wife
17 wrote it down in her Day-Timer.
18    Q. You note on this document you apparently are
19 signing as president of Harvest Marketing/First Harvest.
20    A. I notice that.
21    Q. You note that the lender is the Michelon
22 Family Trust.
23    A. That's correct.
24    Q. And Jae is apparently signing it as a trust
25 officer.

Page 76

1     A. Correct.
2     Q. Not as himself individually?
3     A. Right.
4     Q. Now, if you'll take a look at the next page,
5  is this next page the note that you were talking about
6  that Jae prepared as your indemnity note?
7     A. Correct.
8     Q. You'll notice it's dated February 15, 2000.
9     A. That's correct.
10    Q. And Jae himself is promising to pay the sum of
11 $175,000 and zero cents to the Michelon Family Trust on
12 behalf of Harvest Marketing/First Harvest and Frank
13 Davis' personal guaranteed of the note dated 15 November
14 1999.
15    A. Correct.
16    Q. And then if you look down, at the bottom, it's
17 got Jae signing personally.
18    A. That's correct.
19    Q. Not as a trust officer or on behalf of
20 Michelon, right?
21    A. Correct.
22    Q. In fact, his promise in this document was to
23 pay Michelon on your behalf?
24       MR. QUESENBERRY: And I'll object. That calls
25 for a legal conclusion. Speaks for itself.

Page 77

1    Go ahead and answer.
2    THE WITNESS: I mean, yeah, I can -- that's
3 what the document says, right.
4    Q. (By Mr. Wahlquist) Right. And again, up at
5 the top right-hand corner of the document, it lists Jae
6 Forschen individually, not representing some other
7 person or entity; is that right?
8    A. That's correct.
9    Q. Did he give you this document?
10   A. Yes.
11   Q. And you signed it?
12   A. I did.
13   Q. Now, returning to the promissory note
14 agreement dated November 15, 1999, you knew that you
15 were signing a document at that time which by its terms
16 said that Harvest Marketing/First Harvest promised to
17 pay $175,000 to Michelon Family Trust?
18   A. Did I know I was signing a document?
19   Q. That said that.
20   A. Yes.
21   Q. Jae asked you to sign it?
22   A. That's correct.
23   Q. He said that he needed this document so that
24 he could satisfy some concern of the Michelon Family
25 Trust people?

Page 78

1    A. As far as I understand it, yes.
2    Q. So you signed it so he would have some
3 document to show them to satisfy them?
4    A. He wanted to show them that the monies, quote,
5 there were, as he -- I was confident was coming through
6 this loan was going to be paid back -- or money out of
7 that was going to be paid to Michelon Family Trust,
8 right.
9    Q. Well, this promissory note agreement doesn't
10 say anything about some loan somewhere, does it?
11   A. No.
12   Q. It doesn't talk about any high yield
13 investment program?
14   A. That's correct.
15   Q. This simply, as you understand it, is a
16 straight-up promissory note saying Harvest
17 Marketing/First Harvest would pay Michelon Family Trust
18 $175,000 on March 3, 2000; is that right?
19   A. That's right.
20   Q. You understood from Jae that he needed this
21 document to show the Michelon Family Trust people so
22 that they could see -- or some document showing them
23 they were going to get their money back?
24   A. As I understand it, correct.
25   Q. So you accommodated that request?

Page 79

1    A. That's right, based on him signing.
2    Q. At the time you signed this document, you did
3 not intend for Harvest Marketing or First Harvest to pay
4 the Michelon Family Trust any amount, did you?
5    A. If money came in and that's what -- that Jae
6 was facilitating, I mean, that's where he wanted it to
7 go, that would be fine with me.
8    Q. If the money came in?
9    A. Sure.
10   Q. Does this document say that it's conditional
11 upon whether the money comes in or not?
12   A. The only condition that I required is that he
13 sign it to take that obligation.
14   Q. I'm talking about the promissory note
15 agreement.
16   A. No.
17   Q. It doesn't say anything about any condition,
18 does it?
19   A. No.
20   Q. And it doesn't say that Jae is signing another
21 note at the same time personally promising to pay off
22 this obligation?
23   A. It does on the back of it.
24   Q. Okay.
25   A. That original note.

Page 80

1    Q. Do you have that?
2    MR. QUESENBERRY: You have it. It's right
3 there, Exhibit 1, page 28.
4    MR. WAHLQUIST: I have the original note?
5    MR. QUESENBERRY: No. You have this language
6 on the back of it.
7    Q. (By Mr. Wahlquist) Do you have the original
8 note?
9    THE WITNESS: I think you have it, don't you?
10   MR. QUESENBERRY: It's Exhibit 28.
11   MR. WAHLQUIST: I've got a copy.
12   Q. (By Mr. Wahlquist) I'm asking, where is the
13 original note?
14   THE WITNESS: I believe I delivered it to you
15 last time.
16   MR. QUESENBERRY: Oh, yeah. And we provided
17 copies pursuant to your request.
18   MR. WAHLQUIST: Thank you for providing those.
19   Q. (By Mr. Wahlquist) Do you believe
20 Mr. Quesenberry has the original copy?
21   A. I do.
22   MR. QUESENBERRY: I do. I have it in my file,
23 I believe. I'm very confident.
24   Q. (By Mr. Wahlquist) So is it your testimony
25 that you signed the original of this note at Jae's